IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE FMC CORPORATION SECURITIES LITIGATION | CLASS ACTION<br>No. 2:25-cv-00771<br>DEMAND FOR JURY TRIAL |
| **This Document Applies To:**<br>**ALL ACTIONS** | |

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS


I. NATURE OF THE ACTION AND OVERVIEW ... 1

II. JURISDICTION AND VENUE ... 6

III. PARTIES ... 7

A. Plaintiffs ... 7

B. Defendants ... 8

C. Relevant Non-Parties ... 9

IV. SUBSTANTIVE ALLEGATIONS OF FRAUD ... 13

A. Crop Protection Industry Background ... 13

B. FMC Company Background ... 15

C. In the Months Leading Up to the Class Period, FMC Faced Scrutiny Over Rising Inventory Buildup and Increased Generic Competition ... 18

D. Claiming a Reset, Defendants Initiated "Project Focus" and Reported "Strong Results" and "Normalizing" Channel Inventories Throughout the Class Period ... 20

E. In Reality, FMC's Sales Far Exceeded Demand, and Defendants Pushed Product Into the Channel Through Heavy Discounting, Rebates and Other Manipulative Sales Practices, Worsening and Not Normalizing Channel Inventory Buildup ... 23

1. FMC Employed Manipulative Sales Practices to Close Sales Far in Excess of Market Demand, Which Worsened the Already Scrutinized Channel Inventory Buildup ... 24

2. FMC Slowed Down and Reconfigured Returns of Unneeded Product to Avoid Reporting the Hit to Revenues ... 34

3. FMC Leadership Recorded Large Sales to High-Risk Customers Suffering Known Financial Difficulties, Who Soon Filed for Bankruptcy, Leaving Those Debts Unpaid ... 40

4. FMC Pulled Sales Forward to Make Quarterly Sales Goals at the Expense of the Following Quarters ... 42

F. An Independent Analysis of FMC's Class Period Financials Finds "Fundamental Deterioration Masked by Aggressive Financial Practices" ... 45

V. THE TRUTH IS REVEALED ........ 52

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........ 55

A. FMC Investor Day 2023 — November 16, 2023 ........ 55

B. Form 8-K — December 18, 2023 ........ 58

C. Fourth Quarter 2023 Financial Results — February 5-6, 2024 ........ 60

D. Bank of America Global Agriculture and Materials Conference — February 29, 2024 ........ 61

E. First Quarter 2024 Financial Results — May 6-7, 2024 ........ 66

F. BMO Global Farm to Market Conference — May 15, 2024 ........ 73

G. Wells Fargo Industrials Conference — June 11, 2024 ........ 74

H. Second Quarter 2024 Financial Results — July 31, 2024 and August 1, 2024 ........ 75

I. Third Quarter 2024 Financial Results — October 29-30, 2024 ........ 78

J. Goldman Sachs Industrials and Materials Conference — December 4, 2024 ........ 83

VII. SUMMARY OF SCIENTER ALLEGATIONS ........ 84

VIII. LOSS CAUSATION ........ 90

IX. PRESUMPTION OF RELIANCE ........ 92

X. CLASS ACTION ALLEGATIONS ........ 93

XI. THE INAPPLICABILITY OF THE STATUTORY SAFE HABROR NOR THE BESPEAKS CAUTION DOCTRINE ........ 95

XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........ 97

COUNT I For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against FMC and the Individual Defendants ........ 97

COUNT II For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants ........ 99

XIII. PRAYER FOR RELIEF ........ 101

XIV. JURY DEMAND ........................................................................................................ 101

Lead Plaintiffs Teamsters Local 710 Pension Fund ("Teamsters 710"), Macomb County Employees' Retirement System, and Macomb County Retiree Health Care Fund (collectively, "Macomb County," and together with Teamsters 710, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs' own acts and upon information and belief as to all other matters based on the ongoing investigation conducted by and through counsel, which includes, among other things, a review and analysis of: (i) the public U.S. Securities and Exchange Commission ("SEC") filings of FMC Corporation ("FMC" or the "Company"); (ii) Company press releases; (iii) transcripts of the Company's conference calls with analysts and investors; (iv) investor presentations; (v) research reports issued by securities and financial analysts; (vi) news and media reports and other public reports and information regarding the Company and Defendants; (vii) economic analyses of the movement and pricing of the Company's publicly traded securities; (viii) consultations with consulting experts; and (ix) interviews of former employees of the Company (referred to herein as "FE-__"). Lead Counsel's investigation is ongoing and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a securities class action on behalf of persons and entities that purchased or otherwise acquired FMC common stock during the period from November 16, 2023 through February 4, 2025, inclusive (the "Class Period"). Plaintiffs bring this action to recover damages caused by violations of the federal securities laws, namely Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, committed by Defendants FMC, FMC's former CEO Mark A. Douglas ("Defendant Douglas"),

current CEO Pierre R. Brondeau ("Defendant Brondeau"), and current CFO Andrew D. Sandifer ("Defendant Sandifer"). This case arises from a series of materially false or misleading statements and omissions made by the Company and its senior executives about the success of the Company's efforts to balance its channel inventory and achieve organic sales sufficient to foster sustainable growth.

2. FMC is an agricultural sciences company based in Philadelphia, Pennsylvania, that manufactures insecticides and other crop protection products. FMC sells these products to a channel of wholesale distributors located in North America, Latin America, Europe, the Middle East, Africa, and Asia, that in turn sell FMC products out of their inventories to retailers. These retailers then ultimately sell the products to farmers.

3. During the height of the COVID-19 pandemic, supply chain disruptions and the fear of product shortages caused FMC's distributors to stockpile crop protection products in their inventories. As a result, FMC posted record revenues that peaked in 2022. However, supply chain disruptions eased as pandemic restrictions were lifted, which left FMC's channel distributors holding excess inventories that exceeded then-current demands. In the year prior to the start of the Class Period here, this excess channel inventory resulted in a revenue slowdown for FMC during the first two quarters of 2023 as distributors and retailers began to destock their inventories by significantly reducing their orders for crop protection products. FMC's revenues were also negatively impacted by mounting generic competition for its top-selling crop protection products.

4. FMC's stock also took a hit in the third quarter of 2023 when an investment firm published a report claiming that FMC had previously "concealed from investors the deterioration of [its] core business[,] resulting in an inescapable cycle of falling revenues, plummeting cash flows, [and] declining profits." The report noted that FMC had been employing steep discounts

and rebates to offload product and "shore up Company cash," including to customers with "deteriorating creditworthiness." The report also emphasized that FMC had misrepresented the threat of generic market competitors to FMC's patent products. Then, on October 30, 2023, FMC reported a staggering 29% year-over-year decrease in third quarter 2023 revenues due to "channel destocking in all regions."

5. In the wake of this news, FMC supposedly embarked on a reset to rebalance its channel inventory and improve its financial performance within the coming quarters. On November 16, 2023—the first day of the Class Period—FMC unveiled a "strategic restructuring plan" that would be called "Project Focus." Project Focus's professed intent was to maximize operational efficiencies, right-size FMC's cost base, and "normalize" FMC's distribution channel's inventory levels. Throughout the Class Period, Defendants touted the "excellent progress" of Project Focus and represented to investors that FMC was "reducing channel inventory every quarter" and that its channel inventories were "rebalancing" and "normalizing" at a faster pace than expected. Defendants repeated these assurances to investors through FMC's SEC filings, press releases, and analyst calls, conditioning the market to believe that its distribution channel was successfully normalizing and that FMC was therefore able to create organic sales figures that were on track with its sales forecasts and revenue projections.

6. Unbeknownst to investors, however, FMC failed to meaningfully improve distributor inventory levels or create organic demand for FMC's products. In fact, the Company counteracted its own publicly stated performance and goals by setting unrealistic and unattainable sales targets and revenue projections, employing high-risk and high-pressure sales tactics that undercut revenues, and pumping unwanted product into its distribution channel, which kept inventory levels stuffed. Multiple former FMC employees described how FMC's senior

management actually increased the Company's practices that had originally overstuffed its channel with inventory, including "rebates over rebates"; heavy discounts; granting extremely long payment terms for products, often to distributors with a high risk of bankruptcy (including some who soon after declared bankruptcy with tens of millions of dollars left unpaid); pulling sales into earlier quarters (leaving future quarters in jeopardy); and preventing returns from occurring when requested to inflate quarterly figures. Through these undisclosed sales practices, FMC propped up its short-term revenue and sales numbers at the expense of long-term growth, nullifying any potential Project Focus cost savings.

7. Throughout the Class Period, Defendants specifically misled FMC investors by making statements that failed to disclose and actively concealed that: (a) FMC was not succeeding in its goal of significantly lowering FMC inventory in the distribution channel; (b) FMC's channel inventories were not rebalancing or normalizing, and in fact, were getting worse, due to the Company's own manipulative sales practices; (c) FMC had inflated short-term revenues by engaging in high-risk sales with delayed payment to companies like AgroGalaxy and Lavoro (both of which subsequently filed for bankruptcy) and by implementing and encouraging a policy to stall or reconfigure returns when initiated by distributors; (d) Project Focus was lagging in its goal of accelerating manufacturing cost reductions; (e) FMC's pricing arrangements with key distributors would significantly lower FMC's revenues and profits in the near-term; (f) FMC's risk disclosures were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and (g) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

8. Investors ultimately learned that FMC's purported reset was a failure. Specifically, on February 4, 2025, FMC reported that its fourth quarter 2024 revenue missed consensus revenue estimates by ***$90 million*** while telling investors that "***growth was below [the Company's] expectations*** as [it] learned during the quarter that ***customers in many countries sought to hold significantly less inventory*** than they have historically." The Company also issued a disappointing 2025 financial outlook due to "***weaker demand in the channel***."

9. In an earnings call held the same day, the Company's CEO, Defendant Brondeau, revealed that FMC "need[s] to significantly lower FMC inventory in the channel much beyond what we were expecting." Brondeau stated that the Company had faced pricing competition which it was "unwilling to meet" or adjust to, which led FMC to "walk away" from "sales opportunities," and claimed that this strategy had backfired as the Company was met with "lower-than-expected demand across most regions as customers lowered the amount of inventory they are willing to hold" to a historical low. As a result, the Company had "high levels of FMC product in the channel" including "elevated channel inventories in some countries in LATAM [Latin America], including Brazil, Asia, including India, as well as Canada and Eastern Europe."

10. On this news, FMC's stock price dropped $18.12 per share, or ***33.5%***, to close at $35.92 per share on February 5, 2025, with FMC losing over $2 billion in market capitalization in a single day.

11. Wall Street analysts were caught off guard. For example, analysts at Wells Fargo described FMC's 2025 outlook as a "shock to the system" driven by "company-specific inventory and cost actions impacting its price." Analysts at Morgan Stanley also expressed surprise that "there is still FMC-specific elevated levels of inventory in some countries." Analysts at Bank of America remarked that "the discussion of 'cost-plus' pricing is new, and in our view may be a

newer pricing approach that passes some of the already-expected 2025 [cost of goods sold] tailwinds to FMC's diamide partners thus hitting margins."

12. Defendants' disclosures also sparked skepticism about the Company's Class Period sales practices and the legitimacy of their previously represented growing organic demand. Specifically, independent research analysts at the Center for Financial Research and Analysis ("CFRA") issued an analyst note on February 5, 2025 expressing concern that "***FMC poses significant risk to investors***" as "***several indicators suggest a high likelihood of earnings manipulation***," and the sharp rise in "***accrued customer rebates and advance payments from customers as a percentage of sales***" was "***consistent with 'channel stuffing' practices***."

13. Indeed, after the Class Period, CFRA followed up with a detailed research report titled "FMC Corporation: Fundamental Deterioration Masked by Aggressive Financial Practices." In this report, CFRA again stressed that FMC exhibited "***multiple indicators suggest[ing] aggressive revenue recognition practices and potential financial manipulation***" and "***several red flags indicative of 'channel stuffing***.'" The CFRA report also included the results of its "Beneish Model Analysis," which "revealed a systematic deterioration in FMC's financial reporting quality" during the Class Period.

14. As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's common stock pursuant to the revelation of the fraud, Plaintiffs and other members of the Class (defined herein) have suffered significant damages.

## II. JURISDICTION AND VENUE

15. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (*see* 17 C.F.R. § 240.10b-5).

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). The Company's principal offices are located in this District. Substantial acts in the furtherance of the alleged fraud or the effects of the fraud have occurred in this District. Defendants' wrongful acts also arose in, emanated from, and caused harm in this District. Such acts include the dissemination of false and misleading statements into this District.

18. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange, the New York Stock Exchange.

## III. PARTIES

### A. Plaintiffs

19. Lead Plaintiff Teamsters 710 purchased or otherwise acquired FMC stock during the Class Period, as reflected in the certification attached to its motion for appointment as lead plaintiff in this Action (ECF No. 17-1), and was injured as a result of Defendants' false and misleading statements and omissions. Local 710 is a pension fund headquartered in Mokena, Illinois. Teamsters 710 is a Taft-Hartley defined pension fund representing more than 13,500 workers across the Midwest that oversees approximately $3.8 billion in investments for the benefit of participants and their beneficiaries.

20. Lead Plaintiffs Macomb County Employees' Retirement System and Macomb County Retirement Health Care Fund (collectively, "Macomb County") purchased or otherwise acquired FMC stock during the Class Period, as reflected in the certification attached to their

motion for appointment as lead plaintiff in this Action (ECF No. 17-1), and was injured as a result of Defendants' false and misleading statements and omissions. Macomb County Employees' Retirement System is a single employer defined public pension fund located in Mount Clemens, Michigan, that oversees more than $1 billion in total assets on behalf of over 6,000 members. Macomb County Retiree Health Care Fund is a related public employee health and welfare trust.

**B. Defendants**

21. Defendant FMC is incorporated in Delaware and headquartered in Philadelphia, Pennsylvania, and is described more fully *infra*. FMC common stock trades on the New York Stock Exchange under the ticker symbol "FMC." Founded in 1883 as the Bean Spray Pump Company, FMC was incorporated in 1928 as the Food Machinery Corporation and began using the initials FMC. Over its 142-year history, FMC has evolved from a manufacturer of miscellaneous products, such as military vehicles and chewing gum, into a multinational behemoth narrowly focused on insecticides and other crop protection products. A self-described "tier-one leader" in the crop protection industry, FMC employs nearly 6,000 people worldwide, with operations on every inhabited continent. Although the Company manufactures a variety of crop protection products, it is best known for its insecticides, which accounted for 56% of FMC's $4.246 billion in 2024 revenues.

22. Defendant **Mark A. Douglas** ("Defendant Douglas") served as FMC's President and Chief Executive Officer from June 1, 2020 until June 11, 2024, when he abruptly resigned. Douglas had served in a variety of leadership roles at FMC since March 2010, including as the leader of the Company's commercial operations and technology organizations where he served as President and Chief Operating Officer from June 2018 until June 2020.

23. Defendant **Andrew D. Sandifer** ("Defendant Sandifer") was at all relevant times FMC's Executive Vice President and Chief Financial Officer. Sandifer began working at FMC in September 2010 and assumed the role of CFO in May 2018.

24. Defendant **Pierre R. Brondeau** ("Defendant Brondeau") was at all relevant times Chairman of the Board of FMC and was appointed Chief Executive Officer of FMC on June 11, 2024. Brondeau previously served as FMC's CEO from January 2010 until June 1, 2020.

25. Defendant Douglas, Defendant Sandifer, and Defendant Brondeau are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of FMC's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and investors, *i.e.*, the market, and are presumptively responsible for the statements in SEC filings and press releases. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Defendant Sandifer signed each of the relevant SEC filings. Because of their positions and access to material non-public information available to them, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations that were being made were then materially false or misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

### C. Relevant Non-Parties

26. Ronaldo Pereira ("Pereira") has spent 28 years at FMC and has served as FMC's President since June 2024. Prior to that role, Pereira was President, Americas from July 2019 until

June 2024, as well as Vice President LATAM from January 2017 until June 2024. During the Class Period, Pereira reported to FMC's CEO.

27. William Mills ("Mills") has served as FMC's CFO, Americas since March 2024, and served as CFO, LATAM from April 2018 until July 2024, out of FMC's Brazil headquarters. Mills is responsible for financial reporting and financial analysis, and participated in meetings with the Commercial Team under his direction at least once a quarter. As described herein, Mills attended and participated in direct negotiations with distributors in Brazil regarding right-to-return agreements.

28. FE-1 worked for FMC Brazil in a variety of roles between fall 2012 and spring 2024. During the Class Period until his[1] departure, FE-1 worked out of the Company's LATAM headquarters in Campinas, Sao Paolo and was a senior level sales manager. In that role, FE-1 reported to FMC's Brazil Commercial and Business Director.

29. FE-2 was employed by FMC from 2017 until late 2024 as a regional Sales Manager in Brazil. FE-2 reported to a Sales Director in Brazil who reported to the Brazil Business Director who reported to Pereira who in turn reported to the CEO.

30. FE-3 was employed by FMC from 2018 until the end of January 2024. FE-3 was initially employed as a Technical Sales Representative from 2018 until 2022 before transitioning to the role of Regional Sales Manager for the final years of his tenure. In his role as Regional Sales

---

[1] Individuals referenced herein as "FEs" or "Former Employees" refer to former FMC employees interviewed as part of Lead Counsel's investigation of Plaintiffs' claims. In order to protect their identities, the FEs are referred to with male pronouns regardless of their gender. The exact titles and reporting structure of certain FEs have been made less specific in deference to those FEs' concerns regarding identification and retribution.

Manager, FE-3 reported to former Sales Director for the Eastern Region, Marco Faria, who reported to former Brazil Business Director Marcelo Magurno.[2]

31. FE-4 was an internal audit analyst at FMC from June 2023 until July 2024 at the Company's Philadelphia headquarters. FE-4 reported to John Mulcahy, who was the Chief Audit Executive at FMC. FE-4 was part of a team of internal auditors responsible for auditing financials and inventory, including product inventory and assets inventory. As part of FMC's audit team, FE-4 visited FMC facilities in the United States to conduct inventory audits at the Company's U.S. locations. FE-4 was aware of audits conducted by his overseas colleagues at FMC sites in China, Italy, Brazil, and other countries.

32. FE-5 joined the Company full-time as a sales representative in Summer 2019 and held this position until spring 2025. The person to whom FE-5 reported in turn reported to the person responsible for FMC's sales in non-coastal regions of the United States, which FMC referred to as the "Heartlands" division. The "Heartlands" division manager in turn reported to Darren Dillenbeck, FMC's president of U.S. sales. FE-5 visited FMC's headquarters several times during his employment at the Company. As a sales representative, he was responsible for marketing FMC products to retailers, wholesale distributors, and distributor-owned retailers.

33. FE-6 was employed by FMC from before the Class Period until January 2025 in a variety of roles with the Company's North America Integrated Supply Chain Division. FE-6's final role with the Company, throughout the Class Period until his departure, was as a Supply Chain Management Lead. FE-6 oversaw aspects of FMC's supply chain, and this role required FE-6 to

---

[2] According to FE-3, former Business Director FMC Brazil Sinara Giombelli Ferreira was responsible for the Western Region of Brazil.

work closely with FMC's Demand Planning Team, as well as the Company's Integrated Supply Chain Team.

34. FE-7 was employed by FMC in a variety of inventory and sales roles from prior to the Class Period until spring 2024. FE-7 was a Supply Chain Management Lead from before the Class Period until the end of his tenure and worked out of one of FMC's offices in Europe. As Supply Chain Management Lead, FE-7 oversaw supply chain functions, including materials planning, for one of FMC's facilities in Southern Europe. FE-7 reported to a Supply Chain Manager and had weekly meetings with his counterparts responsible for FMC's other facilities throughout Europe.

35. FE-8 was employed by FMC as a Rebate and Commissions Analyst from April 2023 until January 2024. FE-8 worked out of FMC's office in Cork, Ireland. FE-8 was a member of a three-person team that reported to a manager, who reported to another manager, who reported to the Site Lead in Cork, Ireland. As cost-cutting measures were implemented at FMC, the manager positioned between FE-8's direct report and the Site Lead was removed at the end of 2023.

36. FE-9 was employed by FMC as the Business / Managing Director for Austria-Germany-Switzerland from December 2020 until May 2024. He reported to the current FMC Vice President & President Europe, Middle East and Africa, Sebastià Pons, who reported directly to the CEO.

37. FE-10 was employed by FMC from fall 2022 through the end of the Class Period as a Supply Chain Manager responsible for supply and demand planning, as well as supporting the efficiency of processes in multiple regions.

38. FE-11 was employed by FMC as the Digital Channel Strategy Lead working out of FMC's Corporate headquarters in India from July 2022 until April 2024. His role was

"centralized," and he worked and regularly interacted with sales staff throughout India. FE-11 was responsible for the digital tools used by sales staff, including the CRM system,[3] to facilitate sales. This role required daily conversations with sales staff and also included informal conversations about market conditions and sales performance. FE-11 reported to the Head of CRM, who reported to the Head of Revenues Operations, who reported to the President of India, who reported to the President of APAC, who reported to former CEO Defendant Douglas.

## IV. SUBSTANTIVE ALLEGATIONS OF FRAUD

### A. Crop Protection Industry Background

39. Crop protection products are substances that protect crops from weeds, insects, and other phenomena that inhibit crop growth. The main categories of crop protection products are pesticides (which target insects and other pests), herbicides (which target weeds), and fungicides (which target fungi).

40. Most crop protection products are made from synthetic chemicals. These chemicals contain an "active ingredient" that has been engineered to protect crops from harm. For example, Coragen—one of FMC's most popular products—contains the active ingredient Rynaxypyr, which kills harmful pests by disrupting the calcium channels necessary for pests to move and eat. Active ingredients are subject to patent protection, as are the various processes used to manufacture active ingredients.

41. The crop protection industry is divided between "basic manufacturers," which manufacture and sell products containing patented active ingredients (such as Rynaxypyr), and "generic manufacturers," which manufacture and sell products containing active ingredients that have lost patent protection. Once a patented product or ingredient loses its patent protection,

[3] A "CRM" system refers to "Customer Relationship Management" system.

generic substitutes generally flood the market and lead to substantial price competition for all patented products.

42. It is the standard practice of crop protection product manufacturers, including FMC, to sell their products directly to distributors. These distributors, in turn, sell products to retailers, who then sell the products to farmers and other end-users. This flow of product—from distributors to retailers to end users—is referred to in the crop protection industry as "the channel."

43. Distributors are a vital component of the crop protection industry. While manufacturers possess sophisticated operations for researching, marketing, and producing crop protection products, they lack the storage and logistics networks necessary to distribute products at scale. Moreover, distributors have extensive knowledge of regional markets as well as connections with local retailers, growers, and farmers. Accordingly, crop protection manufacturers prioritize forming close relationships with distributors.

44. While crop protection products are used around the world, the industry's most profitable market is Brazil. Brazil is the world's largest consumer of insecticides by far, surpassing the second-largest consumer—the United States—by approximately 330,000 metric tons of product per year. Brazil is also the world's largest consumer of herbicides. This demand reflects Brazil's status as an agricultural powerhouse: it is the world's second-largest exporter of agricultural goods, and the largest producer of key crops like soybeans, oranges, coffee, and sugarcane.

45. The years leading up to the Class Period were marked by extreme volatility in the crop protection industry. During the COVID-19 pandemic, distributors feared that supply chain disruptions would prevent manufacturers from fulfilling product orders in a timely fashion. Accordingly, in 2020 and 2021, distributors filled their warehouses with crop protection products,

buying much more product than was necessary to satisfy then-existing retailer and farmer demand, as crop protection manufacturers reported record profits.

46. As the COVID-19 pandemic waned, these profits did not last. Because distributors had stockpiled more product than was necessary to meet demand, distributors began to sharply reduce their purchases from manufacturers beginning approximately in late 2021. At the same time, the price of agricultural commodities plummeted, further reducing farmers' willingness and ability to pay for crop protection products. Manufacturer profits receded in 2023 as a result of this reduced demand.[4]

**B. FMC Company Background**

47. Founded in 1883, FMC is one of the world's most profitable crop protection product manufacturers. From FMC headquarters in Philadelphia, the Company's senior managers oversee and direct a global workforce of almost 6,000 employees, divided into four regions: North America; Latin America; Asia-Pacific ("APAC"); and Europe, the Middle East, and Africa ("EMEA").[5]

48. FMC is a basic manufacturer of crop protection products, meaning that it primarily sells products that contain patented active ingredients. FMC's principal products consist of four categories: insecticides, herbicides, fungicides, and plant health products. Among FMC's largest revenue generators are insecticides containing its patented active ingredients Rynaxypyr and

---

[4] *See* Dr. Nomman Ahmed, *2023 Crop Protection Market Review, Looking Ahead to 2024*, AGRIBUSINESS GLOB. (March 1, 2024), https://www.agribusinessglobal.com/agrochemicals/2023-crop-protection-market-review-looking-ahead-to-2024/ ("A pivotal factor influencing market dynamics [in 2023] was the destocking of inventory by retailers, particularly for generic products but also those of key proprietary crop protection products. This movement exerted downward pressure on crop protection prices in crucial markets, leading to a notable contraction in sell-in across almost all regions and major markets.").

[5] FMC also groups together the North America and LATAM regions as an "Americas" division for certain reporting and organizational purposes.

Cyazypyr, which belong to a class of chemical compounds called diamides. During the Class Period, global sales of insecticides accounted for 56% of FMC's 2024 total revenues. As shown below, FMC's sales in Latin America accounted for 33% of FMC's revenue, North America accounted for 27%, and EMEA and Asia each accounted for 20%:







49. As demonstrated below, FMC primarily sells its product directly to authorized distributors. These distributors, in turn, sell FMC products to retailers, who then sell the products to farmers and other end-users. FMC refers to the flow of its products from distributors to farmers as "the channel."




50. FMC's focus on Brazil reflects Latin America's status as the crop protection Company's most lucrative region. FMC puts special emphasis on its sales to distributors in Brazil, and this is reflected in the fact that many veterans of the Brazilian crop protection industry are heavily represented in the Company's senior management. FMC's President, Pereira, is a Brazil native who previously managed the Company's operations in that country. Another Brazil-born executive, Thaisa Hugenneyer, is the Executive Vice President responsible for FMC's manufacturing, logistics, and supply chain operations. In addition, Mills, the current CFO, Americas since March 2024 (which includes LATAM and Brazil), was also CFO, LATAM until July 2024.

51. The Company has close and long-standing relationships with many of its distributors. Through those close relationships, FMC has strong visibility into channel inventory levels. Leading up to the Class Period, FMC touted its visibility to investors, frequently repeating that the Company had "good visibility into demand for the quarter," and that "visibility for Q4

[2022] is pretty good." And at FMC's 2023 Investor Day—the first day of the Class Period—Defendant Douglas told investors that FMC "use[s] various tools to gain visibility into on the ground applications" of the Company's products. With respect to Brazil, a key market for the Company, FMC explained its keen involvement in inventory management there:

> We manage inventory not only in our own facilities, not only in third-party warehouses, but also at the grower level. So, our sales force and our financial groups are actually lockstep in terms of how much products are we selling into the market, how much is actually getting through to the grower, and then importantly, how much is getting used on the ground. So, this system is completely different to what it was seven, eight, nine years ago in terms of how we manage inventory in Brazil.

52. Defendant Douglas further acknowledged during the 2023 Investor Day that FMC was investing resources in increasing its visibility into the global channel, including by personally visiting Brazil to talk to distributors there:

> [W]e're spending a lot more time talking to distribution, retail and where we have access to growers, talking to growers. That's happening in Asia, it's happening in Europe, certainly happening in the US and Brazil. Ronaldo and I were just – we'd literally just come back from Brazil over the last few days. And we spent a lot of time with very large co-ops talking about where are your inventory levels now versus where you expected them to be and as you look forward?

53. Thus, investors understood that FMC had strong visibility into its inventory levels and was focused on inventory in each of its geographic regions, with a focus on Brazil and Latin America.

### C. In the Months Leading Up to the Class Period, FMC Faced Scrutiny Over Rising Inventory Buildup and Increased Generic Competition

54. Like other crop protection companies, FMC experienced extreme volatility in the years leading up to the Class Period. Supply chain disruptions and the fear of product shortages during the COVID-19 pandemic caused distributors to overstock FMC products in their inventories. By 2022, revenues at FMC and its peers jumped to record highs from this heavy buying activity. As supply chain disruptions ceased, however, distributors were left with excess

FMC products and began to significantly reduce their orders, resulting in an inventory buildup and revenue slowdown for FMC prior to the start of the Class Period. At the same time, mounting generic competition for FMC's marquee patented insecticides Rynaxypyr and Cyazypyr negatively impacted FMC's revenues in 2023. These challenges culminated in late October 2023, when FMC reported a 29% year-over-year decline in revenue for its third quarter of 2023 because of "channel destocking in all regions."

55. In the midst of this bad news, on September 7, 2023, investment firm Blue Orca Capital published a report (the "Blue Orca Report") claiming that FMC "concealed from investors the deterioration of [its] core business[,] resulting in an inescapable cycle of falling revenues, plummeting cash flows, [and] declining profits." Such deterioration was exacerbated by FMC's use of steep discounts and rebates to offload product and "shore up" cash. Blue Orca focused on claims that FMC had misrepresented the strength of its patent protection for its diamide products and the threat of generic market competitors heightened exposure to problems in its extremely important Brazilian market.

56. FMC rejected the contents of the Blue Orca Report, releasing, in response, a statement the same day, in which the Company claimed Blue Orca made "misleading and factually inaccurate statements regarding FMC's patents for its diamide insecticide technology and inaccurately speculated on the strength of FMC's business."

57. By the beginning of November 2023, FMC faced industry and investor scrutiny over its prior year's representations concerning demand for FMC's products, the level of its channel inventory buildup, and increasing competition from generic products entering the market.

### D. Claiming a Reset, Defendants Initiated "Project Focus" and Reported "Strong Results" and "Normalizing" Channel Inventories Throughout the Class Period

58. In acknowledgement of this investor scrutiny and inventory challenges, Defendants acknowledged the challenging market conditions FMC faced towards the end of 2023 and, at the start of the Class Period, unveiled a strategic restructuring plan to maximize operational efficiencies, right-size its cost base, and "normalize" distributor inventory levels. Among other things, FMC unveiled a plan called "Project Focus," which would result in massive cost savings that would contribute to the Company's future profits together with its focus on right-sizing the inventory buildup.

59. On November 16, 2023, FMC held its Investor Day and announced that the Company was embarking on a "2023 Global Channel Reset" that involved a "destocking reset." The Company outlined "actions we're taking that significantly improve cost efficiencies across the enterprise and drive profitable growth." During the presentation, FMC assured investors that through the Company's new strategic plan, "the channel will begin to rebalance and ease back into somewhat more normal patterns as we enter mid-2024." The Company further told investors that channel inventories would normalize "pretty quickly."

60. In its related Investor Day Presentation, the Company purported to detail the manner in which Defendants were addressing and managing FMC's channel inventory volumes, including "[p]rioritizing sales of existing inventory" and "[u]tilizing variable pricing based on

local market dynamics." The presentation stated the following, in relevant part:




61. Throughout the Class Period, Defendants further described FMC's efforts to normalize its channel inventories while incorporating changes that would "right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity." For example, on FMC's 4Q 2023 earnings call on February 6, 2024, FMC CEO, Douglas, explained that the Company's global restructuring plan was "***fundamentally transform[ing]*** our operating model, including how we're organized, where we operate and the way we work."

62. On June 11, 2024, FMC unexpectedly announced that Defendant Douglas was no longer CEO, claiming that he "stepped down" effective immediately, and that former CEO, Defendant Brondeau, would once again serve as CEO. In that same announcement, FMC announced that President of the Americas region, Ronaldo Pereira, would assume a new role as President of FMC.

63. Defendants' efforts seemed to be working. Over the next three quarters, FMC touted that the inventories of the Company's distributors and retailers were returning to "***more normal levels***," and that FMC was "***clearing out the channel inventory***." The Company praised its sales practices, stating it had been "***pretty disciplined about limiting price discounting and not pursuing volume in a weak demand environment***." The Company also assured investors its "***inventory reduction actions in the channel are making good progress***" and would be in "***much better shape***" as the Company approached the latter half of 2024. Further, FMC reported strong quarterly growth, which it attributed to the Company's "***improved channel inventory levels***."

64. Investment analysts widely acknowledged FMC's efforts to bring channel inventories to more sustainable levels. For example, a Morningstar Analyst Note published on November 17, 2023 detailed that "[w]e think the market is overly focused on the near-term decline in FMC's profits due to industrywide inventory destocking. . . Further, we think the market gives FMC virtually no credit for its pipeline. . . Accordingly, we see a strong margin of safety in the current share price, with much of the bad news already priced in." Morningstar additionally stated: "[w]e view FMC's issues as temporary, driven by the industrywide inventory reset in crop protection products being held by retailers and distributors that are normalizing their own inventories… Accordingly, we view FMC shares as materially undervalued with the stock trading at less than 50% of our fair value estimate and in 5-star territory."

65. In another report, published on December 30, 2023, CFRA stated that "[o]ur Hold rating is driven by projected global crop protection demand, offset by the disclosed inventory reductions." CFRA also noted that it "view[s] grower inventory depletion and stock-to-use ratios which sit lower vs. historical averages as a nice tailwind for FMC's top line." An Equisights analyst report, issued on January 2, 2024, explained that "management's focus on cost-saving measures,

product mix benefits, and input cost moderation adds to the positive outlook for cost-related factors." The Equisights report went on to conclude that "[t]he company's commitment to innovation, cost management, and strategic restructuring provides confidence in its ability to navigate market challenges and capitalize on emerging opportunities. With a diversified portfolio, strong brand presence, and focus on market expansion, FMC remains an attractive investment opportunity in the agricultural sciences sector."

66. Thus, with Project Focus underway and FMC's touted inventory reduction efforts supposedly making an impact, investors understood FMC's inventory problems to be waning, and FMC's sales practices to be "disciplined" and not subject to practices such as excessive "price discounting" or "pursuing volume in a weak demand environment" that could maintain or worsen the Company's channel inventory problems.

### E. In Reality, FMC's Sales Far Exceeded Demand, and Defendants Pushed Product Into the Channel Through Heavy Discounting, Rebates and Other Manipulative Sales Practices, Worsening and Not Normalizing Channel Inventory Buildup

67. Despite assurances from the Company that FMC was setting down a new path, Defendants' short-sighted sales practices of pushing unneeded product into an already overstuffed market flourished during the Class Period. As former FMC employees confirm below, during the Class Period, FMC: (i) employed manipulative sales practices to close sales far in excess of market demand, which worsened the heavily-scrutinized channel inventory buildup; (ii) fostered a policy to slow down or reconfigure product returns to avoid reporting lost revenues; (iii) sought out and recorded large sales with lengthy payment terms to high-risk customers with known financial difficulties; and (iv) pulled sales forward to make quarterly sales at the expense of the following quarters. All of these practices were directed or allowed to continue by senior management

including Defendants, worsened the Company's financial health, and were in stark contrast to the statements made to investors about a global reset and inventory reduction.

### 1. FMC Employed Manipulative Sales Practices to Close Sales Far in Excess of Market Demand, Which Worsened the Already Scrutinized Channel Inventory Buildup

68. Numerous former FMC employees describe how leading up to and throughout the Class Period, while Defendants assured investors that FMC had embarked on a global restructuring plan to "fundamentally transform our operating model, including how we're organized, where we operate and the way we work," FMC continued and even escalated a policy of employing aggressive sales tactics to generate sales in excess of the market's demands. These practices served to perpetuate and worsen the inventory buildup Defendants had publicly committed to reduce—and reported that FMC was reducing—during the Class Period.

69. The use of these undisclosed aggressive sales tactics was particularly widespread in FMC's primary LATAM market, the bulk of which was centered in Brazil.

70. FE-1 recalled that FMC used all available methods to facilitate sales, including rebates, discounts, longer payment terms (which could exceed a calendar year), and the ability of customers to return product within a year of purchase. Over time, FE-1 explained, these incentives increased depending on the length of the crop cycle.

71. While these aggressive sales tactics began prior to 2023, they increased in 2023 at the same time Defendants were signaling to the market that the Company would allow the market to reset and reduce inventory. Years before the Class Period, FE-1 stated that FMC offered to pay customers' storage, transportation, and insurance costs in an effort to convince them to take on more product. Although the market was already adequately supplied with product and large distributors in Brazil were experiencing inventory buildup, according to FE-1, FMC continued to push its customers to buy additional product. FE-1 explained that while this practice occurred prior

to the appointment of former CEO Defendant Douglas, the practice increased once he became CEO [in 2020], as Douglas was more aggressive in his pursuit of sales goals. FE-1 recalled there were "many" more meetings occurring under Douglas to discuss sales than his predecessor.

72. FE-1 explained that between 2022 and 2024, the Company increased the number of incentives that were offered to customers. This included, for example: (i) protection against exchange rate fluctuations between the U.S. dollar and the Brazilian real; (ii) guaranteed right of return for product that the customer could not sell; and (iii) payment for storage and insurance costs at a third-party logistics company so the customer could take on additional product. Another incentive, FE-1 stated, was to extend payment terms without interest; this was a big risk because this practice put FMC further down the line for payments due from farmers.

73. FE-1 stated that during the final week of each fiscal quarter or year, FMC approached customers to strike deals specifically aimed at meeting year-end sales targets. Under these arrangements, customers filled out the paperwork necessary for sales, allowing FMC to record sales before the quarter closed. However, many times customers did not honor these payment agreements at all or only honored them partially and returned the remaining product. In these end-of-quarter deals, FE-1 explained, there was an exchange of paperwork and issuance of a document whereby the customer assumed ownership of the product ***without any physical exchange of the product***. Instead, FMC sent the products to a distribution center, where the products sat unused. FMC paid the cost of transporting, insurance, and storage of the product at a third-party distribution center on behalf of the customer. Some of the products sat in storage for over a year, while other products expired while sitting in the distribution center. According to FE-1, FMC only asked customers to pay for the unused products if there was a product shortage. In the case of a shortage, FMC would ask customers to pay for the unused products and would sell

the products to other customers if they refused. FE-1 explained that there was no guarantee that the customers would honor these end-of-the-quarter deals.

74. FE-1 recalled that these practices grew more common throughout his tenure in 2023 and 2024, as the Company began selling customers far more product than was needed at lower prices and in higher volumes. Eventually, the distribution centers informed the Company they had run out of space and could no longer accept FMC's excess product. FE-1 explained that FMC lost money on sales where customers did not end up paying for the product or the product expired.

75. FE-3, a Regional Sales Manager in Brazil until his departure in January 2024, confirmed FE-1's accounts of aggressive sales tactics leading up to and continuing into the Class Period, explaining that FMC used aggressive tactics and personal relationships between Sales Representatives and the Company's customers to force through new sales on products that customers simply did not need. For example, FE-3 recalled how FMC became aggressive with the rebates offered to customers to further entice them to take on product. According to FE-3, for example, FMC offered sales on credit so customers did not need to pay for product; FMC then sold that credit to banks.

76. FE-3 explained that in Brazil, both FMC and the client were liable for payment for these types of transactions, but that FMC reported these transactions as paid sales immediately. FE-3 further explained that it is his understanding that current FMC's CFO for LATAM (and beginning in March 2024, also for the Americas), William Mills, was aware of these rebate practices because such transactions required financial expertise and CFO approval, explaining that although credit notes with lower dollar figures were authorized by the Finance Department, for which Mills was responsible, as the value of credit notes increased above a certain dollar figure, these transactions required approval from Mills.

77. As another example of manipulative sales and revenue reporting tactics, FE-3 said that FMC routinely booked long-term sales agreements as short-term. According to FE-3, this was not only fraudulent but also led to extra costs for FMC. For example, instead of paying 3% interest to banks on short-term sales, the Company was paying 7% interest on long-term sales. According to FE-3, while this conduct was partially brought to light in the Blue Orca Report a few weeks before the start of the Class Period (*see supra* ¶55), this behavior continued at FMC after the start of the Class Period. In fact, FE-3 explained that following the publication of the Blue Orca Report, FMC sent a notice to all employees instructing them to ignore the report, and Pereira led a meeting with the entire Commercial and Marketing Teams where he reiterated the same.

78. FE-3 also explained how FMC attempted to persuade distributors to take on more products through rebates and incentives, such as, for example, offering rebates of $2 or $5 for every liter a distributor sold down the channel. While rebates were a common practice in the crop protection industry, FMC began offering what FE-3 described as "rebates over rebates," which were not officially reported because they would not have been approved by FMC's compliance function. FE-3 also recalled that there was a limit on the percentages of sales that FMC was able to give as a rebate, but the Company found alternative ways to get around these limitations while maintaining compliance. For example, the Company classified additional rebates or discounts ("rebates over rebates") in other categories of expenses for reporting purposes to take away the focus of compliance, such as by classifying a trip offered to a distributor as marketing fees.

79. According to FE-3, both incentives and pressure increased in 2023 as customers became more reluctant to take on additional product, causing FMC to come up with creative ways to close sales, including additional benefits, covering the customer's taxes, and restructuring rebates. FE-3 explained that FMC commonly offered distributors trips, such as major soccer games

or fishing trips, and other benefits such as sponsored events at a distributor's offices and paying for employee training, as incentives. FE-3 recalled that the Company offered benefits and exemptions to customers to entice them to buy more products and, if customers did not agree to those terms, they were promised additional benefits.

80. FE-2, a Regional Sales Manager in Brazil, also confirmed the impact and escalation of the Company's use of aggressive sales tactics to force through sales of products that the market did not need. According to FE-2, sales practices at FMC were "normal" in 2018 and 2019, but beginning in 2020, the Company's CFO for LATAM, Mills, personally called FE-2 to pressure him to increase his sales. FE-2 recalled that Mills, who was responsible for financial reporting and financial analysis, participated in meetings with the Commercial Team at least once a quarter, and demanded results from Magurno (Brazil Country Manager) who reported to Head of Americas (Pereira) and the Commercial Team.

81. FE-2 recalled that while Pereira was not present in meetings where pressure was placed on the Commercial Team, it was known he was placing pressure on "high management," which included Brazil's Country Manager and FMC's CFO for LATAM (and beginning in March 2024, also for the Americas), Mills, for results, demanding that they had to make "sales, sales, sales." FE-2 confirmed that pressure to increase sales very much increased in 2023 and 2024 (during the Class Period).

82. FE-2 described how in 2023, the existing inventory levels in Brazil were valued at approximately $1 billion (meaning that $1 billion of unused inventory was already out in the market), and this information was reported to Pereira. According to FE-2, inventories remained built up in 2024. For example, in FE-2's region alone, the entire market was worth approximately $120 million, but there was already $120 million worth of inventory buildup at the start of 2024.

FE-2 recalled that while the sales goal was set lower at $60 million, that was a huge challenge when the channels were already full.

83. FE-2 explained that the pressure to increase sales included offering incentives to distributors in the form of rebates, discounts, cost adjustments, and price matching. FE-2 added that non-financial incentives were also offered in the form of days in the field showcasing products. According to FE-2, to entice customers to take on more product, the Company had to offer very big discounts, some as high as 30%, as well as provide generous rights of return. FE-2 confirmed that the problem he faced was the pressure of meeting these sales goals while trying to sell to customers who already had inventory and were paying FMC's high prices.

84. According to FE-2, the Company's claims that products such as Onsuva and Cyazypyr were experiencing positive sales figures and growth in 2024 was due to the already-high inventory buildups for Rynaxypyr and Bifentra. FE-2 explained that FMC wanted the Commercial Teams to push Onsuva and Cyazypyr in Brazil as alternatives in order to meet sales targets.

85. FE-2 described FMC's sales practices as a big discomfort for him in 2023 and 2024 because sales growth was insufficient to offset returns and still meet the overall sales targets. According to FE-2, based on his decades of experience in the industry, although it was difficult to acknowledge when sales targets could not be met, it was even more damaging to inflate inventory levels only to have the product returned later, as was happening at FMC. FE-2 added that not only was this practice potentially illegal, but it also affected the Company's ability to make future sales, as ultimately occurred in 2024.

86. FE-10, who served as a Supply Chain Manager from September 2022 and throughout the Class Period until May 2025, recalled that when he joined FMC, he was told that FMC does not "worry about inventory" and that the Company's emphasis was on having enough

product on hand to ensure that FMC did not miss out on any sales. FE-10 disagreed with this approach, explaining that FMC needed more long-term planning even if it meant sacrificing some sales, but that the Company did not want to do this.

87. According to FE-10, FMC was a "very short-sighted" company with a "very commercial focus." FE-10 further explained that the Company's focus was always on the next quarter or the next reporting period. According to FE-10, FMC's employees "crave[d]" longer-term strategy and foresight from the Company's senior managers.

88. Heavy pressure to push sales through despite the lack of demand was also prevalent in the European markets. FE-9 described how he participated in weekly meetings to discuss progress during the quarter and produced written reports providing high-level analysis of the current situation to headquarters in Philadelphia. FE-9 added that he had access to customer inventory data when making his assessment and that "we [the European market] raised the red flag" that sales were going to be difficult and that inventory levels were too high. FE-9 explained that he was responsible for Austria, Germany, and Switzerland, but "everyone else" in Europe was in the same situation.

89. According to FE-9, his direct supervisor, Sebastia Pons, who reported directly to the CEO, also had direct communication with headquarters in Philadelphia about the issues that Europe was facing. FE-9 explained that the messaging they received in return from leadership was that they "recognized" the difficulty that teams in Europe were facing and to "be creative" and to continue to "push" sales.

90. FE-9 explained that "bottom up" budgets were presented to leadership and Europe and then "top down" responses were provided by headquarters in Philadelphia, including from former CEO Defendant Douglas. FE-9 recalled that when presenting the forecasts, opportunities

and risks for what may impact the forecast positively or negatively were also presented. FE-9 further recalled that leadership wanted to hear more about opportunities for increasing sales and less about possible risks.

91. According to FE-9, Country Heads in Europe met to establish yearly targets, and then produced forecasts based on what was deemed realistic. According to FE-9, forecasts were reviewed weekly based on progress during the quarter and adjustments were made accordingly. FE-9 explained that messaging such as that it was very unlikely that markets in Europe would reach their sales targets was communicated and the response from the "top down," including from Defendant Douglas, was "we hear you but try to get more."

92. According to FE-9, Country Heads began "underbudgeting" or setting lower targets. Yet, regardless of what targets were set, FMC's senior leadership "always added on top" of that number and Country Heads were responsible for trying to make up the difference. FE-9 said the Country Heads attempted to reach these unrealistic targets through additional meetings with customers during which they made "special offers" and conducted marketing promotions.

93. FE-9 described 2023 as a "perfect storm," so meeting goals for 2024 became "impossible." Because FMC failed to meet its targets in Q1 and Q2 of 2023, "pressure mounted" to make pre-sales in the second half of the year. FE-9 added that these issues were raised to management, but FMC continued working towards established targets.

94. According to FE-9, FMC started "pushing too much product" to wholesalers to hold in their warehouses at the end of 2023. FE-9 added that wholesalers took on product during this period because they were able to benefit from receiving product early at current prices and also benefit from rebates and other discounts offered by the Company. FE-9 recalled that during this period in 2023, interest rates were increasing and taking on more inventory was becoming more

expensive for wholesalers and the Company had to utilize further rebates and adjusted payment terms to entice them to take on product.

95. FE-9 also recalled his region experiencing "huge build ups" of inventory and explained that inventory buildups at the end of one year impacted sales for the following year since some sales that would have been made in 2024 were made in 2023 and a "perfect agricultural season" was then required to meet targets.

96. According to FE-9, the Company had the ability to monitor inventory levels at wholesale, retail, and farm levels through reports employees received, and he informed EMEA headquarters in Geneva about concerns regarding the "huge stockpile" of inventory he was observing. FE-9 explained that he participated in weekly calls with Country Heads and Geneva, where stock/inventory levels were discussed. FE-9 added that he produced monthly reports based on information he was receiving from down the channel. FE-9 recalled that he noted in his report at the end of 2023 that there was "excess stock in warehouses" which in turn would "put pressure on Q1 targets."

97. Regional leaders from around the world expressed concerns about the unattainable sales targets and unmanageable inventory, and those concerns were discussed with FMC's CEOs Defendant Douglas and Defendant Brondeau. According to FE-10, he understood that in strategy meetings among all regional leadership and former CEO Mark Douglas or current CEO Pierre Brondeau and current President Pereira, forecasted projections brought forth by European and other leaders were ignored in favor of higher, less obtainable forecasts produced for reporting purposes.

98. The rising inventory was communicated to leadership throughout the Company on a regular basis. According to FE-10, beginning in early 2024, and possibly during 2023, Regional

Commercial Leaders and Supply Chain Leaders were provided monthly inventory projection reports that were automatically generated by FMC's central system, which included information on sales forecasts and results, inventory levels, and "slow-moving inventory." FE-10 explained that Leaders in each region were responsible for responding to these reports and providing action items for how slow-moving inventory was going to be addressed, and that these responses were sent to the Company's headquarters in Philadelphia.

99. FE-10 explained that the Company instituted a "robust scorecard dashboard" in 2024 which showed slow-moving inventory both regionally and globally, and provided month-over-month figures. According to FE-10, despite small steps taken to improve supply and demand planning, during Q4 2024 the same short-sighted approach was echoed by the new Executive Vice President, Integrated Supply Chain and Chief Sustainability Officer Thaisa Hugenneyer, who stated in a meeting, "I don't want to hear anything beyond this quarter," and further stated that if FMC failed to meet targets for 2024, the Company "won't survive."

100. FE-6, who was employed by FMC throughout the Class Period until his departure in January 2025 as a Supply Chain Management Lead and who oversaw aspects of FMC's supply chain, similarly described increased sales pressure and targets for 2024 within North America that exceeded actual demand. FE-6 noted how FMC was "pleading with customers" to take on product to meet its targets, yet the Company nonetheless ***increased*** its sales targets for 2024." FE-5, a U.S. sales representative responsible for marketing FMC products to retailers, wholesale distributors and distributor-owned retailers during the Class Period until his departure in spring 2025, explained that in order to reduce inventory in the channel and increase revenue in 2023 and 2024, FMC management wanted its sales representatives to "get it [product] out the door" at any cost, such as by making "price more favorable by offering additional rebate programs."

101. FE-5 heard from his colleagues at FMC and from his retailer clients that the Company pushed its distributors to clear out inventory so it could sell them new products, regardless of their actual needs. In order to achieve this goal, FE-5 described how he heard from his colleagues at FMC and from his retailer clients that FMC product was being sold "cents on the dollar" to the "tin shed market." FE-5 described the "tin shed market" as retailers that would agree to purchase product from distributors and retailers without any assurances—no returns, no financing, and no ability to file a performance claim. In exchange for the foregoing assurances, the retailers paid significantly less for FMC's products.

### 2. FMC Slowed Down and Reconfigured Returns of Unneeded Product to Avoid Reporting the Hit to Revenues

102. FE-3, a Regional Sales Manager in Brazil until his departure in January 2024, explained that since 2022, sales numbers at FMC in Brazil were all inflated and artificial due to the manipulative sales practices that were implemented. FE-3 explained that asking customers to take on more product than they needed was a normal practice and part of the culture at FMC. However, FE-3 recalled how FMC put pressure on distributors and clients to keep and not return the unneeded products because sales had already been reported, and they did not want to reverse the sale on its books and subtract the revenue.

103. FMC had a policy to avoid returns and customers were compensated to minimize returns in the form of benefits that conflicted with the Company's written policies, FE-3 explained. In order to prevent returns from being recorded on FMC's books, according to FE-3, FMC instructed Sales Representatives to use their special relationships with customers by asking customers to retain products rather than make returns, on top of already existing pressure to buy more products than the customers needed. For example, Faria instructed FE-3 to tell customers

that in exchange for not returning product, FMC would pay the associated taxes and storage costs related to that product.

104. FE-2 provided additional details about the Company's efforts to slow or stop returns of unneeded inventory. FE-2 explained that there was a clear understanding with customers to accept a sale and agree to increase their inventories in exchange for a promise from FMC for support, which included the right of the customer to return product or seek additional discounts. FE-2 added that the promise of a right of return was a problem because of the risks associated with these types of agreements. According to FE-2, sales of this nature (i.e., with a similar delayed payment and right of return) are considered non-completed sales, but these sales were reported as complete for the financial health and stock price of the Company.

105. FE-2 explained that, in order to meet sales goals, senior management made deals with distributors whereby sales were recorded, but the distributors were not liable for payment and were able to return product after the quarter ended. As a result of these deals, product returns became more common, and distributors regularly returned products before payment was due. FE-2 recalled an incentive for the Commercial Team to find alternatives to prevent returns. FE-2 claimed that senior management instructed distributors to make returns slowly so that FMC would have time to sell to other distributors, such that it could still log the sales for that quarter. According to FE-2, these deals were done "exclusively" as a tactic to record orders as sales at the end of each quarter. Further, FE-3 confirmed that these returns and rebate practices required approvals from Mills.

106. However, the Company's attempts to stop or slow down returns faced significant hurdles during the Class Period. FE-2 explained that in those circumstances where deals were agreed upon, booked as sales, and the customer was not liable for payment, the customer had up

to a year in some instances to make payment. According to FE-2, this gave customers time to sell, but also presented a risk that if the customer could not make the sale, they would not pay for and would ultimately return the product with no exchange of money. FE-2 recalled instructions to have customers make returns slowly, which FE-2 described as "dangerous," because these instructions were often given verbally and informally. FE-2 explained that FMC made an effort to delay returns until after the quarter end to try to make up the sales in the interim, yet problems arose when they could not make enough new sales to cover the returns. FE-2 explained that the Company's attempts to stop or slow down returns faced significant hurdles.

107. FE-2 recalled that FMC had generous right of return deals with a number of large distributors.[6] According to FE-2, these distributors were responsible for large sales and subsequent large returns. FE-2 explained that senior management, including Mills, CFO for LATAM (and after 2024 also CFO for the Americas), was aware of these deals, that Pereira (President, Americas and since June 2024, President of FMC) had requested that these deals occur, and that, in 2024, Bruno Pereira Lopes Giudicissi (Magurno's successor) requested that FE-2 resume offering these deals to distributors after a brief pause. FE-2 was present in meetings where these deals were discussed, and the instructions from Mills, Giudicissi, and Ferreira were to have these conversations verbally and not in writing, and to be careful with emails. According to FE-2, everyone was aware of these deals and they have continued since his departure from the Company.

108. FE-2 recalled that in order to keep the P&L position, he was instructed by Directors, including Mills, Ferreira, Giudicissi, and others that for each $1 of product returned, FE-2 needed to sell $2 of new product. FE-2 explained that Mills, Ferreira, Giudicissi, and current Business

[6] Some of FMC's largest distributors in Brazil included AHL, TCHÊ Produtos Agrícolas, and Cooperfarms.

Finance Associate Director Fabiana Coimbra, who reported directly to Mills, all attended and participated in direct negotiations with distributors regarding right of return agreements, which FE-2 also attended. These deals persisted until FE-2 left the Company. Even after FE-2's departure, FE-2 learned from colleagues that FMC had offered customers at another large distributor a deal with the right of return for 2025, approved by Giudicissi.

109. In September 2024, FE-2 recalled that Giudicissi pressured him to increase inventory and improve sales for Q3 2024, but FE-2 refused. FE-2 discussed these issues with Giudicissi and explained that these deals with these rights of return were a big risk and compliance problem. When FE-2 departed the Company, Giudicissi brought in a replacement, current Regional Sales Manager Bruno Alves, to conduct these types of deals.

110. According to FE-2, Pereira and Mills knew to be careful not to mention these deals in writing. FE-2 explained that former CEO Defendant Douglas would have been aware of these deals due to Douglas' very close relationships with Pereira and Mills, and FE-2 explained that he discussed these issues with his direct supervisor. FE-3 confirmed FE-2's account of how sales representatives were instructed not to put deals with improper customer incentives in writing. Faria, FE-3's direct supervisor, instructed FE-3 to not put anything in writing and to only verbally agree to these conditions, noting specifically that Faria instructed him to tell customers that in exchange for not returning product, FMC would pay the associated taxes and storage costs related to that product. Rather than write down terms and to avoid a written record, according to FE-3, Sales Representatives would tell clients: "Trust me, I always deliver what I promise."

111. FE-10, who served as a Supply Chain Manager from September 2022 and throughout the Class Period until May 2025 and was responsible for supply and demand planning as well as supporting the efficiency of processes in multiple regions, confirmed the accounts of

FE-2 and FE-3, and recalled observing returns occurring in Latin America a month or two following the end of each quarter. FE-10 explained that he observed a lot of pressure on Latin America given how important that region was to FMC. FE-10 added that it is his understanding that pressure on sales teams is even greater now. FE-10 also noted that FMC "overload[ed]" employees in an attempt to reach sales targets, and the Company's approach was sales over everything else. FE-10 recalled that FMC placed "huge pressure" on the sales teams, with a lot of pressure falling on teams in Latin America. FE-10 further recalled that commercial and marketing teams were so overloaded and focused on sales that they were not able to contribute any effort or time to collaborating on supply and demand planning.

112. FMC faced similar issues with product returns not being recorded as returns in North America. FE-4 was an internal audit analyst at FMC from June 2023 until July 2024 at the Company's Philadelphia headquarters. FE-4 reported to John Mulcahy, who was the Chief Audit Executive at FMC. FE-4 was part of a team of internal auditors responsible for auditing financials and inventory, including product inventory and assets inventory.

113. As part of FMC's audit team, FE-4 visited FMC facilities in the United States to conduct inventory audits at the Company's U.S. locations. FE-4 was aware of audits conducted by his overseas colleagues at FMC sites in China, Italy, Brazil, and other countries. According to FE-4, inventory was "always a problem" at every FMC location audited, including "a lot of product returns and invoices" that were not recorded as returns.

114. FE-4 stated that the Company's audits were not conducted for the purpose of fixing any problems with inventory or tracking. According to FE-4, "The whole reason we were doing these audits, it was my impression, was they were making sure we completed the audit." FE-4 elaborated and explained that he never felt like the audits were conducted for the purpose of fixing

any problems at the company, but instead to "check the box" that the audit had been conducted. "There were no consequences" for sites when auditors identified discrepancies in reporting. "There was no impact if a negative audit rating" was issued, explaining how the same problems occurred at every audit at every site over and over again.

115. FE-4 explained how, at the end of every audit, FE-4 and his colleagues would create a report and meet with FMC Chief Audit Executive, John Mulcahy, to discuss their findings. However, as described above, FMC never acted on the discrepancies the audit team identified. According to FE-4, there were "no consequences" for the inventory discrepancies that the audit team identified. FE-4 observed that inventory "was always a problem" at the FMC sites he audited, yet no site was held accountable. According to FE-4, FMC had a "lax attitude" about inventory discrepancies, which FE-4 described as "significant".

116. FE-11, who worked out of FMC's Corporate headquarters in India as the Digital Channel Strategy Lead from July 2022 until April 2024, observed that inventory buildup persisted throughout 2023, after FMC announced Project Focus. According to FE-11, FMC "couldn't just burn the product off," yet the Company continued to pump the market with product. FE-11 further recalled that from early 2023 through the end of his tenure in April 2024, he "always" heard that sales were low and that there were a lot of returns. FE-11 explained that 30-40% of sales from "Super Distributors" to distributors[7] were returned, yet FMC nonetheless was able to book the sale because the product was not actually returned to the Company as FMC only reflected sales to the Super Distributors (and not the returns from distributors to their Super Distributors) on the

[7] According to FE-11, FMC's standard practice in India is to sell its product to a handful of so-called "Super Distributors." These Super Distributors, in turn, sell FMC products to distributors, who then sell the products to retailers, who then sell the products to farmers and other end-users.

Company's books. FE-11 confirmed that FMC had visibility into inventory levels, including returns at India's Super Distributors.

#### 3. FMC Leadership Recorded Large Sales to High-Risk Customers Suffering Known Financial Difficulties, Who Soon Filed for Bankruptcy, Leaving Those Debts Unpaid

117. Multiple former employees based in Brazil described how senior executives at the Company, desperate to report sales in the challenging Class Period market, signed large deals worth tens of millions of dollars with companies suffering from significant known financial difficulties, making it unlikely that those customers would ever follow through with payment on those sales. Indeed, at least two companies filed for bankruptcy before payment on the already recorded sales was due.

118. FE-2 believed that the worst decision made by FMC in 2023 was a deal invoiced in December 2023 with AgroGalaxy for $50 million. AgroGalaxy is a Brazilian company engaged in the sale of crop protection products and other agricultural products, as well as services like seed origination and the storage and sale of grains.[8] At this point, AgroGalaxy had already signaled that it was experiencing financial difficulties, and FE-2 voiced concern about selling products to the company to former Credit and Receipt Manager (Barter Operation), Elisa Gomes. Nevertheless, Pereira and Mills met with AgroGalaxy's CEO to complete the deal and a sale was reported. FE-2 recalls wondering at the time how Mills could have ever approved the deal. According to FE-2, under the terms of the deal, AgroGalaxy's payment was due in approximately October or November 2024. However, AgroGalaxy filed for bankruptcy prior to the payment due date.[9] At

---

[8] *Corporate Profile*, AGROGALAXY, https://ri.agrogalaxy.com.br/en/about-agrogalaxy/corporate-profile-and-history/ (last visited July 23, 2025).

[9] Richard Mann, *AgroGalaxy Files for Judicial Recovery Amid Financial Turmoil*, THE RIO TIMES, Sept. 18, 2024, https://www.riotimesonline.com/agrogalaxy-files-for-judicial-recovery-amid-financial-turmoil/ (last visited July 25, 2025).

the time FE-2 left the Company in 2024, no payment had been made, nor had AgroGalaxy returned any of the purchased products.

119. FE-2 explained that, following his departure, he learned that Pereira, Mills, and Giudicissi had entered into a similar deal with another company, as well as with a company called Lavoro, which has also since filed for bankruptcy while owing debts of approximately $50 million to FMC.

120. FE-3 confirmed that FMC sold to customers that it knew were in bad financial health, including because of concerns regarding their ability to pay. For example, FE-3 confirmed FE-2's account that FMC frequently sold to AgroGalaxy, a large distributor that was widely known to be experiencing financial difficulties. According to FE-3, AgroGalaxy presented many indicators of financial distress, such as unsustainable expansion, mass layoffs, and decreased sales. Even as other competitors backed away from doing business with AgroGalaxy, FMC persisted, and even increased sales to fill the void left by other competitors.

121. FE-3 recalled that the customer-facing members of the Commercial Team wanted to stop selling to AgroGalaxy, but Commercial and Finance Team leadership instructed these teams to continue making sales and explained that, as a result of a meeting it had with AgroGalaxy, it was fine to continue sales as normal. FE-3 added that AgroGalaxy ultimately declared bankruptcy with a debt owed to FMC of approximately $30 million.

122. FE-3 explained that it was FMC executives' strategy to continue to make sales or lend credit to financially unstable customers. Specifically, FE-3 recalled an "unprecedented" meeting in February or March 2023 led by Mills and current National Head of Credit & Collection Brazil Francisco Francisco, where Commercial and Finance Teams' leadership were convincing

the entire sales force to sell to AgroGalaxy. This included, FE-3 recalled, Regional Directors for the North, South, East and West Regions, all of whom reported to Magurno.

123. Following this meeting, FE-3 recalled that Sales Representatives discussed the inversion of roles. Typically Sales staff want to sell and the Finance Team presents an obstacle to selling to risky customers. At FMC, however, FE-3 recalled Sales Representatives describing it as the "banana eating the monkey," and the meeting caused discomfort among Sales staff.

124. FE-1 confirmed FE-3's and FE-2's accounts of how FMC sold product and provided credit to companies known to have financial issues, including specifically AgroGalaxy and Lavoro, two of Brazil's largest agrobusiness companies. FE-1 described how these two companies were so large that FMC did not require them to provide guarantees for payment. According to FE-1, payments from AgroGalaxy and Lavoro became delayed by the end of 2023 and by the end of Q1 2024, payments from both companies had stopped and they began defaulting on payments. According to FE-1, FMC also knew that these companies sold product on credit to farmers with a history of defaulting on payments and who displayed signs of financial distress, such as selling off equipment. Nevertheless, the Company continued selling to AgroGalaxy and Lavoro until they had already defaulted on multiple payments. Eventually, Lavoro declared bankruptcy in 2025 and FMC is one of the company's three largest creditors.

#### 4. FMC Pulled Sales Forward to Make Quarterly Sales Goals at the Expense of the Following Quarters

125. Several former employees described how the Company manipulated its recording of sales in order to report inflated quarterly sales revenues at the expense of future quarters.

126. This process of pulling sales forward was very notable in the EMEA region, as described by several former employees. FE-9 was employed by FMC as the Business / Managing Director for Austria-Germany-Switzerland from December 2020 until May 2024. He reported to

the current FMC Vice President & President Europe, Middle East and Africa Sebastià Pons, who reported directly to the CEO.

127. According to FE-9, FMC was known as the "most aggressive" company in the crop protection industry in terms of pushing to reach ambitious sales targets.

128. FE-9 explained that FMC had an approach to increase inventory with pre-sales hoping that if conditions were good the next season would be better in terms of sales. FE-9, who had experience working at FMC competitors in the region, including Bayer and BASF, compared FMC to a competitor such as Bayer, and explained that FMC pushes to meet targets each quarter rather than taking the following year or following three years into consideration. FE-9 further explained that the Company pushed distributors to take product that was not in season, which along with pushing sales in the "Pre-Sale Season," diminished the sales potential in future quarters. FE-9 described how there was a widespread mentality to "keep accumulating" and "keep pushing" inventory. For example, FE-9 explained that FMC allocated 25% to 30% of sales to be made in Q4, called the "Pre-Sale Season," and how putting so much emphasis on sales in Q4 diminishes sales that can be made in Q1 of the following year.

129. According to FE-9, Q1 2024 was "not good" for FMC because of high product inventory levels in 2023. FE-9 further explained that even though many 2024 sales had already been recorded in 2023 through pre-sales, the Company still increased its sales targets.

130. FE-7, a European-based Supply Chain Management Lead during the Class Period until the end of his tenure in spring 2024, confirmed FE-9's accounts of pulling sales forward, and described how, despite encouraging customers to take product early and changing production plans, FMC still fell short of sales targets—and yet continued to increase them.

131. FE-7 recalled that in 2023, the Company was internally saying "we're going to hit budget" but in reality, the Company already "had the numbers" and knew that it was not going to make its stated goals. FE-7 further explained that the forecasts in Europe were "wrong" and throughout 2023, going into 2024, there were downward revisions each quarter to decrease forecasts, yet FMC did not even meet these reduced goals.

132. FE-7 explained that initial forecasts exceeded what was possible and were based on historical figures plus additional increases, which employees "knew they couldn't hit." FE-7 stated that FMC always had a "short-term vision" by looking at the current quarter without any long-term planning.

133. FE-7 recalled that the routine pulling forward of sales in each quarter of 2023 negatively impacted year end as farmers already had sufficient product. FE-7 likened FMC's method of pulling forward sales, which eventually left them short at year end, to "the snake who eats its own tail." FE-7 explained that at FMC, there was a consistent "race to the next quarter" to fill gaps in the forecast by pulling forward sales to meet targets and then doing the same the following quarter.

134. FE-7 further explained that the Company asked customers to take orders in advance and to adjust terms to accept product early. FE-7 recalled, for example, that this occurred with customers in Africa.

135. Similar accounts were given by FE-8, who was employed by FMC as a Rebate and Commissions Analyst from April 2023 until January 2024, worked out of FMC's office in Cork, Ireland, and was personally responsible for the reconciliation of the ledgers in various countries, including Ukraine, Romania, the Netherlands, and the Czech Republic, with other countries under his team's purview including the United Kingdom, Italy, Spain, Hungary, and Bulgaria.

136. FE-8 confirmed that executives at multiple levels implemented improper formal and informal processes to increase short-term revenue at the expense of the Company's long-term health, including by leaving the books open beyond the quarter end to record more sales. FE-8 recalled that a particular market had a big sale coming in January and was told to leave the books open so that sales could be recorded during the current year.

### F. An Independent Analysis of FMC's Class Period Financials Finds "Fundamental Deterioration Masked by Aggressive Financial Practices"

137. On May 28, 2025, CFRA, a global leader in independent equity research that applies sophisticated forensic analysis and fundamental equity research, issued a research report on FMC titled "FMC Corporation: Fundamental Deterioration Masked by Aggressive Financial Practices" (the "CFRA Report") that reflected on CFRA's key takeaways in the wake of the Company's Q4 2024 financial disclosures.

138. The CFRA Report concluded, based on an analysis of several factors including CFRA's mathematical modeling, that the Company's financials at the end of 2023 through 2024 (i.e., the Class Period) revealed "aggressive revenue recognition practices and potential financial manipulation" by FMC. CFRA further highlighted how FMC's "leadership exodus"—including the unexpected June 2024 departure of Defendant Douglas and reinstatement of the Company's previous CEO Defendant Brondeau—coincided with "mounting operational challenges" and pre-Class Period allegations of securities fraud.

139. CFRA also pointed out how FMC's signs of financial distress and "fundamental deterioration" compared to the financial condition of a chief competitor during the Class Period, weakening any claims by FMC that its problems were market-driven. CFRA reported that FMC competitor Corteva's "financial strength (negative leverage, cash surplus, efficient collections)

compares sharply with FMC's concerning metrics (high debt, cash deficit, extended payment periods), highlighting fundamental differences in business execution."

140. Alarmingly, CFRA opined that "FMC poses significant risk to investors" because CFRA's "analysis indicates that ***these challenges are not temporary setbacks but rather symptoms of fundamental business deterioration that will likely lead to significant shareholder value destruction***."

141. CFRA's analysis independently corroborated the impact of the manipulative sales and pricing practices described by FMC's former employees. CFRA had no access to the detailed accounts of the FEs herein that describe a system of pricing manipulation and inorganic and shortsighted use of "rebates over rebates," extreme discounts, large sales to high-risk clients in financial distress with extended payment plans, sales of products piling up in distribution centers with no end-user sales, and exorbitant return policies without penalty or payment. *See supra*, Section IV.F.

142. Nonetheless, CFRA applied a mathematical model to FMC's financials called the Beneish Model that was developed by Professor Messod D. Beneish in 1999 and that is "designed to detect financial statement manipulation." The Beneish model has been described as a "useful technique that can be employed to identify the presence of earnings management" and that "is widely used by financial analysts and forensic accounting investigators to assess the probability of earnings manipulation." *See* SPECIAL REPORT: Evaluating the Quality of Financial Statements—A Guide for Audit Committees, SEC Accounting and Reporting Update, 2008 WL 11502620 (October 2016). This model assigns a "score" to a company's financials, and according to CFRA, "flags scores above -1.78 as indicating an elevated probability of earnings manipulation."

143. CFRA applied the Beneish model to FMC's financials and determined that:

> Through our analysis, ***we have identified several red flags indicative of "channel stuffing," a practice of enticing customers to order products that they may not otherwise order in advance***. ***The overall effect of channel stuffing inflates revenues in the current period by pulling forward future sales, which could eventually lead to decreased demand as inventory channels become flooded with product***. Red flags related to channel stuffing include significant increases in customer incentives, receivables increasing faster than revenue, significant differences between net income and cash flows from operations, and increasing DSO [Days Sales Outstanding] over time or a high DSO relative to peers.

144. CFRA also calculated FMC's M-score, which "reached concerning levels multiple times in 2023-2024, hitting -1.81 (3.5% likelihood of manipulation) in Q4 2023," the start of the Class Period, "before worsening to the critical threshold of -1.78 (3.8% likelihood) in Q3 2024." Notably, "[t]hese elevated risk levels marked a significant departure from historical norms, as the score had consistently remained below -2.20 in prior years."

145. CFRA noted that the period following Q4 2022 indicated that FMC's "receivables as a percentage of sales grew substantially, potentially signaling inappropriate revenue recognition practices," while the "dramatic decline in sales growth, coupled with other concerning metrics like accruals quality and leverage changes, created significant pressure on management to manipulate financial statements to maintain the appearance of stability."

146. In its report, CFRA focused on "individual components of the M-score [that] provide deeper insight into specific areas of deterioration" that supported the "***red flags indicative of 'channel stuffing.***'"

147. ***First***, CFRA noted that FMC's Days Sales Outstanding ("DSO") "has more than doubled from 107 days in 2011 to 242 days in 2024, and further deteriorated to 253 days in Q1 2025, far exceeding industry norms." FMC explained that FMC's growing DSO "***stands in stark contrast to industry peers and raises serious questions about the quality of reported revenues***." Moreover, FMC's "***accounts receivable to revenue ratio reached 70.4% in Q1 2025, up from***

***68.4% in 2024, dramatically surpassing peer ratios of 9.5%-43.3%, suggesting potential channel stuffing or aggressive revenue recognition practices***." A graphic comparing FMC to its peers shows this stark discrepancy:




148. ***Second***, CFRA discussed how a "sharp increase in customer incentives" in 2023 and 2024, "with accrued rebates and advance payments averaging 21% of revenue in 2021-2024 compared to 15.5% in the prior decade . . . suggests FMC may be pulling forward future sales through aggressive incentive programs, potentially masking underlying demand weakness," as reflected in the below figure:

**Figure 3: FMC DSO and Customer Incentives**




Source: Company filings, S&P Global Market Intelligence.

149. ***Third***, CFRA compared cash flow from FMC's operations to its reported net income, noting that "operating cash flow is generally less susceptible to manipulation than net income, with large differences potentially signifying manipulation." CFRA then presented a graphic demonstrating the "severe divergence between cash and accrual earnings" beginning in 2022 and extending through 2024:

**Figure 4: Cash Flow from Operations vs. Net Income (in $ millions)**




Source: S&P Global Market Intelligence.

150. ***Fourth***, CFRA examined FMC's "expanded use of supply chain financing [that] increased dramatically from $71.9 million as of December 31, 2023 to $227.4 million as of December 31, 2024," as well as "FMC's two receivables factoring programs [that] have significantly increased following the inception of the programs in Q3 2022, with receivables factoring increasing by 86% from $163 million in 2022 to $303.3 million in 2023, with a 4% increase in 2024 to $315.9 million." CFRA noted that "[t]hese financing arrangements appear increasingly necessary to maintain the appearance of normal business operations, even as underlying fundamentals deteriorate."

151. ***Fifth***, CFRA reviewed FMC's "mounting debt burden and repeated need for lender accommodations," reporting that "FMC's leverage ratio has risen to 4.77x [in Q1 2025], up significantly from 3.72x in Q4 2024" and "[t]he company has required three covenant amendments since 2023 to avoid violations, with limits being repeatedly raised from 3.5x to the current 5.25x." CFRA concluded that "[t]hese frequent amendments, along with continued restrictions on share buybacks and rising net debt ($3.69 billion from $3.01 billion), indicate ongoing concerns about FMC's financial stability."

152. ***Sixth***, CFRA described how the Company incurred substantial charges in 2024, totaling over $305 million, which "suggest possible 'big bath' accounting, where current period charges may include expenses that should have been recognized in prior periods," and noting that "[t]he timing of these charges, coinciding with management turnover and deteriorating metrics throughout 2024, ***raises serious questions about the quality of previous period reporting***."

153. ***Finally***, CFRA attempted to discount any reliance on mere market factors for these concerning benchmarks of financial manipulation by comparing FMC to competitors in the fertilizers and agricultural chemicals (crop protection) sub-industry. Focusing on competitor

Corteva "due to their shared specialization in proprietary crop protection products," CFRA compared FMC's Beinish M-score and other metrics to Corteva (CTVA), CF Industries (CF), Mosaic (MOS), and Nutrien (NTR), revealing the disparity between FMC's Beneish M-Score of -1.9% and its competitors' significantly lower scores:

**Table 1: Competitors**

| 2022-2024 (Annual Data) | FMC | CTVA | CF | MOS | NTR | Average |
|---|---|---|---|---|---|---|
| **Average Beneish Model Manipulation Likelihood** | 1.9% | 0.5% | 0.5% | 0.6% | 0.5% | 0.8% |
| **Average Net Debt/Adjusted EBITDA** | 3.0x | -0.2x | 0.3x | 1.2x | 1.7x | 1.2x |
| **Three-year Revenue CAGR** | -5.6% | 2.5% | -3.2% | -3.4% | -2.3% | -2.4% |
| **Three-year Adjusted EBITDA CAGR** | -12.0% | 9.4% | -5.9% | -15.0% | -9.1% | -6.5% |
| **Average Days Sales Outstanding** | 213 | 90 | 23 | 33 | 62 | 84 |
| **Average Cash Flow from Operations – Net Income from Continuing Operations (in $ millions)** | -$594.63 | $600.33 | $931.33 | $906.53 | $2,373.00 | $843.31 |

Source: CFRA, S&P Global Market Intelligence.

## Relative Performance




Source: S&P Global Market Intelligence (May 28, 2020 to May 27, 2025).

154. Ultimately, based on its independent analysis and modeling—as well as FMC's own public statements and allegations lodged against the Company in legal proceedings—CFRA

concluded that FMC's problems posed a "significant risk to shareholder value" and expressed "serious concerns about FMC's business trajectory and financial reporting quality."

## V. THE TRUTH IS REVEALED

155. On February 4, 2025, new information was released that corrected Defendants' prior misrepresentations and omissions of material fact, when FMC reported its Q4 2024 financial results, missing consensus revenue estimates by $90 million and revealing that "growth was below [the Company's] expectations as [it] learned during the quarter that customers in many countries sought to hold ***significantly less inventory than they have historically***." In particular, sales in Latin America—FMC's most significant region—were down 10%. FMC also provided a shockingly poor 2025 outlook, disclosing that it expected revenue to remain essentially flat due to "weaker demand in the channel as many customers prioritize holding lower-than-historical levels of inventory." This stood in stark contrast to the Company's repeated Class Period statements that FMC's distributors and retailers are "bringing their inventories back to more normal levels," and that the Company's channel would "normalize pretty quickly." Indeed, as set forth above, multiple former employees described how channel inventory had not normalized because while FMC told investors that demand was increasing and inventory was reducing throughout 2024, the opposite was true. *See* Section IV.E. In fact, FMC's sales far exceeded actual demand and were achieved through a series of risky and undisclosed aggressive sales practices, as distributor inventories remained inflated as a result. *See* Section IV.E.1.

156. In an earnings call held the same day to discuss these results, Defendant Brondeau admitted that he had "modified [his] view of what needs to be done for FMC," and that the Company "needs a stronger reset." Brondeau admitted that the Company's channel inventory had not improved in the prior quarters, stating: "[a]bove all we need to significantly lower FMC inventory in the channel, much beyond what we were expecting." Brondeau reiterated this

sentiment later on in the call, explaining again that the Company "need[ed] to significantly lower FMC inventory in the channel much beyond what we were expecting." These efforts, Brondeau stated, "will have a pronounced negative impact on 2025 financial performance."

157. Also on the Q4 2024 earnings call, Defendant Brondeau explained that FMC's "LatAm Q4 sales were disappointing," which he attributed in part to the "channel inventory situation." The Company saw "lower-than-expected demand across most region[s] as customers lowered the amount of inventory they were willing to hold versus historical levels." Brondeau further admitted that FMC's channel inventory levels were problematic, noting that given "the current high levels of FMC product in the channel, ***we now believe we have elevated channel inventories in some countries in LatAm, including Brazil; Asia, including India, as well as Canada and Eastern Europe***."

158. Regarding the Company's Q1 2025 guidance, the Company stated it expected a low first quarter "as we aggressively start the correction process early in the year," projecting that "[s]ales are expected to be $750 million and $800 million, a decline of 16% against prior year." This lower volume was attributed in part to "excess levels of FMC inventory in the channel in many countries, which [wa]s amplified by customers prioritizing much lower-than-historical inventory levels."

159. In response to an analyst question regarding FMC's channel visibility and the Company's strategy on the inventory side to "get a better handle on the channel," Defendant Brondeau confirmed that although "most of our inventory actions are going to take place in the first half [of the year] . . . I think that it will take more than one quarter" to remedy. Brondeau elaborated that there was a "country-per-country set of action," that would impact the Company's operations in India, Brazil, Eastern Europe, and Asia.

160. Analysts reacted to this news with shock. For example, analysts at KeyBanc Capital Markets cut price targets on FMC stock from $69 to $55, noting that "[w]hile normally a one-quarter inventory adjustment would not be such a shocking development, ***we are quite surprised to see a fresh inventory correction amid what should have been a recovery year***." Analysts at Wells Fargo similarly described it as a "***shock to the system***," and analysts at Morgan Stanley expressed surprise that "there is still FMC-specific elevated levels of inventory in some countries." Morgan Stanley further noted that while "[o]verall crop chemical markets remain challenging, [ ] the ***vast majority of our estimate reductions are FMC specific***." Analysts at Bank of America downgraded its rating on FMC stock from "Neutral" to "Underperform" and cut its price target from $61 to $48, further stating that "yesterday's earnings release highlighted additional broader and ***company-specific challenges*** which in our view ***raise FMC's risk profile substantially***, warranting our downgrade."

161. The same day, CFRA—who would later issue its detailed report analyzing FMC's Class Period financials (*supra* Section IV.F)—pointed out that the Company's disclosures revealed something more than simply poor performance, but in fact indicated that the Company may have engaged in "channel stuffing practices." On February 5, 2025, analysts at CFRA issued a research note in which CFRA stated: "***We think FMC poses significant risk to investors***." CFRA added that "***several indicators suggest a high likelihood of earnings manipulation***," and that the sharp rise in "accrued customer rebates and advance payments from customers as a percentage of sales" was "***consistent with 'channel stuffing' practices***."

162. On this news, FMC's stock price dropped $18.12 per share, or 33.5%, to close at $35.92 per share on February 5, 2025. FMC's investors thus lost over $2 billion in market capitalization in a single day.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

163. During the Class Period, Defendants FMC, Douglas, Sandifer, and Brondeau made materially false and misleading statements and omissions about Project Focus and the Company's related successful efforts to balance its channel inventory, achieve massive cost savings, and increase productivity to foster organic, sustainable growth. In reality, FMC had actively undermined these goals through practices of: (1) short-sighted and manipulative sales practices to push product into the market leading to inflated inventory levels that the Company had publicly committed to reducing (*supra* Section IV.E.1); (2) reconfiguring and delaying returns of unused product to avoid reporting returns (*supra* Section IV.E.2); (3) recording large sales to known high-risk and financially strapped customers (*supra* Section IV.E.3); and (4) pulling sales forward to achieve the Company's quarterly sales goals at the expense of later quarters (*supra* Section IV.E.4).[10]

### A. FMC Investor Day 2023 — November 16, 2023

164. On November 16, 2023, during trading hours, the Company held its FMC Investor Day 2023 during which the Company introduced strategic initiatives, some of which would later be included in what the Company called "Project Focus." During this Investor Day conference, Defendant Douglas outlined FMC's path forward and stated that ***"[w]e are maintaining or gaining market share at the grower level in all regions***, while continuing to see good traction for our new products. ***We fully expect the destocking reset is transitory and that the channel will begin to rebalance and ease back into somewhat more normal patterns as we enter mid-2024***."

[10] Throughout this section, false and misleading statements are identified with bolding and italics, and additional portions of each statement are provided for context.

165. On the same call, Defendant Sandifer provided additional details on FMC's restructuring program, stating:

> Well, Mark gave an overview of our restructuring program in his opening remarks. Let me share some additional details, given the importance of this program to our 2024 outlook. ***The restructuring program builds on a number of initiatives identified within our strategic plan, particularly with respect to two of our strategic imperatives, one, driving a competitive and resilient supply network***; and ***two, increasing operating leverage and optimizing functional costs***. We've chosen to accelerate these actions as part of the restructuring program in order to more quickly ***align FMC's cost structure to the current market realities***, ***while ensuring we remain positioned for long-term success***. Through this program, we'll reduce cost and complexity as well as improve speed and efficiency.

166. Defendant Sandifer added that the Company's focus would be on keeping inventory at "***lower targeted levels***," stating:

> ***Our focus this coming year will be on returning working capital to more normal levels. This means converting inventory to receivables by selling product on hand and then collecting those receivables***. ***This further means cautiously ramping up production to keep inventory at lower targeted levels, rebuilding payables in the process.***

167. Defendant Douglas' and Sandifer's statements in ¶¶164-66 were materially false and misleading at the time they were made. Indeed, rather than allowing the channel to "rebalance," FMC forced excess product into its own distribution channels through high-pressure and high-risk sales tactics which, as reported by FEs included: (1) offering to pay for storage, transportation, and insurance for customers in an effort to convince them to take on more product than needed or take product early, despite knowing those customers were fully stocked (*supra* ¶¶71-75); (2) fostering a policy to slow down or reconfigure returns to avoid reporting lost revenues (*supra* ¶¶102-05, 110, 116); (3) utilizing deep rebates and adjusted payment terms to entice wholesalers to take on more product than needed in light of interest rate increases (*supra* ¶¶70, 75-79, 94, 100); (4) pursuing and recording large sales with extended payment terms and rights of return while recording those sales for the present quarter (*supra* ¶¶77, 104-05, 107); (5)

continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC (*supra* ¶¶117-24); and (6) pulling forward sales to make quarterly sales numbers at the expense of future quarters (*supra* ¶¶125-28, 133-35). In addition, CFRA's analysis confirmed that FMC's Class Period practices were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See* Section IV.F, *supra*.

168. Moreover, Defendant Sandifer's statements in ¶¶165-66 touting FMC's strategy to, for example, "align FMC's cost structure to the current market realities" and "convert[] inventory to receivables" were materially false and misleading when made for the reasons stated above in ¶167. In addition, by electing to speak publicly about the Company's channel inventory levels, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the increasing channel inventory among the Company's distributors and customers due to, among other things, FMC's aggressive and manipulative sales practices to inflate sales revenue. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

169. Further, during the question-and-answer portion of FMC's Investor Day 2023 presentation, an analyst from Seaport Research Partners asked Defendant Douglas about his "view that channel inventory levels might be below normal now at least in some regions," asking: "What gives you that visibility? Are you doing anything differently now than you have earlier in the year? And if so, what gives you that?" Douglas responded:

> Yeah. Certainly ***when you think about where the industry is today, we're spending a lot more time talking to distribution, retail and where we have access to growers, talking to growers***. That's happening in Asia, it's happening in Europe, certainly happening in the US and Brazil. Ronaldo and I were just – we'd literally just come

> back from Brazil over the last few days. And we spent a lot of time with very large co-ops talking about where are your inventory levels now versus where you expected them to be and as you look forward? I do think there are certain places and Brazil will get to that point where we see pockets of people drawing their inventories down below normal. That's going to happen.
>
> There are some places where it won't be below normal. But I do think in the U.S., we certainly know that at the grower level and at retail, the inventory levels are way below normal. But at the distribution level, as we enter the season, they're high. ***So that material will flow through the channel. It's already starting to flow through the channel***. ***So we expect that to normalize pretty quickly***.

170. Defendant Douglas' statements in ¶169 that FMC expected the channel to "normalize pretty quickly" were materially false and misleading when made, for the reasons stated above in ¶167. In addition, by electing to speak publicly about the Company's channel inventory levels, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the increasing channel inventory among the Company's distributors and customers due to, among other things, FMC's aggressive and manipulative sales practices to inflate sales revenue. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

171. Analysts believed Defendants' statements about the normalization of its channel inventory. For example, one Morningstar report dated November 17, 2023 reported that "[w]e view FMC shares as materially undervalued," explaining that "[w]e think the market is overly focused on the near-term decline in FMC's profits due to industrywide inventory destocking." The report further elaborated that "we see a strong margin of safety in the current share price, with much of the bad news already priced in."

**B. Form 8-K — December 18, 2023**

172. On December 18, 2023, after the close of trading, FMC filed a Form 8-K describing the goals of its Project Focus cost restructuring and inventory balancing plan:

> In response to the unprecedented downturn in the global crop protection market that resulted in severe channel destocking, which has materially impacted volumes in 2023, the Company has initiated a global restructuring plan, which we refer to as "Project Focus." ***This program is designed to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity.*** The Company's objective for Project Focus is to deliver $50 to $75 million in contributions to adjusted EBITDA in 2024. The Company is further targeting annual run-rate savings of $150 million or more by the end of 2025 from the program once fully implemented.

173. Defendants' statements in ¶172 that through Project Focus, it was trying to "right-size our cost base and optimize our footprint" in order to "drive significant cost improvement and productivity," were materially false and misleading when made for the reasons stated above in ¶167. Indeed, while conveying these assurances to investors, the Company employed short-sighted and manipulative sales practices to push product into the market (*supra* Section IV.E.1), reconfigured and delayed returns on unused product to avoid reporting returns (*supra* Section IV.E.2), and pulled sales forward to make quarterly sales goals at the expense of future quarters (*supra* Section IV.E.4). Further, CFRA's analysis confirmed that FMC's Class Period practices were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See* Section IV.F, *supra*. In addition, by electing to speak publicly about the Company's channel inventory levels, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the increasing channel inventory among the Company's distributors and customers due to, among other things, FMC's aggressive and manipulative sales practices to inflate sales revenue. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

174. Analysts widely acknowledged Defendants' statements about FMC's Project Focus as a mechanism to drive profitable growth. As one CFRA report published on December 30, 2023 explained, "our hold rating is driven by projected global crop protection demand, offset by the

disclosed inventory reductions…we also view grower inventory depletion and stock-to-use ratios which sit lower vs. historical averages as a nice tailwind for FMC's top line." In another Equisights report published on January 1, 2024, analysts reported that "despite the challenges faced by FMC in the third quarter of 2023, including global supply chain disruptions and destocking activities, the company has demonstrated resilience and adaptability to navigate the market." Another Morningstar report published on January 9, 2024 stated that FMC shares "are materially undervalued as 2024 recovery and strong pipeline drive long-term growth."

**C. Fourth Quarter 2023 Financial Results — February 5-6, 2024**

175. On February 5, 2024, FMC issued a press release titled "FMC Corporation announces fourth quarter and full-year 2023 results within guidance ranges, provides 2024 outlook," in which the Company announced its results for Q4 and full year ended December 31, 2023 (the "Q4 2023 Press Release"). The Q4 2023 Press Release touted that FMC's "[n]ew products and branded diamides delivered ***strong results despite continued destocking***." Moreover, Defendant Douglas was quoted as stating that "***[d]uring the fourth quarter we observed continued channel destocking in all regions***, while drought in Brazil also amplified challenges in Latin America." The press release further stated that "[f]irst quarter revenue is expected to be in the range of $925 million to $1.075 billion, a 26% decrease at the midpoint compared to first quarter 2023 ***due to lower volume from destocking activity in all regions***."

176. Defendants' statements in ¶175 that the Company observed "continued destocking in all regions" and "destocking activity" were materially false and misleading when made for the reasons stated above in ¶167. Although FMC claimed to reap "strong results despite continued destocking," in truth, the Company employed short-sighted and manipulative sales practices to push product into the market (*supra* Section IV.E.1), and pulled sales forward to make quarterly sales goals at the expense of future quarters (*supra* Section IV.E.4). Further, CFRA's analysis

confirmed that FMC's Class Period practices were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See* Section IV.F, *supra*. In addition, by electing to speak publicly about the Company's channel inventory levels, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the increasing channel inventory among the Company's distributors and customers due to, among other things, FMC's aggressive and manipulative sales practices to inflate sales revenue. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

177. Analysts' reports following FMC's February 5, 2024 press release and its February 6, 2024 earnings call underscore the market's belief in Defendants' statements. For example, a Morningstar Equity Analyst Note published on February 6, 2024 reported that "as inventory destocking ends by midyear, we expect FMC will see markedly improved results by the end of the year." A Roth MKM report published on February 6, 2024 similarly explained that "as we exit 2024, concerns over inventory destocking in the channel and generic pricing will have abated and sentiment and valuation will be based on this more favorable long-term outlook."

### D. Bank of America Global Agriculture and Materials Conference — February 29, 2024

178. On February 29, 2024, during trading hours, the Company participated in the Bank of America Global Agriculture and Materials Conference. During the question-and-answer portion of the conference, an analyst asked Defendant Sandifer for "a bit of an update on how things are going" in Brazil, asking: "You're two months into the quarter, is it going better or worse than you thought? And what's your near-term outlook?" Sandifer responded that while "[w]e expected a challenging quarter," visibility was increasing and that was "the first step towards ***what we think***

***is coming around midyear, sometime in Q2, a real turn in the business***," adding "specifically what are we seeing? I think, one, ***sales through the first two quarter – two months of the quarter have been pretty much in line with our internal forecast***. That's the first time that's happened in three quarters."

179. Defendant Sandifer's statements in ¶178 that the Company's sales in the first two quarters "have been pretty much in line with our internal forecast" were materially false and misleading when made for the reasons stated above in ¶167. However, Sandifer failed to disclose that in truth, the Company employed short-sighted and manipulative sales practices to push product into the market (*supra* Section IV.E.1), reconfigured and delayed returns on unused product to avoid reporting returns (*supra* Section IV.E.2), and pulled sales forward to make quarterly sales goals at the expense of future quarters (*supra* Section IV.E.4). Further, CFRA's analysis confirmed that FMC's Class Period practices were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See* Section IV.F, *supra*. In addition, by electing to speak publicly about the Company's channel inventory levels, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the increasing channel inventory among the Company's distributors and customers due to, among other things, FMC's aggressive and manipulative sales practices to inflate sales revenue. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

180. Defendant Sandifer then continued to explain that FMC has a long supply chain that necessitated early, detailed conversations with distributors to plan production. However, according to Sandifer, these conversations stopped around June 2023. Sandifer then explained that

as distributors and retailers normalized their inventories, and the Company was back in dialogue with its customers, "***the distributors and retailers downstream of us start bringing their inventories back to more normal levels***."

181. Defendant Sandifer further noted that in Brazil, due to dry weather, sales fell short of the Company's expectations. However, despite this weakness, Sandifer represented that inventory was normalizing:

> But it does mean that we're – as we're looking ahead to the next growing season in Brazil starting in September, our expectations are the same, that ***we are clearing out the channel inventory***. It might still be a bit high in places or in specific products, but it's ***getting more normal such that when we get into the new selling season, the new growing season in Q3, we'll be starting from a more healthy base.***

182. Defendant Sandifer's statements in ¶¶180-81 that FMC's distributors and retailers were "bringing their inventories back to more normal levels" and that the Company was "clearing out the channel inventory" were materially false and misleading when made for the reasons stated above in ¶167. While FMC told investors that inventory was becoming "more normal," in truth, the Company employed short-sighted and manipulative sales practices to push product into the market (*supra* Section IV.E.1) and reconfigured and delayed returns of unused product to avoid reporting returns (*supra* Section IV.E.2). In addition, CFRA's analysis confirmed that FMC's Class Period practices were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See* Section IV.F, *supra*. Moreover, by electing to speak publicly about the Company's channel inventory levels, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the increasing channel inventory among the Company's distributors and customers due to, among other things, FMC's aggressive and manipulative sales practices to inflate sales revenue. In light of these undisclosed material facts,

Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

183. Later, during this same call, an analyst asked Defendant Sandifer to comment about pricing in the market, specifically in Brazil: "And besides demand and volume, how would you assess the outlook in Brazil for competition from generics? … Is that a factor that's looking greater than you had in the past, and why? And what about pricing?" Sandifer responded:

> So we have seen some pricing pressure in Brazil. That pricing pressure is less to do with generics, and more to do with inventory correction. We have not seen anything in the data for the products that we sell that suggests any increase in volumes of generic product coming into Brazil. We've not seen any real change in competitive activity with our more generic competitors other than a difference in approach***. We have been pretty disciplined about limiting price discounting and not pursuing volume in a weak demand environment***.

184. Defendant Sandifer's statements in ¶183 that the Company had been "pretty disciplined about limiting price discounting" were materially false and misleading when made for the reasons stated above in ¶167. While the Company told investors that it was "not pursuing volume in a weak demand environment," in reality, the Company employed short-sighted and manipulative sales practices to push product into the market (*supra* Section IV.E.1), reconfigured and delayed returns of unused product to avoid reporting returns (*supra* Section IV.E.2), recorded large sales to known high-risk and financially strapped customers (*supra* Section IV.E.3), and pulled sales forward to achieve the Company's quarterly sales goals at the expense of later quarters (*supra* Section IV.E.4). Indeed, CFRA's analysis confirmed that FMC's Class Period practices were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See* Section IV.F, *supra*. Moreover, by electing to speak publicly about the Company's channel inventory levels, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the increasing channel inventory among the Company's distributors and customers due

to, among other things, FMC's aggressive and manipulative sales practices to inflate sales revenue. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

185. Then, the analyst noted that "[t]here are a couple of fertilizer companies yesterday that were commenting on Brazil, specifically on – in the challenges of knowing how much is in inventory" and asked Defendant Sandifer, "[a]nd do you think that there's potential for that to improve or anything that you're trying to take on as different approach to give you more visibility?" Defendant Sandifer responded:

> Yeah. Look. I think this is an issue bigger than Brazil. I think our industry, unlike many other industries, if you think about consumer products, consumer electronics, where you literally have POS level data at retail flowing all the way back up the channel, ***we have a very opaque channel***. Our retailers and our distributors and back to us and just the fragmentation that we have in many markets make it very hard to have that kind of high visibility.

186. Defendant Sandifer's statement in ¶185 that FMC has a "very opaque channel" was materially false and misleading when made because, as acknowledged by the Company leading up to and during the Class Period, Defendants had visibility into the inventory levels of its distributors (*supra* ¶¶51-52). Moreover, by electing to speak publicly about the Company's visibility into channel inventory levels, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the increasing channel inventory among the Company's distributors and customers due to, among other things, FMC's aggressive and manipulative sales practices to inflate sales revenue. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

187. Following the conference, Defendants' statements had the desired effect. FMC's stock price increased $5.10 per share, or 9.94%, to a closing price of $56.39 per share on February

29, 2024. Moreover, Defendants' misstatements garnered analysts' attention. For instance, a CFRA report issued on March 2, 2024 recommended a "Hold" rating for FMC due to "projected global crop protection demand, ***offset by the disclosed inventory reductions***."

**E. First Quarter 2024 Financial Results — May 6-7, 2024**

188. On May 6, 2024, FMC issued a press release titled "FMC Corporation delivers first quarter earnings at higher end of guidance range, maintains full-year outlook." In this press release, FMC announced its results for the first quarter ended March 31, 2024. Defendant Douglas was quoted in the press release stating:

> Free cash flow improved significantly, and we delivered adjusted EBITDA at the high end of our guidance range during the first quarter. As expected, sales continued to be impacted by inventory management actions by customers in all regions. ***Our results benefitted from our restructuring actions and the continued resilient sales of our new products, particularly in Latin America***.
>
> ***Our second quarter revenue outlook includes volume growth for the first time since global destocking began in the second quarter of 2023***. We expect the market to continue to improve as we progress through the year and transition to more normal conditions in 2025. ***The combination of steady on-the-ground application, demand for our innovative and differentiated portfolio and a more efficient cost structure places FMC in a strong position as the market recovers.***

189. Defendant Douglas' statements in ¶188 that the Company had benefitted from restructuring actions and was experiencing "volume growth," "steady on-the-ground" application and "demand for [its] innovative and differentiated portfolio and a more efficient cost structure" were materially false and misleading when made for the reasons stated above in ¶167. Indeed, rather than seeing organic "volume growth," in truth, the Company saw volume grow only as the result of short-sighted and manipulative sales practices to push product into the market (*supra* Section IV.E.1), and pulled sales forward to make quarterly sales goals at the expense of future quarters (*supra* Section IV.E.4). Further, CFRA's analysis confirmed that FMC's Class Period practices were consistent with financial statement manipulation, stood "in stark contrast to industry

peers," and supported the "red flags indicative of 'channel stuffing.'" *See* Section IV.F, *supra*. In addition, by electing to speak publicly about the Company's channel inventory levels, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the increasing channel inventory among the Company's distributors and customers due to, among other things, FMC's aggressive and manipulative sales practices to inflate sales revenue. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

190. On the next day, May 7, 2024, before trading began, the Company hosted an earnings call for the first quarter of 2024 (the "Q1 2024 Call"). During the Q1 2024 Call, Defendant Douglas stated:

> ***Data from third parties as well as input from our commercial teams, shows that the inventory reduction actions in the channel are making good progress.*** On a regional basis, the pace of destocking is varied. We see North America furthest along with inventories at the retail and grower level back to normal, while distributors are still working to reduce their level of inventory.
>
> EMEA is in a similar condition, except in countries hit by unfavorable weather. ***In both these geographies, our customers are now targeting to operate with inventories at lower than normal levels.*** In Latin America, ***inventories are materially lower and are expected to trend towards more normal levels as we move through the rest of the year***. We expect India destocking to persist well into 2025, but parts of Asia, such as ASEAN and Pakistan, have made strong progress in destocking in Q1.

191. Defendant Douglas continued to discuss FMC's outlook in relation to inventory and market stabilization. Defendant Douglas stated:

> ***While these activities continue to run their course, we're encouraged by the first signs that customers are starting to return to historical order patterns***. In North America, we continue to receive orders for products that will be used early in the current season, which indicates that the inventories of such products have now been depleted. In Brazil, customers are now discussing next season's volumes, providing visibility that we did not have last year. Our full year outlook assumes that the market improves as the year progresses, but the customers will seek to hold lower levels of inventory.

192. Defendant Douglas' statements in ¶¶190-91, including such as that FMC's customers were "return[ing] to historical order patterns," were materially false and misleading when made for the reasons stated above in ¶167. Instead, Defendants were engaged in aggressive, short-sighted, high-risk sales and revenue practices that artificially inflated its sales and revenue data to pump-up short-term revenue and portray the image of healthy, organic growth, despite jeopardizing the Company's long-term growth and manipulating customer demand (*supra* Section IV.E.1). Further, FMC's contemporaneous inventory-related actions increased the level of unwanted inventory in the channel, exacerbating the channel stocking issues that FMC told investors it was resolving (*supra* Section IV.E). Indeed, CFRA's analysis confirmed that FMC's Class Period practices were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See* Section IV.F, *supra*. In addition, by electing to speak publicly about the Company's channel inventory levels, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the increasing channel inventory among the Company's distributors and customers due to, among other things, FMC's aggressive and manipulative sales practices to inflate sales revenue. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

193. During the question-and-answer portion of the Q1 2024 Call, an analyst asked Defendant Douglas about FMC's "internal inventory" and "where you are now versus where you would like inventories to be." In response, Defendant Douglas touted the success of the Company's sales and inventory reduction efforts, stating that "we peaked inventory basically around about August last year internally and ***we've been obviously on the track since we first came into this***

***channel destocking to really remove inventory as fast as we could*. *We're getting close to the point.*** We're not quite there yet. ***We're getting close to the point where at the macro level for our inventory we're going to be pretty much where we want to be***." Douglas added: "***I would say by the time we get through Q2 and into Q3, we're going to be in pretty good shape in terms of where our revenue is reset this year versus where the inventory needs to be***."

194. Also during the question-and-answer portion of the Q1 2024 Call, an analyst asked Defendant Douglas about volume growth following destocking:

> Q: Edlain Rodriguez, Mizuho Securities: As inventory destocking comes to an end and as you get into 2025, like, how do you see volume grow for the portfolio in 2025 and 2026?
>
> A: Douglas: Yeah. Listen, as we go through 2025, I think we've said that we expect what we would consider a more normal type of growth for the marketplace. Acres continue to grow, certainly, in Latin America and Brazil, so we expect that to be a driver. And don't forget, ***at that point, people will be then resetting from a lower level of inventory. So, you would expect more of a normal market growth***. Typical market like this grows at anywhere from 2% to 3% per annum, and we generally speaking with our differentiated portfolio, outgrow the market in the long haul.
>
> So, I think it's more about a normalized market. ***Demand on the ground, as we said, even in these conditions, is very good, we expect that to continue***. ***As pressure continues to change, so we see that market piece as being pretty robust***. Obviously, our NPIs are growing rapidly, so we would expect 2025 and 2026 to be actually faster than the growth we see in 2024.
>
> And then, the other piece of which is not really market driven, but just a view of 2025, we have a lot of cost headwinds flowing against us right now that are obviously depressing our EBITDA and our EBITDA margin. ***Those turn into tailwinds as we go into next year and I think it's an important facet as we walk through the next couple of earnings calls, as we build out the picture of what 2025 is going to look like, you certainly have got a more stable, more robust external market***. But we also have some pretty significant tailwinds in the sense of how we think about our P&L.

195. During the same call, an analyst asked Defendant Sandifer about whether the market should expect FMC's cash flow to "be more back half weighted in 2024." Sandifer

responded affirmatively, stating that "essentially all of the positive free cash flow for the year is going to come in the second half." Sandifer continued, explaining:

> ***What we are carefully balancing is continuing to bring down our absolute level of inventory while selling through at the higher rate we're expecting to sell in the second half new production***. So, it will be a staggered step as we go through the rest of the year to bring payables back up to a more reasonable level and to get inventory again a couple hundred million less than where we are today. So, there'll be the combination of those two and it really will take through the full second half to get the cash benefit from those actions.

196. Defendant Douglas's and Defendant Sandifer's statements in ¶¶193-95 regarding normalizing inventory and market growth were materially false and misleading when made for the reasons stated above in ¶167. Indeed, by electing to speak publicly about the Company's channel inventory levels, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the increasing channel inventory among the Company's distributors and customers due to, among other things, FMC's aggressive and manipulative sales practices to inflate sales revenue. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

197. Later in the call, another analyst posed a question to Defendant Sandifer about FMC's receivables, asking him: "[y]ou talked a lot about getting inventories down and payables and working with those. I was just wondering what's in terms of receivables, if they're where – you're comfortable where they are? Is that something that's to be worked on as well?" Sandifer responded that "Yeah, ***I think we're comfortable with receivables***." Sandifer continued, stating: "***we have been managing very carefully our balance sheet and I think if you look at how we've chosen to manage through this correction period as opposed to some of our peers, we have been disciplined about pricing and about not chasing volume that wasn't there, so as not to build up***

***receivables and longer term collection risk***." Sandifer downplayed there being any concerning risks to the collection of the Company's receivables, noting that while "there's always collection risk, . . . ***we are in a very good position***." He went on to say that: "[w]e understand what our risks are, we understand – ***we've taken some lumps by, again, not pursuing extra volume when there really wasn't volume in the market to be had***. And instead, working through this so that we can comment to ***what will be an upturn here in the second half and into 2025 with a strong balance sheet with healthy receivables***."

198. Also on May 7, 2024, during the trading day, the Company filed with the SEC a Form 10-Q reporting the Company's financial results for the first quarter of 2024 (the "Q1 2024 10-Q"). In the Q1 2024 10-Q, the Company stated: "We expect 2024 free cash flow (Non-GAAP) to fall within a range of approximately $400 million to $600 million. At the mid-point of the range, ***there is a significant increase year over year driven largely by the rebuilding of payables and lower inventory***."

199. Defendant Douglas's and Defendant Sandifer's statements detailed in ¶¶197-98, including that FMC has "been disciplined about pricing and about not chasing volume" and about the Company's efforts to "not build up receivables and longer-term collection risk" while rebuilding payables were materially false and misleading when made for the reasons stated above in ¶167. Specifically, Defendants were engaged in aggressive, short-sighted, high-risk sales and revenue practices that artificially inflated its sales and revenue data to pump-up short-term revenue and portray the image of healthy, organic growth, despite jeopardizing the Company's long-term growth and manipulating customer demand (*supra* Section IV.E.1). Further, FMC leadership recorded large sales to companies FMC knew were exhibiting signs of financial distress, creating the "longer-term collection risk" the Company told investors it sought to avoid (*supra* Section

IV.E.3). Further, CFRA's analysis confirmed that FMC's Class Period practices were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See* Section IV.F, *supra*. In addition, by electing to speak publicly about the Company's channel inventory levels, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the increasing channel inventory among the Company's distributors and customers due to, among other things, FMC's aggressive and manipulative sales practices to inflate sales revenue. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

200. Defendants' false and misleading statements again artificially inflated FMC's stock price. Indeed, after Defendants assured investors that its customers were "return[ing] to historical order patterns" and that Project Focus would "right-size our cost base and optimize our footprint and organization structure with a focus on driving significant cost improvement and productivity," FMC stock price increased $5.77 per share, or 9.46%, to a closing price of $66.75.

201. Moreover, analysts widely acknowledged Defendants' false and misleading statements from FMC's Q1 2024 earnings call. As exemplified by a Wolfe Research report published on May 8, 2024, analysts "attribute[d] FMC's +9% reaction to constructive commentary on America's destocking activity." The Wolfe Research Report further noted that "[r]ising payables and inventory reduction are keeping FMC on pace to reach FCF [Free Cash Flow] targets." Similarly, a Goldman Sachs Equity Research report published on May 7, 2024 reported that "FMC shares outperformed the market on Tuesday . . . mainly on the back of a 1Q EBITDA beat and ***management commentary that remained pointed to an end to destocking activity in NA*** and a reiterated full-year EBITDA outlook."

### F. BMO Global Farm to Market Conference — May 15, 2024

202. On May 15, 2024, the Company participated in the BMO Global Farm to Market Conference. In the opening remarks, Defendant Douglas made the following statements about FMC's channel inventory levels:

> I think many of you are aware of all the issues we've had coming out of COVID with supply chains, with destocking. That's something that's on everybody's mind. Certainly is on Andrew and I's – with my mind, I think ***as we go through the rest of this year and as we certainly go into 2025, you're going to start to see a more normalization***. It's not going to be smooth. It's going to be bumpy. ***But we're getting to the end of this destocking period, and I think that's an important facet for investors to recognize that supply chains can't empty forever and they have to replenish***. That's the phase we're in now. ***We call it a transition this year. I think that's an apt description***.

203. Defendant Douglas's statements in ¶202 that channel inventory would be "normaliz[ing]" over the course of 2024 into 2025 were materially false and misleading when made for the reasons stated above in ¶167. Contrary to normalizing inventory levels, in truth, the Company employed short-sighted and manipulative sales practices to push product into the market (*supra* Section IV.E.1), reconfigured and delayed returns on unused product to avoid reporting returns (*supra* Section IV.E.2), and pulled sales forward to make quarterly sales goals at the expense of future quarters (*supra* Section IV.E.4). Further, CFRA's analysis confirmed that FMC's Class Period practices were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See* Section IV.F, *supra*. In addition, by electing to speak publicly about the Company's channel inventory levels, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the increasing channel inventory among the Company's distributors and customers due to, among other things, FMC's aggressive and manipulative sales practices to inflate sales revenue. In light of these undisclosed material facts,

Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

### G. Wells Fargo Industrials Conference — June 11, 2024

204. On June 11, 2024, after trading began for the day, the Company participated in the Wells Fargo Industrials Conference. In the opening remarks, Defendant Sandifer made the following statements about FMC's channel inventory levels:

> The demand for them can be fickle and hard to predict. When bugs show up in your field, you need an insecticide today. Not two weeks from now, not five weeks from now, you need it today. ***So we are seeing these things rebalance.*** The timing and the magnitude of that rebalancing $324 million is a bit, it is a complicated issue we're working through. ***But I think fundamentals here, the in market demand is still strong as the channel inventory corrects. And we get more in sync the flow from manufacturers through the distribution channel into the grower hands, we will see a rebalancing and a rebasing of the business***.

205. During the question-and-answer portion of the conference, an analyst asked Defendant Sandifer about channel inventory levels:

> Q: Richard Garchitorena, Wells Fargo Capital Markets: So as we enter 2025, the expectation of that inventories at that point should be at a place where [indiscernible]?
>
> A: Defendant Sandifer: Yeah, I think as we move into 2025, look I'm very careful about using the word normal because we've been through a period in the last five years. And I think anybody who tries to define normal at this point to fool's game. ***What we are seeing is improving conditions. We are seeing channel inventories reduced. We will see a rebalancing and resyncing of pull-through by growers from all the way back up the channel back to manufacturers, where that's been broken in the past 4 quarters as that channel – the inventory that built up in between needed to be drawn down***.

206. Defendant Sandifer's statements in ¶¶204-05 that the Company is seeing channel inventory "rebalance," "correct" and "reduced," were materially false and misleading when made for the reasons stated above in ¶167. Contrary to rebalancing inventory levels, in truth, the Company employed short-sighted and manipulative sales practices to push product into the market (*supra* Section IV.E.1), reconfigured and delayed returns on unused product to avoid reporting

returns (*supra* Section IV.E.2), and pulled sales forward to make quarterly sales goals at the expense of future quarters (*supra* Section IV.E.4). Further, CFRA's analysis confirmed that FMC's Class Period practices were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See* Section IV.F, *supra*. In addition, by electing to speak publicly about the Company's channel inventory levels, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the increasing channel inventory among the Company's distributors and customers due to, among other things, FMC's aggressive and manipulative sales practices to inflate sales revenue. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

207. Again, analysts acknowledged the Defendants' statements. For example, one Morningstar report published on June 12, 2024 explained that "[o]ur thesis on FMC has been that the inventory destocking that began in the second quarter of 2023 and led to revenue and profit declines would prove temporary. We expect the company's second-quarter results ***will improve as inventory destocking was largely completed in most of the company's geographies*** and the destocking in Brazil begins to wind down." Similarly, a Seaport Research Partners report issued on June 14, 2024 noted that "[l]ower volumes would have the effect of prolonging FMC's headwinds ***associated with elevated channel inventories, which we still think are progressing toward more normal levels***."

### H. Second Quarter 2024 Financial Results — July 31, 2024 and August 1, 2024

208. On July 31, 2024, FMC issued a press release titled "FMC Corporation announces second quarter earnings at higher end of guidance range; updates full-year outlook," in which Defendants announced FMC's financial results for the second quarter ended June 30, 2024 (the

"Q2 2024 Press Release"). In the press release, new CEO Defendant Brondeau was quoted as stating: "***[d]emand improved during the second quarter***, resulting in a pronounced increase in our sales volumes, most notably within the United States and Brazil, ***despite customers continuing to actively manage inventory***." Brondeau further stated: "***We expect demand to increase as the year progresses even as customers maintain a careful approach of managing inventory***."

209. Defendant Brondeau's statements in ¶¶208 that customers were "continuing to actively manage inventory" and that the Company nonetheless "expect[ed] demand to increase" over 2024 were materially false and misleading when made for the reasons stated above in ¶167. While the Company touted improving demand, in truth, the Company employed short-sighted and manipulative sales practices to push product into the market (*supra* Section IV.E.1), reconfigured and delayed returns on unused product to avoid reporting returns (*supra* Section IV.E.2), and pulled sales forward to make quarterly sales goals at the expense of future quarters (*supra* Section IV.E.4). Further, CFRA's analysis confirmed that FMC's Class Period practices were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See* Section IV.F, *supra*. In addition, by electing to speak publicly about the Company's channel inventory levels and the impact on demand for its products, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the increasing channel inventory among the Company's distributors and customers due to, among other things, FMC's aggressive and manipulative sales practices to inflate sales revenue. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

210. The next day, on August 1, 2024, before trading began, the Company hosted an earnings call for the second quarter of 2024 (the "Q2 2024 Call"). During the Q2 2024 Call, Defendant Brondeau stated: "***[w]e expect continued growth in Q3 and Q4 from demand recovery led by the Americas, where we expect channel inventory to approach normal levels by year-end***." Defendant Brondeau further stated:

> We delivered a solid Q2, helped by a successful execution of our restructuring program. ***We expect continued growth in Q3 and Q4 from demand recovery led by the Americas, where we expect channel inventory to approach normal levels by year-end.***
>
> Q2 through Q4 also ***show higher revenue driven by volume*** with the rate of growth accelerating in Q4 as we shift into the next crop season. ***The markets have begun to recover as channel inventories are starting to normalize, even if not as fast as we had previously expected.***

211. Defendant Brondeau's statements in ¶210 that FMC's channel inventory would approach "normal levels" and were "starting to normalize" were materially false and misleading when made for the reasons stated above in ¶167. In addition, by electing to speak publicly about the Company's channel inventory levels and the impact on demand for its products, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the increasing channel inventory among the Company's distributors and customers due to, among other things, FMC's aggressive and manipulative sales practices to inflate sales revenue. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

212. Defendants' false and misleading statements had the desired effect. FMC's share price increased $5.98 per share, or 10.25%, to a closing price of $64.34 per share on August 1, 2024. Moreover, analysts incorporated Defendants' statements about "demand recovery" and about channel inventory approaching "normal levels" into their reports. For example, one August 2, 2024 Wells Fargo report noted that one upside risk to its price target was a "sooner-than-

expected demand recovery." The Equity report further expected a strong Q4 recovery because ***"[m]anagement notes they have done extensive channel checks and are highly confident in achieving the guide***." Furthermore, a Jefferies report published on August 2, 2024 explained that "normalized inventory level, new products and cost-cutting benefits will likely bolster sales." Finally, a CFRA report published on August 1, 2024 explained "[w]e believe that demand is recovering, as evidenced by volume growth across multiple regions during the quarter."

### I. Third Quarter 2024 Financial Results — October 29-30, 2024

213. On October 29, 2024, FMC issued a press release titled "FMC Corporation reports strong growth in third quarter, confirms full-year outlook adjusted for expected sale of GSS business," in which Defendants announced the Company's results for the third fiscal quarter ended September 30, 2024 (the "Q3 2024 Press Release"). In the Q3 2024 Press Release, FMC "report[ed] strong growth in third quarter [2024]" and stated: "***[r]evenue growth in the quarter of 9 percent was driven by a 17 percent increase in volume***, with some North America second half orders occurring earlier than expected ***due to improved channel inventory levels***." Defendant Brondeau was also quoted in this press release as saying: "***[s]trong volume growth in Latin America and North America*** more than offset lower pricing, particularly in Brazil and Argentina which accounted for two-thirds of the total company price decline." Further, the Q3 2024 Press Release stated:

> Price was lower by 5 percent, driven primarily by Latin America due to challenging market conditions in Brazil and Argentina including delayed rains and elevated channel inventory. ***In addition, the bankruptcy of a large customer led FMC to offer additional incentives to replace lost volumes and maintain market share***.

214. Then, on October 30, 2024, before the market opened, the Company hosted an earnings call for the third quarter of 2024 (the "Q3 2024 Call"). Defendant Brondeau began the Q3 2024 Call by addressing the Company's quarterly results. Brondeau noted that the Company

"reported strong third quarter with growth at the top and bottom line," while noting that the Company "***operated in a weaker-than expected market landscape in Latin America***." Specifically, Brondeau explained, however, that while "***Latin America faced some unanticipated challenges this quarter, [] we still delivered growth***." Brondeau then commented on the bankruptcy referenced in the press release, stating that "***[m]arkets in Brazil and Argentina were more challenging than expected due to the delayed rains and increased borrowing rates***" and that "***[t]he bankruptcy of a large customer in Brazil added specific challenges for FMC. Given that we believe we're only a couple of quarters away from a more normal market situation, we decided to take pricing actions to maintain our market position***."

215. During the Q3 2024 Call, Defendant Brondeau further stated:

> Looking ahead, ***a view on the timeline of channel inventory recoveries is relatively unchanged from what we communicated during our August earnings call***. The US and most countries in Europe are normalizing the fastest and Latin America is expected to be much improved in the second quarter of 2025. Asia markets are still expected to be challenging in 2025, with no recovery expected until 2026 as India continues to work through excess channel inventory.
>
> ***On a cost basis, we are accelerating the delivery of savings and increasing our targets***. We are now targeting cost benefits from restructuring of $125 million to $150 million to be reflected in the P&L in 2024, with greater than $225 million of gross run rate in 2025. To accomplish this, we are accelerating restructuring, taking new critical initiative to realign our manufacturing footprint and using attrition as a key tool to drive further savings.

216. Defendants' statements in ¶¶213-15 that FMC was experiencing "strong volume growth" were materially false and misleading when made for the reasons stated above in ¶167. While the Company touted improving and "unchanged" inventory levels and growth, in truth, the Company employed short-sighted and manipulative sales practices to push product into the market (*supra* Section IV.E.1), reconfigured and delayed returns on unused product to avoid reporting returns (*supra* Section IV.E.2), recorded large sales to known high-risk and financially strapped customers (*supra* Section IV.E.3), and pulled sales forward to make quarterly sales goals at the

expense of future quarters (*supra* Section IV.E.4). Further, CFRA's analysis confirmed that FMC's Class Period practices were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See* Section IV.F, *supra*. In addition, by electing to speak publicly about the Company's channel inventory levels and the impact on demand for its products, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the increasing channel inventory among the Company's distributors and customers due to, among other things, FMC's aggressive and manipulative sales practices to inflate sales revenue. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

217. Further, FMC's statement in ¶¶213-14 regarding the "bankruptcy of a large customer" refers to AgroGalaxy, a leading Brazilian distributor of agricultural products that filed for the Brazilian equivalent of Chapter 11 bankruptcy protection in September 2024. The statements concerning the bankruptcy were materially misleading when made because Defendants failed to disclose that the Agrogalaxy bankruptcy, known by them to be likely for many months, it did not simply leave yet recorded large sales to known high-risk and financially strapped customers (*supra* [x]), including AgroGalaxy, but as described by FE-2 and FE-3, at the direction of the Commercial and Finance Teams, FMC signed and recorded as revenue high-risk sales with Agrogalaxy in Q4 2023 for which no payment was made. Although payment for that deal was due in approximately October or November 2024, according to FE-2, no payment was ever made by Agrogalaxy and, by the time he left FMC in October 2024, no product had been returned. That Q4 2023 sale to Agrogalaxy totaled $50 million, which was equal to 4.3% of FMC's Q4 2023 reported revenues.

218. Also on the Q3 2024 Call, Defendant Brondeau stated: "let's review the company's third quarter performance in more detail. Slide 3 through 5 provide an overview of our third quarter results. ***Sales growth of 9% was above the midpoint of the guidance range, with organic sales growth of 12%. Volume grew by 17%, led by Brazil and the US***." Brondeau continued, stating: "***Latin America sales grew 8% with 15% growth***, ***excluding currency***." Brondeau attributed the LatAm sales growth to higher sales volume "mainly in Brazil," stating: "***Sales were higher across all product categories due to volume growth versus the prior-year period, mainly in Brazil more than offset lower pricing and FX tailwinds***."

219. On the same call, in response to an analyst question regarding diamides sales volumes, Defendant Brondeau stated "I almost have one certainty is that Cyazypyr will be doing very well in 2025. It's a product – it's a good product. ***We have a very, very strong demand. There is very little competition***."

220. And in response to another analyst question regarding diamide volumes and prices in Asia, Defendant Brondeau stated:

> So, right now, what is happening to the market, to a diamide market right now, okay, and it's difficult because we are combining a situation where we have two countries which are accepting illegal sales of product below production cost in the middle of a downturn. So, it's not a very normal situation. But today, ***overall, our diamide are growing, driven by very strong demand of Cyazypyr.*** I think when we talk diamides, we have to separate Cyazypyr from Rynaxypyr. One-third is Cyazypyr, two-third is Rynaxypyr. ***Cyazypyr is growing very fast. Rynaxypyr is because, and mostly because of Asia, has a negative growth in the low-single digit globally, driven by Asia.***
>
> So, think about it, overall growing positively, but at the same time, I think ***our overall market for diamide globally is up 10%***. It's driven by Cyazypyr being up in the 50% to 60% and Rynaxypyr down in the mid-single digits driven by Asia. That's what is happening today to the overall diamide portfolio.

221. Defendant Brondeau's statements in ¶¶218-20 that FMC's sales were "higher across all product categories" due to volume growth and that the Company saw strong demand and

growth for its products were materially false and misleading when made for the reasons stated above in ¶167. Indeed, FMC's purported growth and increased sales was not "driven by strong demand" for its products, but rather because the Company employed short-sighted and manipulative sales practices to push product into the market (*supra* Section IV.E.1), reconfigured and delayed returns of unused product to avoid reporting returns (*supra* Section IV.E.2), recorded large sales to known high-risk and financially strapped customers (*supra* Section IV.E.3), and pulled sales forward to achieve the Company's quarterly sales goals at the expense of later quarters (*supra* Section IV.E.4). Indeed, CFRA's analysis confirmed that FMC's Class Period practices were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See* Section IV.F, *supra*. Moreover, by electing to speak publicly about the Company's channel inventory levels and demand and growth for FMC's products, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the increasing channel inventory among the Company's distributors and customers due to, among other things, FMC's aggressive and manipulative sales practices to inflate sales revenue. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

222. Defendants' false and misleading statements again artificially inflated FMC's stock price. Indeed, on October 30, 2024, FMC's stock price increased $6.44 per share, or 10.7%, to a closing price of $66.62. Analysts again widely acknowledged Defendants' statements in the Company's Q3 earnings call. RBC Equity Research, for example, noted that "[s]tronger performance in North America was heavily driven by diamide sales, and some distributors shifting Q4 purchases to Q3 in response to lower channel inventories." RBC also noted that "FMC's view

on the timeline of channel inventory recovery remains unchanged." Bank of America Global Research also reported on October 31, 2024 that "global channel destocking appears to have flipped to restocking."

### J. Goldman Sachs Industrials and Materials Conference — December 4, 2024

223. On December 4, 2024, the Company participated in the Goldman Sachs Industrials and Materials Conference. During the question-and-answer portion of the conference, an analyst asked Defendant Brondeau about channel inventory:

> Q: Unidentified speaker: [w]hen you look at kind of the high watermark for that inventory and where you think you're at today with your products through the chain, how would you categorize the delta? Are you where you want to be all the way through the chain, or do you think there's still some more inventory to come out?
>
> A: Defendant Brondeau: I think it's very region dependent. ***We are pretty comfortable with North America and Europe. Things are happening well in Latin America and Brazil, Argentina, where we see product going through the channel with the season, which is turning out despite the delay in rain, pretty good. So we believe Latin America will get by a normalized channel toward the second quarter.***

224. Defendant Brondeau's statements in ¶223 that "[t]hings are happening well in Latin America and Brazil, Argentina," and that "product [is] going through the channel with the season" such that "Latin America will get by a normalized channel toward the second quarter" were each materially false and misleading when made for the reasons stated above in ¶167. While conveying these assurances to investors, Defendants employed short-sighted and manipulative sales practices to push product into the market (*supra* Section IV.E.1), reconfigured and delayed returns of unused product to avoid reporting returns (*supra* Section IV.E.2), recorded large sales to known high-risk and financially strapped customers (*supra* Section IV.E.3), and pulled sales forward to achieve the Company's quarterly sales goals at the expense of later quarters (*supra* Section IV.E.4). Indeed, CFRA's analysis confirmed that FMC's Class Period practices were consistent with financial

statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See* Section IV.F, *supra*. Moreover, by electing to speak publicly about the Company's channel inventory levels, Defendants put these subjects in play, triggering a duty to fully, completely, and accurately disclose all material facts regarding the increasing channel inventory among the Company's distributors and customers due to, among other things, FMC's aggressive and manipulative sales practices to inflate sales revenue. In light of these undisclosed material facts, Defendants' public statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

225. Several analyst reports underscore how Defendants' statements regarding normalization of channel inventory levels were widely received and acknowledged. For example, a KeyBanc Capital Markets report issued on January 1, 2025 reported that the Company "expect[s] destocking in LATAM to be over by mid-2025, resulting in strong volumes in 2025."

## VII. SUMMARY OF SCIENTER ALLEGATIONS

226. At all relevant times, Defendants acted with scienter. During the Class Period, FMC and the Individual Defendants fostered a pervasive culture of increasing sales targets, booking high-risk sales, and forcing product into the channel at all costs—including adding costs to FMC's own business when these practices ultimately came back to impair the Company's ability to book sales by the end of 2024 and in 2025 guidance. *See supra* ¶¶155-59. As set forth below, the Individual Defendants and FMC knew or recklessly disregarded the truth about these practices, the risks associated with those practices, and the impact of these practices on the Company's channel inventory throughout the Class Period. FMC possesses the scienter of its management-level employees, including each of the Individual Defendants. When viewed holistically, these facts support a strong inference of scienter.

227. ***First***, Defendants and senior management were aware of the Company's manipulative sales practices. As described in detail above, key senior management who reported directly to the Individual Defendants knew about and approved FMC's aggressive "rebates over rebates," booking of long-term sales agreements as short term, heavy discounting, and other incentives offered to customers to further get them to take on more product than needed, perpetuating and worsening FMC's unsustainable inventory buildup that harmed the Company and caused revenue losses and lowered guidance at the end of the Class Period. *See* Section IV.E.1, *supra*.

228. Further, senior management knew of the impact of these aggressive tactics on sales. For example, the Company's CFO for Latin America and the Americas, Mills, was responsible for financial reporting and financial analysis, and participated in meetings with the Commercial Team at least once a quarter in which he demanded results from the Brazil Country Manager, who reported to Head of Americas Pereira. Pereira was similarly responsible for pressure on "high management," demanding that they had to make "sales, sales, sales." FE-2 confirmed that pressure to increase sales very much increased in 2023 and 2024 (during the Class Period). *See supra*, ¶¶80-81. Senior executives also signed large deals with companies with no immediate payment requirement when those companies were known to be in financial distress, and who soon thereafter filed for bankruptcy, posing a direct and unreasonable threat to FMC's ability to ever receive payment on those deals. *See supra*, ¶¶117-24.

229. ***Second***, Defendants and senior management were similarly aware of FMC's existing inventory levels but continued to push aggressive sales targets and manipulated and slowed or prevented returns of unneeded product to avoid a negative impact on revenue. For example, FE-2 described how in 2023, the existing inventory levels in Brazil were valued at

approximately $1 billion, meaning that $1 billion of unused inventory was already out in the market, and this information was reported to Pereira. These inventory issues were prevalent in FMC's other markets. For example, FE-9 (who was responsible for Austria, Germany, and Switzerland) recalled weekly meetings to discuss progress and "we [the European market] raised the red flag" that sales were going to be difficult and that inventory levels were too high. In response, however, FE-9's direct supervisor, Pons, who reported directly to the CEO, received messaging from leadership that they "recognized" the difficulty that teams in Europe were facing and to "be creative" and to continue to "push" sales.

230. This sentiment of pushing sales at all costs was entrenched in the Company's Philadelphia headquarters, where FE-9 recalled that leadership wanted to hear more about opportunities for increasing sales and less about possible risks. In fact, FE-10 understood that in strategy meetings among all regional leadership and former CEO Defendant Douglas and, later, current CEO Defendant Brondeau, and current President Pereira, forecasted projections brought forth by European and other leaders were ignored in favor of higher, less obtainable forecasts produced for reporting purposes. In light of its rising inventory, FMC sought to avoid or slow returns of unneeded inventory and even provided its Commercial Team with incentives to find alternatives to returns. *See supra*, ¶¶90, 97, 105.

231. According to FEs, senior management was well aware of the constantly and increasingly elevated inventory levels caused by a plethora of manipulative sales practices, and in fact ignored concerns from regional leaders who received monthly inventory reports on "slow-moving inventory." *See supra*, ¶¶98-99. Specifically, FE-2 explained that CFO William Mills, former Business Director FMC Brazil Sinara Giombelli Ferreira, Brazil's Commercial Director Bruno Pereira Lopes Giudicissi, and current Business Finance Associate Director Fabiana

Coimbra, who reported directly to Mills, all attended and participated in direct negotiations with distributors regarding right to return agreements, which FE-2 also attended. Further, FE-1 confirmed that FMC's practice of pushing customers to take on additional product increased under Douglas after he became CEO in 2020, as Douglas was more aggressive in his pursuit of sales goals. In fact, FE-1 recalled there were "many" more meetings occurring under Douglas to discuss sales than under his predecessor. *See supra*, ¶¶71, 108.

232. Further evidence of senior management's knowledge and endorsement of these manipulative sales and revenue recognition practices is evidenced by former employee accounts describing how senior management instructed certain deals to remain undocumented. For example, according to FE-2, Pereira and Mills knew to be careful not to mention certain deals in writing, and further explained that former CEO Defendant Douglas would have been aware of these deals due to his very close relationships with Pereira and Mills. FE-3 confirmed FE-2's account of how sales representatives were instructed not to put deals with improper customer incentives in writing. Faria, FE-3's direct supervisor, instructed FE-3 to not put anything in writing and to only verbally agree to these conditions, noting specifically that Faria instructed him to tell customers that in exchange for not returning product, FMC would pay the associated taxes and storage costs related to that product. Rather than write down terms and to avoid a written record, according to FE-3, Sales Representatives would tell clients: "Trust me, I always deliver what I promise."

233. ***Third***, Defendants' inventory channel was a significant focus for the Company, and Defendants spoke of it frequently on earnings calls throughout the Class Period. For example, on the very first day of the Class Period, Defendant Douglas responded to an analyst question about channel inventory in which he admitted to personally visiting Brazil alongside Pereira during which they "***spent a lot of time with very large co-ops talking about where are your inventory***

***levels now*** versus where you expected them to be." In fact, with respect to Brazil, FMC was keenly involved in inventory management there. *See supra*, ¶¶51-52. Further, throughout the Class Period, Defendants made repeated statements about their focus on inventory. For example, Defendants assured investors that the channel inventory was "rebalancing" and "normalizing," and that FMC was "clearing out the channel inventory." By FMC's Q1 2024 Earnings Call, Defendant Douglas told investors that "inventory reduction actions in the channel are making good progress," and later, Defendant Sandifer told investors that the Company was "continuing to bring down our absolute level of inventory" while FMC touted "improved inventory levels." Further, analysts were sharply focused on FMC's channel inventory levels—on nearly every earnings call or presentation in which the Company participated during the Class Period, the Company fielded analyst questions about the Company's channel inventory.

234. ***Fourth***, the LATAM market and diamide revenues were critical to FMC's revenue. In 2023, diamide sales were $1.8 billion, and in 2024, FMC's leading diamide brands—Rynaxypyr and Cyazypyr—accounted for 75% of the Company's diamide sales. Indeed, leading up to the Class Period, Defendant Sandifer told investors that "with good cause, ***there's a lot of focus on the diamide portfolio at FMC*** and there should be, ***it's a little more than a third of our total sales***, and it's more than that of our profit. It's been a big driver of our success." Additionally, throughout the Class Period, Latin America was the Company's largest market, generating 33% of total revenues—the largest of any one geographic region. Given the importance of diamides and the importance of the LATAM market, particularly Brazil, to FMC, it is implausible that Defendants were not aware of FMC's channel inventory and manipulative sales tactics impacting those products and regions.

235. ***Fifth***, each of the previously discussed false and misleading statements, *see supra* Section VI, concern "core matters" of central importance to FMC, and thus Plaintiffs have also established scienter by way of the core operations inference. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 268 (3d Cir. 2009). The announcement of Project Focus itself justifies this inference, as these matters—sales, company growth, and channel inventory—were so core to FMC's business that it unveiled a Company-wide strategic restructuring plan to focus on these issues and reported on Project Focus' progress in all of its public filings after its announcement, as endorsed by the Individual Defendants in their accompanying SOX certifications.[11] Moreover, Defendants' failure to disclose the issues affecting sales of Rynaxypyr products implicated a "core matter" of central importance to FMC, given that sales of Rynaxypyr products made up nearly half of the Company's revenues leading up to and during the Class Period, *supra* ¶48.

236. ***Sixth***, as FMC's senior-most officers, the Individual Defendants exercised control over and were responsible for the material misstatements and omissions alleged in Section VI, by virtue of their positions within the Company. Accordingly, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse, undisclosed facts alleged herein had not been disclosed to the public, such that the representations made to investors were materially false and misleading, or omitted facts necessary to render those statements not misleading.

237. ***Seventh***, halfway through 2024—and while FMC's ongoing sales and inventory issues mounted—Defendant Douglas abruptly resigned as President and Chief Executive Officer, effective immediately. Defendant Brondeau, who had previously served as the Company's CEO until his retirement in 2020, took over as CEO, and Pereira was appointed as President of FMC.

[11] "SOX Certifications" are made pursuant to the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241, by which senior management certify the accuracy and completeness of a company's financial statements.

FMC explained that these selections were based in part on Brondeau's "track record of delivering strong, consistent earnings performance" and Pereira's "successful track record of building and growing our business throughout Latin America and North America," respectively. FMC further explained that the leadership change at FMC was driven at least in part by the need to "aggressively drive profitable growth this year while continuing to execute on our longer-term growth strategy."

238. The facts set forth above, when viewed holistically and together with the other allegations in this Complaint, support a strong and compelling inference that each of the Defendants knew or were severely reckless in not knowing that each of the misrepresentations and omissions alleged herein were materially false and misleading at the time they were made.

## VIII. LOSS CAUSATION

239. Lead Plaintiffs incorporate by reference the allegations set forth above. During the Class Period, Defendants publicly disseminated materially false and misleading statements and omitted material facts concerning FMC's unrealistic sales goals, high-pressure and high-risk sales practices, and debilitating, excess inventory position.

240. The conduct alleged and the materially false and misleading statements and omissions made during the Class Period caused FMC's common stock to trade at artificially inflated prices, reaching as high as $68.72 per share during the Class Period, operating as a fraud on investors in the Company's common stock.

241. When the truth was revealed through disclosures on February 4, 2025, FMC's common stock price declined significantly, as the artificial inflation was removed from the common stock price.

242. On February 4, 2025 (after market close), Defendants disclosed, *inter alia*, disappointing results for Q4 2024 and fiscal year 2024, and poor outlook for fiscal year 2025,

including that revenue would remain flat due to weaker demand and the need to significantly lower existing FMC inventory in the channel.

243. On this news, FMC's stock price dropped $18.12 per share, or 33.5%, to close at $35.92 per share on February 5, 2025, on an unusually high trading volume of over 25 million shares.

244. In reaction to the Company's February 4, 2025 announcement, multiple analysts downgraded FMC, expressing shock and surprise, and underscored the significance of the disclosure. *See supra*, ¶¶160-62. For example, analysts at KeyBanc Capital Markets cut price targets on FMC stock from $69 to $55, noting that "[w]hile normally a one-quarter inventory adjustment would not be such a shocking development, ***we are quite surprised to see a fresh inventory correction amid what should have been a recovery year***." Further, analysts at Wells Fargo described it as a "***shock to the system***," and analysts at Morgan Stanley expressed surprise that "there is still FMC-specific elevated levels of inventory in some countries." Morgan Stanley further noted that while "[o]verall crop chemical markets remain challenging, [ ] the ***vast majority of our estimate reductions are FMC specific***." Analysts at Bank of America downgraded its rating on FMC stock from "Neutral" to "Underperform" and cut its price target from $61 to $48, further stating that "yesterday's earnings release highlighted additional broader and ***company-specific challenges*** which in our view ***raise FMC's risk profile substantially***, warranting our downgrade." Likewise, the CFRA's February 5, 2025 research note maintained its sell rating on FMC, noting: "We think FMC poses significant risk to investors." CFRA's note added that "several indicators suggest a high likelihood of earnings manipulation," and that the sharp rise in "accrued customer rebates and advance payments from customers as a percentage of sales" was "***consistent with 'channel stuffing' practices***."

245. The timing and magnitude of FMC's stock price decline evidences the impact that Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions and macroeconomic, industry, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## IX. PRESUMPTION OF RELIANCE

246. To the extent that Plaintiffs allege that Defendants made affirmative misstatements, Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) FMC's common stock traded in an efficient market;

(d) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of FMC common stock;

(e) Plaintiffs and other members of the Class purchased FMC common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f) FMC common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(g) as a regulated issuer, FMC filed periodic public reports with the SEC and the NYSE;

(h) FMC regularly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(i) FMC was followed by securities analysts employed by major brokerage firms who wrote reports, which were distributed to those brokerage firms' sales force and certain customers and that were publicly available and entered the public marketplace; and

(j) Unexpected material news about FMC was reflected in and incorporated into the Company's stock price during the Class Period.

247. As a result of the foregoing, the market for FMC common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of FMC common stock. All persons and entities who or which purchased or otherwise acquired FMC common stock during the Class Period suffered similar injuries through their purchase of FMC common stock at artificially inflated prices, and thus, the presumption of reliance applies.

248. A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), to the extent the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## X. CLASS ACTION ALLEGATIONS

249. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of FMC during the period from November 16, 2023 through February 4, 2025, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, or control person

of FMC during the Class Period and their immediate family members; (iv) any firm, trust, corporation or other entity in which any Defendant has or had a controlling or beneficial interest; (v) FMC's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, subsidiaries, heirs, successors-in-interest, or assigns of any such excluded person or entity, in their capacities as such.

250. The members of the Class are so numerous that joinder is impracticable. During the Class Period, FMC had more than 124,909,227 shares of common stock outstanding and actively trading on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are hundreds or thousands of members in the Class, and they are geographically dispersed. Record owners and other Class members may be identified from records procured from or maintained by the Company or its transfer agent and may be notified of the pendency of this action using a form of notice similar to that customarily used in securities class actions.

251. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all other members of the Class purchased or otherwise acquired shares of FMC common stock during the Class Period and were similarly affected by Defendants' alleged conduct in violation of the Exchange Act as complained of herein.

252. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

253. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of FMC;

(c) whether the Individual Defendants caused FMC to issue false and misleading statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(e) whether the prices of FMC stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

254. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the wrongs alleged. There will be no difficulty in managing this action as a class action.

## XI. THE INAPPLICABILITY OF THE STATUTORY SAFE HABROR NOR THE BESPEAKS CAUTION DOCTRINE

255. The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

256. Statements complained of herein were not forward-looking statements. Rather, they were historical statements or statements of purportedly current facts and conditions at the time each statement was made and/or statements that omitted material current or historical facts necessary to make the statements made not misleading.

257. To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was a mixed statement of present and/or historical facts and future intent, and is not entitled to safe harbor protection with respect to the part of the statement that refers to the present and/or past.

258. To the extent that any materially false or misleading statement alleged herein, or any portions thereof, may be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof. As alleged above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

259. To the extent that the statutory safe harbor may apply to any materially false or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false or misleading statement because at the time such statement was made, the speaker knew the statement was false or misleading, did not actually believe the statement, had no reasonable basis for making the statement, or the statement was authorized and approved by an executive officer of FMC who knew that such statement was false or misleading.

## XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

**COUNT I**
**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against FMC and the Individual Defendants**

260. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

261. Plaintiffs assert this Count on behalf of themselves and all other members of the Class against FMC and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

262. As alleged herein, throughout the Class Period, FMC and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

263. During the Class Period, the Defendants disseminated or approved the false and/ or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

264. As alleged herein, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of FMC stock during the Class Period.

265. FMC and the Individual Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially inflate the price of FMC common stock and maintain the Company's common stock price at artificially inflated prices; and (iii) cause Plaintiffs and the other members of the Class to purchase or otherwise acquire the Company's common stock at artificially inflated prices.

266. The Individual Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein. FMC and the Individual Defendants engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs and the other members of the Class, by virtue of making public statements and preparing, approving, signing, and/or disseminating documents that contained false statements of material fact and/or omitted material facts necessary to make the statements therein not misleading.

267. As set forth above, FMC and the Individual Defendants made the materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased or otherwise acquired the Company's common stock during the Class Period.

268. Plaintiffs and Class members have suffered damages in that, in ignorance of the materially false and misleading nature of FMC's and the Individual Defendants' statements and omissions, and in reliance on the integrity of the market, they paid artificially inflated prices for FMC stock. Plaintiffs and Class members would not have purchased FMC stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

269. As alleged herein, when the true facts were subsequently disclosed, or the risks concealed by FMC and the Individual Defendants' public statements materialized, the price of FMC's common stock declined precipitously. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of FMC stock during the Class Period.

270. By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading during the Class Period.

271. This claim is timely within the applicable statute of limitations and repose.

## COUNT II
## For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

272. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

273. Plaintiffs assert this Count on behalf of themselves and all other members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

274. The Individual Defendants, Douglas, Brondeau, and Sandifer, by virtue of their positions and specific acts described above, were, at the time of the wrongs alleged herein, controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.

275. By reason of their high-level positions of control and authority as FMC's most senior officers, Defendants Douglas, Brondeau, and Sandifer had the authority to influence and control, and did influence and control, the day-to-day decision-making and activities of FMC and its employees, and to cause FMC to engage in the wrongful conduct complained of herein. The Individual Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by FMC during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

276. The Individual Defendants communicated with investors or the public on behalf of FMC during the Class Period. Defendants Douglas, Brondeau, and Sandifer were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Plaintiffs to be materially false or misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. Therefore, Defendants Douglas, Brondeau, and Sandifer were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by FMC during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

277. The Individual Defendants had the power and influence and exercised the same to cause the Company to engage in the illegal conduct and practices complained of herein.

278. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

279. As a direct and proximate result of the Individual Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of FMC common stock.

280. This claim is timely within the applicable statutes of limitations and repose.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, respectfully pray for relief and judgment against Defendants as follows:

(A) determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

(B) awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

(C) awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

(D) granting such other, further, and/or different relief as the Court deems just and proper.

## XIV. JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED: July 28, 2025

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

*/s/ Christina D. Saler*
Christina D. Saler
100 N. 18th St.
Suite 1820
Philadelphia, Pennsylvania
Telephone: (267) 479-5700
csaler@cohenmilstein.com

*/s/ Carol V. Gilden*
Carol V. Gilden*
200 S. Wacker Drive, Suite 2375
Chicago, IL 60606
Telephone: (312) 357-0370
Facsimile: (312) 357-0369
cgilden@cohenmilstein.com

Steven J. Toll*
S. Douglas Bunch*
Margaret (Emmy) Wydman*
1100 New York Avenue, N.W., Suite 800
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohemilstein.com
dbunch@cohenmilstein.com
ewydman@cohenmilstein.com

**LABATON KELLER SUCHAROW LLP**

*/s/ Lauren A. Ormsbee*
Lauren A. Ormsbee*
Lisa M. Strejlau*
Alexandra E. Forgione*
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
lormsbee@labaton.com
lstrejlau@labaton.com
aforgione@labaton.com

* Admitted *pro hac vice*

*Counsel for Plaintiffs and Lead Counsel for the Class*

**VANOVERBEKE MICHAUD & TIMMONY P.C.**
Thomas C. Michaud
Aaron L. Castle
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
tmichaud@vmtlaw.com
acastle@vmtlaw.com

*Additional Counsel for Macomb County Employees' Retirement System and Macomb County Retiree Health Care Fund*

**CERTIFICATE OF SERVICE**

I, Christina D. Saler, hereby certify that on July 28, 2025, I caused a true and correct copy of the foregoing Amended Complaint for Violations of the Federal Securities Laws to be filed electronically with the Clerk of the Court using the ECF system, and it is available for viewing and downloading from the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

*s/ Christina D. Saler*
Christina D. Saler