IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE FMC CORPORATION SECURITIES LITIGATION | CLASS ACTION<br>No. 2:25-cv-00771-GAW<br>DEMAND FOR JURY TRIAL |
| **This Document Applies To:**<br>**ALL ACTIONS** | |

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS


I. NATURE OF THE ACTION AND OVERVIEW OF THE FRAUD ... 1

II. JURISDICTION AND VENUE ... 10

III. PARTIES ... 11

A. Plaintiffs ... 11

B. Defendants ... 12

C. Relevant Non-Parties ... 14

IV. SUBSTANTIVE ALLEGATIONS OF FRAUD ... 17

A. Crop Protection Industry Background ... 17

B. FMC Company Background ... 21

C. In the Months Leading up to the Class Period, FMC Faced Scrutiny Over Rising Inventory Buildup and Increased Generic Competition ... 25

D. Claiming a Reset, Defendants Initiated "Project Focus" and Reported "Strong Results" and "Normalizing" Channel Inventories Throughout 2024 ... 27

E. In Reality, FMC's Sales Far Exceeded Market Demand as Defendants Directed the Use of Manipulative Sales Practices That Worsened, Rather Than Improved, FMC's Unsustainable Channel Inventory Buildup ... 33

1. FMC Employed Manipulative Practices to Report Sales That Far Exceeded Market Demand, Worsening FMC's Channel Inventory Buildup ... 36

2. FMC Offered Essentially Unlimited Return Policies, Sold Product Knowing It Would Be Returned in Subsequent Quarters, and Slowed Down and Reconfigured Returns of Unneeded Product to Avoid Reporting the Hit to Revenues ... 49

3. FMC Exploited Its Asian Market and Relationships with Super Distributors in India to Inflate FMC's Results ... 58

4. FMC Leadership Recorded Large Sales to High-Risk Customers Suffering Known Financial Difficulties Who Soon Filed for Bankruptcy, Leaving Those Debts Unpaid ... 66

5. FMC Pulled Sales Forward to Make Quarterly Sales Goals at the Expense of the Following Quarters ... 69

F. An Independent Analysis of FMC's Class Period Financials Finds "Fundamental Deterioration Masked by Aggressive Financial Practices" ........... 71

V. INVESTORS WERE HARMED AS A SERIES OF PARTIAL DISCLOSURES CONNECTED TO DEFENDANTS' FRAUD TRIGGERED MASSIVE DECLINES IN THE PRICE OF FMC SHARES ........ 79

A. First Loss Causing Event: February 4, 2025 ........ 79

B. Second Loss Causing Event: April 30, 2025 ........ 83

C. Third Loss Causing Event: July 30, 2025 ........ 86

D. Fourth Loss Causing Event: October 29, 2025 ........ 89

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........ 94

A. False Statements Concerning FMC's Sales Practices ........ 95

1. False Statements in FMC's SEC Filings Concerning Revenue Recognition Being Conditioned on an Exchange of Control ........ 95

2. False Statements in FMC's SEC Filings Concerning Rights of Return ........ 98

3. Bank of America Securities Global Agriculture and Materials Conference — February 29, 2024 ........ 100

4. First Quarter 2024 Earnings Call — May 7, 2024 ........ 102

B. False Statements Concerning FMC's Channel Inventory Normalization ........ 104

1. False Statements in FMC's SEC Filings Concerning Customer Liquidity ........ 104

2. False Statements in FMC's SEC Filings Concerning Channel Inventory Behavior ........ 106

3. False Statements in FMC's SEC Filings Concerning Project Focus ...... 108

4. FMC Investor Day 2023 — November 16, 2023 ........ 111

5. Form 8-K — December 18, 2023 ........ 115

6. Fourth Quarter 2023 Financial Results — February 5-6, 2024 ........ 117

7. Bank of America Global Agriculture and Materials Conference — February 29, 2024 ........ 124

8. First Quarter 2024 Financial Results and 10-Q — May 6-7, 2024 ......... 128

9. BMO Global Farm to Market Conference — May 15, 2024 .................. 138

10. Wells Fargo Industrials Conference — June 11, 2024 .......................... 142

11. Second Quarter 2024 Financial Results — July 31, 2024 and August 1, 2024 ......................................................................... 145

12. Jefferies Global Industrial Conference — September 4, 2024 ............... 148

13. Third Quarter 2024 Financial Results — October 29-30, 2024 ............. 150

14. Goldman Sachs Industrials and Materials Conference — December 4, 2024 ......................................................................... 159

15. Fourth Quarter 2024 Financial Results — February 4, 2025 .................. 162

C. False Statements Concerning FMC's SOX Certifications ................................ 166

VII. SUMMARY OF SCIENTER ALLEGATIONS ......................................................... 167

VIII. LOSS CAUSATION ......................................................................................... 182

IX. PRESUMPTION OF RELIANCE ......................................................................... 186

X. CLASS ACTION ALLEGATIONS ......................................................................... 187

XI. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ......................................................................... 189

XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ......................................... 190

COUNT I For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against FMC and the Individual Defendants ......................................................... 190

COUNT II For Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Against FMC and the Individual Defendants ......................................................... 192

COUNT III For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ......................................................................................... 196

XIII. PRAYER FOR RELIEF ......................................................................................... 198

XIV. JURY DEMAND ......................................................................................... 198

Lead Plaintiff Teamsters Local 710 Pension Fund ("Teamsters 710"), and additional plaintiffs Oakland County Voluntary Employees' Beneficiary Association ("Oakland County VEBA"), and Oakland County Employees' Retirement System ("Oakland County ERS") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs' own acts and upon information and belief as to all other matters based on the ongoing investigation conducted by and through counsel, which includes, among other things, a review and analysis of: (i) the public U.S. Securities and Exchange Commission ("SEC") filings of FMC Corporation ("FMC" or the "Company"); (ii) Company press releases; (iii) transcripts of the Company's conference calls with analysts and investors; (iv) investor presentations; (v) research reports issued by securities and financial analysts; (vi) news and media reports and other public reports and information regarding the Company and Defendants; (vii) economic analyses of the movement and pricing of the Company's publicly traded securities; (viii) consultations with experts; and (ix) interviews with former employees of the Company (referred to herein as "FE-__").[1] Lead Counsel's investigation is ongoing and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION AND OVERVIEW OF THE FRAUD

1. This is a securities class action on behalf of persons and entities that purchased or otherwise acquired FMC common stock during the period from November 16, 2023 through

---

[1] Individuals referenced herein as "FEs" or "Former Employees" refer to former FMC employees interviewed as part of Lead Counsel's investigation of Plaintiffs' claims. In order to protect their identities, the FEs are referred to with male pronouns regardless of their gender. The exact titles and reporting structure of certain FEs have been made less specific in deference to those FEs' concerns regarding identification and retribution.

October 29, 2025, inclusive (the "Class Period"). Plaintiffs bring this action to recover damages caused by violations of the federal securities laws, namely Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, committed by Defendants FMC, FMC's former CEO Mark A. Douglas ("Defendant Douglas" or "Douglas"), current CEO Pierre R. Brondeau ("Defendant Brondeau" or "Brondeau"), current CFO Andrew D. Sandifer ("Defendant Sandifer" or "Sandifer"), and former President Ronaldo Pereira ("Defendant Pereira" or "Pereira"). This case arises from a series of materially false or misleading statements and omissions made by the Company and its senior executives about the success of the Company's efforts to balance its channel inventory and achieve organic sales sufficient to foster sustainable growth.

2. FMC is an agricultural sciences company based in Philadelphia, Pennsylvania, that manufactures insecticides and other crop protection products for sale worldwide. FMC sells these products to a channel of distributors located in four primary regions: North America, Latin America (also referred to herein as "LATAM"), Asia Pacific (also referred to herein as "APAC"), and Europe, the Middle East, and Africa (also referred to herein as "EMEA"). Those distributors in turn sell FMC products out of their inventories to retailers. These retailers then ultimately sell the products to growers.

3. FMC posted record revenue in 2022, at a time when the Company identified a fear of product shortages during and following the COVID-19 pandemic as a reason why FMC's distributors stockpiled crop protection products in their inventories. However, as pandemic restrictions were lifted, FMC's channel distributors held excess inventories that exceeded then-current demand. In the year prior to the start of the Class Period, this excess channel inventory resulted in a revenue slowdown for FMC during the first two quarters of 2023 as distributors and

retailers "destocked" their inventories by significantly reducing their orders for crop protection products. Indeed, on October 30, 2023, two weeks before the start of the Class Period, FMC reported a staggering 29% year-over-year decrease in third quarter 2023 revenues due to "channel destocking in all regions."

4. At the same time, FMC's revenues were also negatively impacted by mounting generic competition for its top-selling crop protection products. Prior to the start of the Class Period, an investment firm published a report claiming that FMC had previously "concealed from investors the deterioration of [its] core business[,] resulting in an inescapable cycle of falling revenues, plummeting cash flows, [and] declining profits." The report noted that FMC had been employing steep discounts and rebates to offload product and "shore up Company cash," including to customers with "deteriorating [] creditworthiness," emphasizing that FMC had misrepresented the threat of generic market competitors to FMC's patent products.

5. In the wake of this news, Defendants represented to the market that FMC had embarked on a reset to rebalance its channel inventory to fit actual demand, cut costs, and improve its financial performance within the coming quarters. On November 16, 2023—the first day of the Class Period—FMC unveiled a strategic "restructuring plan" that would be called "Project Focus." Defendants expressly assured investors that Project Focus would maximize operational efficiencies, right-size FMC's cost base, and facilitate the "rebalancing" of FMC's distribution channel's inventory levels in the face of destocking and decreased demand for its products. Throughout the Class Period, Defendants touted the "excellent progress" of Project Focus and the Company's efforts to normalize channel inventory, representing to investors that FMC was "reducing channel inventory every quarter" and that its channel inventories were "rebalancing" and "normalizing" at a faster pace than expected. Defendants repeated these assurances to

investors through FMC's SEC filings, press releases, and analyst calls, conditioning the market to believe that its distribution channel was successfully normalizing and that FMC was therefore able to create organic sales figures consistent with its sales forecasts and revenue projections.

6. Unknown to investors, however, FMC failed to improve distributor inventory levels or create organic demand for FMC's products. In reality, at the direction of the Individual Defendants, regional leaders throughout FMC's worldwide channel set remarkably unrealistic and unattainable sales targets and revenue projections, employed high-risk and high-pressure sales tactics to try to meet those sales targets, and pumped unwanted and unsellable product into the Company's distribution channel: textbook "channel stuffing." As generally understood, "[c]hannel stuffing refers to the practice of shipping more goods to distributors and retailers along the distribution channel than end-users are likely to buy in a reasonable time period. This is usually achieved by offering lucrative incentives, including deep discounts, rebates, and extended payment terms, to persuade distributors and retailers to buy quantities in excess of their needs. Usually, distributors retain the right to return any unsold inventory which calls into question whether a final sale has actually occurred." Das, Shroff, and Zhang, *Detection of Channel Stuffing*, Univ. of Notre Dame Center for Accounting Rsch. and Educ. (May 2011), https://care-mendoza.nd.edu/assets/151939/helenzhang.pdf.[2] As such, "[c]hannel stuffing . . . may give rise to liability under the Exchange Act when a company engages in the practice to deceive investors," including by "attributing [the company's] financial success to consumer demand and by

[2] *See also, e.g.*, Jerry W. Markham, A Financial History of Modern U.S. Corporate Scandals: From Enron to Reform (2006), pp. 218-20 ("'Channel stuffing' is another way to manipulate accounts and manage earnings. This practice involves sending a customer unneeded goods that can be booked as sales and revenue . . .").

downplaying concerns about inventory levels without disclosing their reliance on channel stuffing." *Gimpel v. The Hain Celestial Grp., Inc.*, 156 F.4th 121, 128 (2d Cir. 2025).

7. Defendants' tactics kept inventory levels stuffed, reduced revenues through the use of alarming discounts and return policies, and threatened sales in future quarters—all while Defendants forcefully conveyed the exact opposite message to investors. Multiple former FMC employees described how FMC's senior management knew of and authorized a systemic series of manipulative and unsustainable sales practices by authorizing quarter-end sales that FMC knew would be liberally returned in the following quarters at no cost to the customers; offering exceptional "rebates over rebates" and heavy discounts; granting extremely long payment terms for products, often to distributors with a high risk of bankruptcy (including some who soon after declared bankruptcy with tens of millions of dollars left unpaid); pulling sales into earlier quarters (leaving future quarters in jeopardy); and postponing guaranteed returns from occurring when requested in order to temporarily inflate quarterly figures. Through these undisclosed sales practices, FMC propped up its short-term revenue and sales numbers at the expense of long-term revenue and growth, nullifying any potential Project Focus cost savings.

8. As described herein, former employees also describe how FMC regularly took steps to delay these guaranteed product returns, which only increased FMC's unsustainable inventory buildup. FE-12, who worked in a senior role in Asia, described how FMC's leadership was full of "morally corrupt people" who acted "brazenly" with their improper behavior and, in India, sold products to the channel (often incurring millions in shipping costs on these sales) while knowing that those products would be returned. In fact, FMC employed a scheme to sell product that was going to be returned in the following quarters in which, as FE-12 explained, the Company went so far as to manufacture and sell a 200L drum version of their product in India (666 to 1,333 times

larger than the unit commonly sold to farmers) to ease the return process and costs. Similarly, in Brazil, former employees described FMC's sales tactics as "the snake who eats its own tail" to meet increased forecasts employees "knew they couldn't hit."

9. These ill-fated and misrepresented sales practices occurred worldwide but were most pronounced (and had the biggest impact on FMC's reported revenues) in the Latin American and APAC markets, primarily in Brazil and India, markets that contributed an aggregate $2.3 billion of annual revenues during the Class Period.

10. Throughout the Class Period, Defendants specifically misled FMC investors by making statements that failed to disclose and actively concealed that: (a) FMC was not succeeding in its goal of significantly lowering FMC inventory in the distribution channel; (b) FMC's channel inventories were not rebalancing or normalizing, and in fact, were getting worse, due to the Company's own manipulative sales practices; (c) FMC had inflated short-term revenues by engaging in high-risk sales with delayed payment to companies like AgroGalaxy and Lavoro (both of which subsequently filed for bankruptcy); (d) FMC was forcing through sales that Defendants knew would be returned in ensuing quarters, and implementing and encouraging a policy to stall or reconfigure returns when initiated by distributors; (e) Project Focus was lagging in its goal of accelerating manufacturing cost reductions; (f) FMC's pricing and return arrangements with key distributors would significantly lower FMC's revenues and profits in the near-term; (g) FMC's risk disclosures were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and (h) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

11. All the while, Defendants told investors that FMC's channel reset strategy was working, and, as a result, they were seeing channel inventory rebalance and normalize. Defendants Douglas, Sandifer, Brondeau, and Pereira made Class Period representations to the market that FMC's "***inventory reduction actions in the channel are making good progress***" (Douglas); the Company's customers were "***bringing their inventories back to more normal levels***" (Sandifer); they "***are seeing . . . improving conditions***" and "***channel inventories reduced***" (Sandifer); "***demand recovery***" was occurring (Brondeau); "***channel inventories [are] starting to normalize***" (Brondeau); and "***our focus [] is actually to decrease the existing inventory***" (Pereira). Defendants further represented that FMC's channel normalization was attributable in large part to their prudent and sound sales practices, informing the market that they "***have been pretty disciplined about limiting price discounting and not pursuing volume in a weak demand environment***" (Sandifer) and "***have been disciplined about pricing and about not chasing volume that wasn't there***" (Sandifer).

12. Investors ultimately learned that not only was FMC's purported reset a failure, but the Company never took steps to right-size its inventory levels and continued to inflate revenues and exaggerate the success of FMC's organic sales throughout the Class Period.

13. The truth of these misrepresentations was gradually revealed over a series of disclosures throughout 2025.

14. ***First***, on February 4, 2025, the market learned that FMC missed its fourth quarter 2024 consensus revenue estimates by ***$90 million***, telling investors that "***growth was below [the Company's] expectations*** as [it] learned during the quarter that ***customers in many countries sought to hold significantly less inventory*** than they have historically." The Company also issued a disappointing 2025 financial outlook due to "***weaker demand in the channel***."

15. In an earnings call held the same day, the Company's CEO, Defendant Brondeau, revealed that FMC "need[s] to significantly lower FMC inventory in the channel much beyond what we were expecting." Brondeau stated that the Company had faced pricing competition which it was "unwilling to meet" or adjust to, which led FMC to "walk away" from "sales opportunities," and claimed that this strategy had backfired as the Company was met with "lower-than-expected demand across most regions as customers lowered the amount of inventory they are willing to hold" to a historical low. As a result, the Company had "high levels of FMC product in the channel" including "elevated channel inventor[ies] in some countries in LatAm [Latin America], including Brazil, Asia, including India, as well as Canada and Eastern Europe." On this news, FMC's stock price dropped $18.12 per share, or ***33.5%***, to close at $35.92 per share on February 5, 2025, with FMC losing over $2 billion in market capitalization in a single day.

16. Wall Street analysts were caught off guard. For example, analysts at Wells Fargo described FMC's 2025 outlook as a "shock to the system" driven by "company-specific inventory and cost actions impacting its price." Analysts at Morgan Stanley also expressed surprise that "there is still FMC-specific elevated levels of inventory in some countries." Analysts at Bank of America remarked that "the discussion of 'cost-plus' pricing is new, and in our view may be a newer pricing approach that passes some of the already-expected 2025 [cost of goods sold] tailwinds to FMC's diamide partners thus hitting margins."

17. Defendants' disclosures also sparked skepticism about the Company's Class Period sales practices and the legitimacy of their previously represented growing organic demand. Specifically, independent research analysts at the Center for Financial Research and Analysis ("CFRA") issued an analyst note on February 5, 2025 expressing concern that "***FMC poses significant risk to investors***" as "***several indicators suggest a high likelihood of earnings***

***manipulation***," and the sharp rise in "***accrued customer rebates and advance payments from customers as a percentage of sales***" was "***consistent with 'channel stuffing' practices***."

18. ***Second***, on April 30, 2025, in connection with its Q1 2025 financial results, FMC reported disappointing revenue of $791 million, negative $545 million in cash from operations "due primarily to a smaller reduction in inventory levels as compared to the prior year period," and negative free cash flow of $596 million. The Company further reduced its guidance for Q2 2025, and as a result, FMC's stock price dropped from $41.92 per share when the market closed on April 30, 2025 to $38.45 per share on May 1, 2025, a decline of 8.28%. On May 28, 2025, CFRA later followed up its note with a detailed research report titled "FMC Corporation: Fundamental Deterioration Masked by Aggressive Financial Practices," which again stressed that FMC exhibited "***multiple indicators suggest[ing] aggressive revenue recognition practices and potential financial manipulation***" and "***several red flags indicative of 'channel stuffing***.'" The CFRA report also included the results of its "Beneish Model Analysis," which "revealed a systematic deterioration in FMC's financial reporting quality" during the Class Period.

19. ***Third***, on July 30, 2025, in connection with its Q2 2025 financial results, FMC announced that it would divest the Company's commercial business in India—its ***third-largest market***—due to "lower pricing as well as reduced volume driven by ongoing destocking activity." Despite FMC's earlier promise of a "country-per-country set of action[s]" to address its inventory issues, Defendants were now completely abandoning their India commercial business. As a result, the price of FMC stock dropped from $41.33 per share when the market closed on July 30, 2025, to $39.04 per share when the market closed on July 31, 2025, a 5.54% decline.

20. ***Finally***, the truth was fully revealed on October 29, 2025, when FMC reported its Q3 2025 financial results. Shockingly, FMC reported revenue of $542 million, a 49% decrease

compared to Q3 2024, which Defendants stated was primarily related to "***significant one-time commercial actions taken in India*** to position the business for sale." Despite earlier allusions that an impairment was merely "possible," Defendants ultimately revealed that the carrying value of its India business was cut in ***half***, along with a jarring $510 million in charges and write-downs. Of the $510 million in write-downs, $282 million reflected a one-time adjustment related to "product returns and pricing changes designed to accelerate receivables collection and optimize the working capital mix of receivables and inventory"—squarely attributable to Defendants' Class Period sales practices. On the same day, FMC also revealed that FMC's President, Defendant Ronaldo Pereira, who reported directly to the CEO and had previously been discussed as Defendant Brondeau's successor to the CEO role, was let go. As a result, the price of FMC stock collapsed to its lowest price since 2009, falling from $29.04 per share when the market closed on October 29, 2025, to $15.53 per share on October 30, 2025, a ***46.52%*** decline on unusually high trading volume of 45 million shares.

21. As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's common stock pursuant to the revelation of the fraud, Plaintiffs and other members of the Class (defined herein) have suffered significant damages.

## II. JURISDICTION AND VENUE

22. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") (*see* 17 C.F.R. § 240.10b-5).

23. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). The Company's principal offices are located in this

District. Substantial acts in the furtherance of the alleged fraud or the effects of the fraud have occurred in this District. Defendants' wrongful acts also arose in, emanated from, and caused harm in this District. Such acts include the dissemination of false and misleading statements into this District.

25. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange, the New York Stock Exchange.

## III. PARTIES

### A. Plaintiffs

26. Lead Plaintiff Teamsters 710 purchased or otherwise acquired FMC stock during the Class Period, as reflected in the certification and loss chart attached to its motion for appointment as lead plaintiff in this Action (ECF Nos. 17-1, 17-2), and was injured as a result of Defendants' false and misleading statements and omissions. Local 710 is a pension fund headquartered in Mokena, Illinois. Teamsters 710 is a Taft-Hartley defined pension fund representing more than 13,500 workers across the Midwest that oversees approximately $3.8 billion in investments for the benefit of participants and their beneficiaries.

27. Plaintiff Oakland County VEBA provides healthcare benefits for retired employees of Oakland County, Michigan and their spouses and eligible dependents. As reflected in the accompanying certification attached hereto as Appendix B, Oakland County VEBA purchased FMC common stock during the Class Period and was injured as a result of Defendants' false and misleading statements and omissions.

28. Plaintiff Oakland County ERS provides pension benefits to retired employees of the Oakland County, Michigan retirement system, and their designated beneficiaries. As reflected

in the accompanying certification attached hereto as Appendix B, Oakland County ERS purchased FMC common stock during the Class Period and was injured as a result of Defendants' false and misleading statements and omissions.

**B. Defendants**

29. Defendant FMC is incorporated in Delaware and headquartered in Philadelphia, Pennsylvania, and is described more fully *infra* Section IV.B. FMC common stock trades on the New York Stock Exchange under the ticker symbol "FMC." Founded in 1883 as the Bean Spray Pump Company, FMC was incorporated in 1928 as the Food Machinery Corporation and began using the initials FMC. Over its 142-year history, FMC has evolved from a manufacturer of miscellaneous products, such as military vehicles and chewing gum, into a multinational behemoth narrowly focused on insecticides and other crop protection products. A self-described "tier-one leader" in the crop protection industry, FMC employs nearly 6,000 people worldwide, with operations on every inhabited continent. Although the Company manufactures a variety of crop protection products, it is best known for its insecticides, which accounted for 56% of FMC's $4.246 billion in 2024 revenues.

30. Defendant **Mark A. Douglas** ("Defendant Douglas") served as FMC's President and Chief Executive Officer from June 1, 2020 until June 11, 2024, when he abruptly resigned. Douglas had served in a variety of leadership roles at FMC since March 2010, including as President and Chief Operating Officer from June 2018 until June 2020, through which roles he led the Company's commercial operations and technology organizations.

31. Defendant **Andrew D. Sandifer** ("Defendant Sandifer") was at all relevant times FMC's Executive Vice President and Chief Financial Officer. Sandifer began working at FMC in September 2010 and assumed the role of CFO in May 2018.

32. Defendant **Pierre R. Brondeau** ("Defendant Brondeau") was at all relevant times Chairman of FMC's Board of Directors and was appointed Chief Executive Officer of FMC on June 11, 2024. Brondeau previously served as FMC's CEO from January 2010 until June 1, 2020.

33. Defendant **Ronaldo Pereira** ("Defendant Pereira") spent 28 years at FMC. Pereira served as President, Americas from July 2019 until June 2024 and Vice President of LATAM from January 2017 until June 2024. In June 2024, Pereira was promoted to President of FMC and served in that role until his unexpected separation from the Company was announced on October 29, 2025. During the Class Period, Pereira reported to FMC's CEO (Defendant Douglas until June 11, 2024, and Defendant Brondeau thereafter).

34. Defendant Douglas, Defendant Sandifer, Defendant Brondeau, and Defendant Pereira are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of FMC's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers, and investors, *i.e.*, the market, and are presumptively responsible for the statements in SEC filings and press releases. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Defendant Sandifer signed each of the relevant SEC filings, as did Defendants Douglas and Brondeau during their respective tenures as CEO. Because of their positions and access to material non-public information available to them, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations that were being made were then materially false or misleading. The Individual Defendants are liable

for the false and misleading statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

**C. Relevant Non-Parties**

35. William Mills ("Mills") has served as FMC's CFO, Americas since March 2024, and served as CFO, LATAM from April 2018 until July 2024, working out of FMC's Brazil headquarters. Mills is responsible for financial reporting and financial analysis, and participated in meetings with the Commercial Team under his direction at least once a quarter. As described herein, Mills attended and participated in direct negotiations with distributors in Brazil regarding right-to-return agreements.

36. Pramod Thota ("Thota") spent 13 years at FMC. Thota served as President, APAC and Vice President of FMC from July 2022 until he left the Company in April 2025. Previously, Thota served as President, FMC U.S.A. from 2021 through July 2022, and President of FMC India from 2017 through 2021. During the Class Period, Thota reported to FMC's CEO (Douglas until June 11, 2024, and Brondeau thereafter).

37. FE-1 worked for FMC Brazil in a variety of roles between fall 2012 and spring 2024. During the Class Period until his departure, FE-1 worked out of the Company's LATAM headquarters in Campinas, São Paolo and was a senior level sales manager. In that role, FE-1 reported to FMC's Brazil Commercial and Business Director.

38. FE-2 was employed by FMC from 2017 until late 2024 as a regional Sales Manager in Brazil. FE-2 reported to a Sales Director in Brazil who reported to the Brazil Business Director who reported to Pereira who in turn reported to the CEO.

39. FE-3 was employed by FMC from 2018 until the end of January 2024. FE-3 was initially employed as a Technical Sales Representative from 2018 until 2022 before transitioning to the role of Regional Sales Manager for the final years of his tenure. In his role as Regional Sales

Manager, FE-3 reported to former Sales Director for the Eastern Region, Marco Faria, who reported to former Brazil Business Director Marcelo Magurno.[3]

40. FE-4 was an internal audit analyst at FMC from June 2023 until July 2024 at the Company's Philadelphia headquarters. FE-4 reported to John Mulcahy, who was the Chief Audit Executive at FMC. FE-4 was part of a team of internal auditors responsible for auditing financials and inventory, including product inventory and assets inventory. As part of FMC's audit team, FE-4 visited FMC facilities in the United States to conduct inventory audits at the Company's U.S. locations. FE-4 was aware of audits conducted by his overseas colleagues at FMC sites in China, Italy, Brazil, and other countries.

41. FE-5 joined the Company full-time as a sales representative in Summer 2019 and held this position until spring 2025. The person to whom FE-5 reported in turn reported to the person responsible for FMC's sales in non-coastal regions of the United States, which FMC referred to as the "Heartlands" division. The "Heartlands" division manager in turn reported to Darren Dillenbeck, FMC's president of U.S. sales. FE-5 visited FMC's headquarters several times during his employment at the Company. As a sales representative, he was responsible for marketing FMC products to retailers, wholesale distributors, and distributor-owned retailers.

42. FE-6 was employed by FMC from before the Class Period until January 2025 in a variety of roles with the Company's North America Integrated Supply Chain Division. FE-6's final role with the Company, throughout the Class Period until his departure, was as a Supply Chain Management Lead. FE-6 oversaw aspects of FMC's supply chain, and this role required FE-6 to

[3] According to FE-3, former Business Director FMC Brazil Sinara Giombelli Ferreira was responsible for the Western Region of Brazil.

work closely with FMC's Demand Planning Team, as well as the Company's Integrated Supply Chain Team.

43. FE-7 was employed by FMC in a variety of inventory and sales roles from prior to the Class Period until spring 2024. FE-7 was a Supply Chain Management Lead from before the Class Period until the end of his tenure and worked out of one of FMC's offices in Europe. As Supply Chain Management Lead, FE-7 oversaw supply chain functions, including materials planning, for one of FMC's facilities in Southern Europe. FE-7 reported to a Supply Chain Manager and had weekly meetings with his counterparts responsible for FMC's other facilities throughout Europe.

44. FE-8 was employed by FMC as a Rebate and Commissions Analyst from April 2023 until January 2024. FE-8 worked out of FMC's office in Cork, Ireland. FE-8 was a member of a three-person team that reported to a manager, who reported to another manager, who reported to the Site Lead in Cork, Ireland. As cost-cutting measures were implemented at FMC, the manager positioned between FE-8's direct report and the Site Lead was removed at the end of 2023.

45. FE-9 was employed by FMC as the Business / Managing Director for Austria-Germany-Switzerland from December 2020 until May 2024. He reported to the current FMC Vice President & President Europe, Middle East and Africa, Sebastià Pons, who reported directly to the CEO.

46. FE-10 was employed by FMC from fall 2022 through spring 2025 as a Supply Chain Manager responsible for supply and demand planning, as well as supporting the efficiency of processes in multiple regions.

47. FE-11 was employed by FMC as the Digital Channel Strategy Lead working out of FMC's Corporate headquarters in India from July 2022 until April 2024. His role was

"centralized," and he worked and regularly interacted with sales staff throughout India. FE-11 was responsible for the digital tools used by sales staff, including the CRM system,[4] to facilitate sales. This role required daily conversations with sales staff and also included informal conversations about market conditions and sales performance. FE-11 reported to the Head of CRM, who reported to the Head of Revenues Operations, who reported to the President of India, who reported to the President of APAC, who reported to former CEO Defendant Douglas.

48. FE-12 was employed by FMC from before the Class Period until spring 2024, most recently as a senior officer in one of the APAC regions, where FE-12 reported directly to a senior leader in his region, who reported directly to former President APAC Region, Vice President Pramod Thota, who in turn reported to FMC's CEO.

49. FE-13 was a member of one of FMC's four regional leadership teams until before the start of the Class Period. As a member of a regional leadership team, FE-13 attended monthly S&OP ("Supply and Operations Planning") meetings.

50. FE-14 was employed as a Commercial Manager in APAC from 2022 through mid-2024.

## IV. SUBSTANTIVE ALLEGATIONS OF FRAUD

### A. Crop Protection Industry Background

51. Crop protection products are substances that protect crops from weeds, insects, and other phenomena that inhibit crop growth. The main categories of crop protection products are: pesticides (which include insecticides and target insects and other pests), herbicides (which target weeds), and fungicides (which target fungi).

[4] A "CRM" system refers to "Customer Relationship Management" system.

52. Most crop protection products are made from synthetic chemicals. These chemicals contain an "active ingredient" that has been engineered to protect crops from harm. For example, Coragen—one of FMC's most popular products—contains the active ingredient Rynaxypyr, which kills harmful pests by disrupting the calcium channels necessary for pests to move and eat. Active ingredients are subject to patent protection, as are the various processes used to manufacture active ingredients.

53. The crop protection industry is divided between "basic manufacturers," which manufacture and sell products containing patented active ingredients (such as Rynaxypyr), and "generic manufacturers," which manufacture and sell products containing active ingredients that have lost patent protection. Once a patented product or ingredient loses its patent protection, generic substitutes generally flood the market and lead to substantial price competition for all patented products.

54. It is the standard practice of crop protection product manufacturers, including FMC, to sell their products directly to distributors. These distributors, in turn, sell products to retailers, who then sell the products to farmers, growers, and other end-users. This flow of product—from distributors to retailers to end users—is referred to in the crop protection industry as "the channel."

55. Distributors are a vital component of the crop protection industry. While manufacturers possess sophisticated operations for researching, marketing, and producing crop protection products, they lack the storage and logistics networks necessary to distribute products at scale. Moreover, distributors have extensive knowledge of regional markets as well as connections with local retailers, growers, and farmers. Accordingly, crop protection manufacturers prioritize forming close relationships with distributors.

56. While crop protection products are used around the world, the industry's most profitable market is Brazil. Brazil is the world's largest consumer of insecticides by far, surpassing the second-largest consumer—the United States—by approximately 330,000 metric tons of product per year. Brazil is also the world's largest consumer of herbicides. This demand reflects Brazil's status as an agricultural powerhouse: it is the world's second-largest exporter of agricultural goods, and the largest producer of key crops like soybeans, oranges, coffee, and sugarcane.

57. India, meanwhile, is the world's fourth-largest market for crop protection products, driven by strong recent growth in the country's agricultural output, which increased by 40% between 2015 and 2025. India possesses the second-largest area of arable land in the world, and agriculture provides a livelihood for nearly 55% of its population. It is the world's largest producer of spices and the second-largest producer of key crops such as tea, cotton, sugarcane, wheat, and rice, as well as various fruits and vegetables.

58. The years leading up to the Class Period were marked by extreme volatility in the crop protection industry. During the COVID-19 pandemic, distributors feared that supply chain disruptions would prevent manufacturers from fulfilling product orders in a timely fashion. Accordingly, in 2020 and 2021, distributors "overstocked" on product, filling their warehouses with crop protection products and buying much more product than was necessary to satisfy then-existing retailer and farmer demand as crop protection manufacturers reported record profits.

59. As the COVID-19 pandemic waned, so did these profits. Because distributors had stockpiled more product than was necessary, distributors and other purchasers of crop protection product began "destocking" their inventory. As FMC explained to investors, "destocking" was a market-wide event that began in approximately late 2021 and worsened through 2023, marked by

a substantial decline in demand as purchasers carried less inventory and sharply reduced their purchases from manufacturers like FMC. At the same time, the price of agricultural commodities plummeted, further reducing farmers' willingness and ability to pay for crop protection products. Manufacturer profits receded in 2023 as a result of this reduced demand.[5]

60. FMC communicated to the market that destocking was a painful but necessary process that the Company was allowing to run its course, since it meant that FMC had elevated inventory in its channel, but, once purchasers reduced inventory to normalized levels, FMC's normal, historical sales patterns would resume. For example, on the first day of the Class Period, the Company told investors that, although "[t]he crop protection market is working through the most severe channel destock ever on record," it "fully expect[s] the destocking reset is transitory and that the channel will begin to rebalance and ease back into somewhat more normal patterns as we enter mid-2024." The Company added that, "[w]hen that occurs, we want to be ready to take advantage of business opportunities," and assured investors that, "despite the immediate challenges we are addressing and the de-stocking phenomena, the fundamentals of our business remain strong." In fact, FMC noted that, in Brazil and the United States—its two largest markets—product was "already starting to flow through the channel" such that "we expect [the channel] to normalize pretty quickly."

61. However, contrary to what investors were led to believe, destocking was not being "work[ed] through" by "the [] market" organically, and FMC was not allowing it to run its course

---

[5] *See* Dr. Nomman Ahmed, *2023 Crop Protection Market Review, Looking Ahead to 2024*, AGRIBUSINESS GLOB. (Mar. 1, 2024), https://www.agribusinessglobal.com/agrochemicals/2023-crop-protection-market-review-looking-ahead-to-2024/ (last accessed on Jan. 9, 2026) ("A pivotal factor influencing market dynamics [in 2023] was the destocking of inventory by retailers, particularly for generic products but also those of key proprietary crop protection products. This movement exerted downward pressure on crop protection prices in crucial markets, leading to a notable contraction in sell-in across almost all regions and major markets.").

such that the channel could “rebalance” or “normalize” once customers were no longer oversupplied. Instead, as described *infra* Section IV.E, FMC employed high-risk, high-cost tactics to meet its targets—even reduced, destocking-adjusted targets—through sales that would not have occurred absent those tactics. Thus, while FMC told the market that demand was “transitor[ily]” weak as customers held lower inventory, but would stabilize and improve in the near term, the Company was in fact continuing to stuff the channel, actively ***counteracting*** destocking and normalization, and overstocking distributors and other customers so it could make and sustain inflated revenue targets.

**B. FMC Company Background**

62. Founded in 1883, FMC is one of the world’s most profitable crop protection product manufacturers. From FMC headquarters in Philadelphia, the Company’s senior managers oversee and direct a global workforce of over 6,000 employees, divided into four regions: North America; Latin America; Asia-Pacific (“APAC”); and Europe, the Middle East, and Africa (“EMEA”).[6]

63. FMC is a basic manufacturer of crop protection products, meaning that it primarily sells products that contain patented active ingredients. FMC’s principal products consist of four categories: insecticides, herbicides, fungicides, and plant health products. Among FMC’s largest revenue generators are insecticides containing its patented active ingredients Rynaxypyr and Cyazypyr, which belong to a class of chemical compounds called diamides. During the Class Period, global sales of insecticides accounted for 56% of FMC’s 2024 total revenues. As shown

[6] FMC also groups together the North America and LATAM regions as an “Americas” division for certain reporting and organizational purposes.

below, FMC's sales in Latin America accounted for 33% of FMC's revenue, North America accounted for 27%, and EMEA and Asia each accounted for 20%:







64. Brazil is FMC's largest market by reported revenue; India is its third-largest. In 2022, Brazil generated approximately $1.6 billion in revenue, and India generated approximately $450 million—together, more than $2 billion. At the start of the Class Period, Brazil and India's combined sales accounted for more than 35% of FMC's total revenues.

65. As discussed below, FMC primarily sells its product directly to authorized distributors. These distributors, in turn, sell FMC products to retailers, who then sell the products to growers and other end-users. FMC refers to the flow of its products from distributors to farmers as "the channel."




66. FMC's focus on Brazil reflects the country's status as the Company's largest market, and Latin America's status as the Company's largest and most lucrative region. FMC puts special emphasis on its sales to distributors in Brazil, and this is reflected in the fact that many veterans of the Brazilian crop protection industry are heavily represented in the Company's senior management. FMC's former President, Defendant Pereira, is a Brazil native who previously managed the Company's operations in that country. Another Brazil-born executive, Thaisa Hugenneyer, is the Executive Vice President responsible for FMC's manufacturing, logistics, and supply chain operations. In addition, Mills, the current CFO, Americas since March 2024 (which includes LATAM and Brazil), was also CFO, LATAM from April 2018 until July 2024.

67. At the start of the Class Period, FMC also had a significant presence in India, its third-largest market. The agricultural landscape in India differs sharply from that of FMC's two largest markets (Brazil and the United States), and it is dominated by much smaller growers. As public studies and data show, whereas farms in Brazil and the United States are large and

consolidated, averaging between 150 and 450 acres in size, farms in India average only approximately 2-3 acres in size. To reach these smaller, fragmented farms, FMC relies on a network of "Super Distributors," large companies that act as intermediaries between manufacturers and smaller distributors and retailers. Super Distributors, among other functions, store and hold manufacturers' inventory; supply smaller distributors, retailers, and other downstream channel participants; and manage logistics for manufacturers.

68. India's importance to FMC is further reflected in the Company's APAC leadership. For most of the Class Period, until April 2025, Pramod Thota—who is from India and was the former President of FMC India—served as President of the broader APAC region.

69. The Company has close and long-standing relationships with many of its distributors. Through those close relationships, FMC has strong visibility into channel inventory levels. Leading up to the Class Period, FMC touted its visibility to investors, frequently repeating that the Company had "good visibility into demand for the quarter," and that "visibility for Q4 [2022] is pretty good." And at FMC's 2023 Investor Day—the first day of the Class Period—Defendant Douglas told investors that FMC "use[s] various tools to gain visibility into on the ground applications" of the Company's products.

70. With respect to Brazil, the Company's largest market, Defendant Douglas explained its keen involvement in inventory management there:

> We manage inventory not only in our own facilities, not only in third-party warehouses, but also at the grower level. So, our sales force and our financial groups are actually lockstep in terms of how much products are we selling into the market, how much is actually getting through to the grower, and then importantly, how much is getting used on the ground. So, this system is completely different to what it was seven, eight, nine years ago in terms of how we manage inventory in Brazil.

71. Defendant Douglas further acknowledged during the 2023 Investor Day that FMC was investing resources in increasing its visibility into the global channel, including by personally visiting Brazil to talk to distributors there:

> [W]e're spending a lot more time talking to distribution, retail and where we have access to growers, talking to growers. That's happening in Asia, it's happening in Europe, certainly happening in the US and Brazil. Ronaldo and I were just – we'd literally just come back from Brazil over the last few days. And we spent a lot of time with very large co-ops talking about where are your inventory levels now versus where you expected them to be and as you look forward?

72. Thus, investors understood that FMC had strong visibility into its inventory levels and was focused on inventory in each of its geographic regions, with a focus on Brazil and Latin America.

73. Defendants also represented to the market that, notwithstanding India's highly fragmented agricultural landscape, FMC had effective control over inventory management and distribution through its network of Super Distributors, which Defendants claimed enabled the Company to efficiently place product with growers across India. Prior to the start of the Class Period, Defendant Sandifer explained the Company's Super Distributor model in India as follows:

> So in a place like India, in 2018 we moved to a distribution model using a group of five super-distributors that would then distribute down to a number of local and more regional, sub-regional within India distributors. That's been a great shift for us and it certainly accelerated our growth in India, but it still didn't give us complete coverage of all crops, all regions, all pockets in India. So we've continued to add in second and third tier distributors under that super-distributor structure to continue to increase our ability to reach all areas of India. . . . [w]hat we're trying to do there is essentially be able to get our products in the hands of more growers.

### C. In the Months Leading up to the Class Period, FMC Faced Scrutiny Over Rising Inventory Buildup and Increased Generic Competition

74. Like other crop protection companies, FMC experienced extreme volatility in the years leading up to the Class Period. Supply chain disruptions and the fear of product shortages during the COVID-19 pandemic caused distributors to overstock FMC products in their

inventories. By 2022, revenues at FMC and its peers jumped to record highs from this heavy buying activity. As supply chain disruptions ceased, however, distributors were left with excess FMC products and began to significantly reduce their orders, resulting in an inventory buildup and revenue slowdown for FMC prior to the start of the Class Period.

75. At the same time, mounting generic competition for FMC's marquee patented insecticides Rynaxypyr and Cyazypyr negatively impacted FMC's revenues in 2023. Patents for Rynaxypyr began expiring in August 2022, and, according to the Company, all Rynaxypyr patents will expire globally by the end of 2027. Moreover, patents for Cyazypyr began expiring in January 2024, and, according to the Company, all Cyazypyr patents worldwide will expire by the end of 2029. In 2022, these diamides combined to account for $2.1 billion of the Company's revenues, approximately 36% of total revenues. Overall sales for Rynaxypyr and Cyazypyr products, however, have fallen steadily since: in 2023, the diamides combined to account for $1.8 billion of the Company's total revenues, and in 2024, they combined to account for $1.5 billion of the Company's total revenues.

76. FMC faced another challenge in the weeks leading up to the Class Period when, on September 7, 2023, investment firm Blue Orca Capital published a report (the "Blue Orca Report") claiming that FMC "concealed from investors the deterioration of [its] core business[,] resulting in an inescapable cycle of falling revenues, plummeting cash flows, [and] declining profits." According to the Blue Orca Report, FMC's business deterioration had been worsened by FMC's use of steep discounts and rebates to offload product and "shore up" cash. The Blue Orca Report also asserted that FMC had misrepresented the strength of its diamide patents and the threat of generic market competitors heightened exposure to problems in its extremely important Brazilian market.

77. FMC rejected the contents of the Blue Orca Report, releasing, in response, a statement the same day, in which the Company claimed Blue Orca made "misleading and factually inaccurate statements regarding FMC's patents for its diamide insecticide technology and inaccurately speculated on the strength of FMC's business." The Company claimed that the Blue Orca Report contained "speculation and factually incorrect statements" but provided no specific rebuttals to or explanations for the report's contents.

78. These challenges culminated in late October 2023, when FMC reported a 29% year-over-year decline in revenue for its third quarter of 2023 because of "channel destocking in all regions."

79. By November 2023, FMC faced industry and investor scrutiny over its prior year's representations concerning demand for FMC's products, the level of its channel inventory buildup, and increasing competition from generic products entering the market.

### D. Claiming a Reset, Defendants Initiated "Project Focus" and Reported "Strong Results" and "Normalizing" Channel Inventories Throughout 2024

80. At the start of the Class Period, Defendants acknowledged the challenging market conditions FMC faced toward the end of 2023. On its Investor Day on November 16, 2023, the first day of the Class Period, the Company acknowledged its "inventory build" and the impact of destocking on FMC's financial performance and stock price, informing investors that destocking "has reduced or delayed typical order patterns, leading to severe volume declines across the whole industry." Defendant Douglas expressed to investors "how disappointed, frustrated, and more importantly annoyed I am in FMC's stock price performance this year," and assured investors that this performance "certainly do[es] not reflect the growth prospects and financial performance we have in front of us."

81. To "show [investors] . . . why FMC is a great investment opportunity," Defendants unveiled the Company's response to destocking: a strategic restructuring plan called "Project Focus," which Defendants represented would maximize operational efficiencies, right-size the inventory buildup and FMC's cost base, and "rebalance" inventory levels. They represented that Project Focus would result in massive cost savings and contribute to the Company's future profits and growth, particularly after the market finished "working through" destocking.

82. In its accompanying Investor Day Presentation, FMC outlined the "actions we're taking that significantly improve cost efficiencies across the enterprise and drive profitable growth" and "to align our business operations with the current market realities." It further detailed the manner in which Defendants were addressing destocking and managing FMC's channel inventory volumes, including "[p]rioritizing sales of existing inventory," "adjusting manufacturing plans," and leaning on its "[i]nnovative and differentiated portfolio."

83. The Investor Day Presentation stated the following, in relevant part:



84. In announcing this initiative, Defendants repeatedly assured investors that destocking was a "transitory," industry-wide phenomenon that would ultimately run its course. They represented that the Project Focus initiative was "designed to support and deliver profitable growth" into the future, long past destocking abating. They further assured investors that, thanks to this initiative, "***the channel will begin to rebalance and ease back into somewhat more normal patterns as we enter mid-2024***"—just a few months after Investor Day.

85. Throughout 2024, Defendants continued to describe FMC's efforts to normalize its channel inventories while incorporating changes that would "right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity." For example, on FMC's Q4 2023 earnings call on February 6, 2024, FMC CEO Defendant Douglas explained that the Company's global restructuring plan (*i.e.*, Project Focus) was "fundamentally transform[ing] our operating model, including how we're organized, where we operate and the way we work."

86. Defendants' efforts to get FMC on the right track and rebalance inventory and demand seemed to be working, and, throughout 2024, FMC repeatedly touted that its normalization campaign was paying off. For example, in February 2024, Defendant Sandifer stated that the Company's distributors and retailers were "***bringing their inventories back to more normal levels***," and that FMC was "***clearing out the channel inventory***." Also in February 2024, the Company praised its sales practices, with Sandifer stating that FMC had been "***pretty disciplined about limiting price discounting and not pursuing volume in a weak demand environment***;" in May 2024, Sandifer likewise stated that "***we have been disciplined about pricing and about not chasing volume that wasn't there, so as not to build up receivables and longer term collection risk***." Also in May 2024, the Company assured investors its "***inventory reduction***

***actions in the channel are making good progress***" as the Company approached the latter half of 2024. Defendant Douglas also assured investors in May 2024 that the Company was "***reducing channel inventory every quarter***" in India, and, once weather events settled in the region, the channel would stabilize because "***[t]he markets themselves are good in India for where the weather is good.***"

87. Investment analysts widely acknowledged FMC's efforts to bring channel inventories to more sustainable levels. For example, in a report published September 17, 2023, an analyst at Bank of America Global Research concluded that they expected a "recovery in demand in 2024" from channel destocking. In a Morningstar Analyst Note published on November 17, 2023, Morningstar detailed that: "We think the market is overly focused on the near-term decline in FMC's profits due to industrywide inventory destocking. . . Further, we think the market gives FMC virtually no credit for its pipeline . . . Accordingly, we see a strong margin of safety in the current share price, with much of the bad news already priced in." Morningstar additionally stated on December 12, 2023: "We view FMC's issues as temporary, driven by the industrywide inventory reset in crop protection products being held by retailers and distributors that are normalizing their own inventories . . . Accordingly, we view FMC shares as materially undervalued with the stock trading at less than 50% of our fair value estimate and in 5-star territory."

88. In another report, published on December 30, 2023, CFRA stated that "[o]ur Hold rating is driven by projected global crop protection demand, offset by the disclosed inventory reductions." CFRA also noted that it "view[s] grower inventory depletion and stock-to-use ratios which sit lower vs. historical averages as a nice tailwind for FMC's top line." An Equisights analyst report, issued on January 2, 2024, explained that "management's focus on cost-saving measures,

product mix benefits, and input cost moderation adds to the positive outlook for cost-related factors." The Equisights report went on to conclude that "[t]he company's commitment to innovation, cost management, and strategic restructuring provides confidence in its ability to navigate market challenges and capitalize on emerging opportunities. With a diversified portfolio, strong brand presence, and focus on market expansion, FMC remains an attractive investment opportunity in the agricultural sciences sector." And in a May 7, 2024 report, KeyBanc analysts commented that "FMC provided an update on channel inventories normalization by region," and that "[i]nventories in North America and Europe are back to normal for retailers/growers[.]"

89. Thus, with Project Focus underway and FMC's touted inventory reduction efforts supposedly making an impact, investors understood FMC's inventory problems to be waning, and FMC's sales practices to be "disciplined" and not subject to practices such as excessive "price discounting" or "pursuing volume in a weak demand environment" that could maintain or worsen the Company's channel inventory problems.

90. On June 11, 2024, FMC unexpectedly announced that Defendant Douglas, who had been with FMC for fourteen years, was no longer CEO, claiming that he "stepped down" effective immediately, and that former CEO and current Chairman of the Board, Defendant Brondeau, would once again serve as CEO. Analysts viewed Brondeau's resumption of the CEO role as a positive for the Company, with Seaport Research writing that "Brondeau is a known quantity" and "should hit the ground running." KeyBanc viewed the transition to Brondeau "as a positive step forward for FMC" and noted that "investors are likely to welcome Brondeau back with enthusiasm." Similarly, analysts at UBS remarked that Brondeau's appointment "brings a reset in credibility" that "is likely helpful for the stock." Indeed, FMC shares rallied on the news.

91. In that same June 11, 2024 announcement, FMC announced that President of the Americas, Defendant Pereira, would assume a new role as President of FMC. In that new role, Pereira assumed expanded responsibilities, including executive oversight for all commercial, sales, and marketing globally. Analysts, such as those at Seaport Research, noted that Pereira's new role indicated that "succession appears to be in place with Pereira," opining that he was "a strong candidate to take over as CEO" after Brondeau's term was over.

92. In connection with this news, FMC maintained its second quarter 2024 sales and EBITDA guidance, which analysts at KeyBanc viewed "as a positive development given the relatively difficult crop protection background," especially in light of a peer's lowered expectations that same day. During a Wells Fargo industry conference held on June 11, Defendant Sandifer presented a rosy picture for FMC, explaining that the Company was "***seeing***" "***things rebalance***," "***improving conditions***," and "***channel inventories reduced***." Analysts took note, with KeyBanc reporting that "[m]anagement highlighted that market conditions are continuing to improve as channel inventories are reduced. The market is described to be shifting from a correction to a recovery in the words of management. The Company is upbeat about the outlook for 2025 as: 1) unabsorbed fixed costs in 2024 turn into a tailwind; and 2) there is a pull on volumes from growers all the way back up the supply chain."

93. Following Defendant Brondeau's ascension to CEO, the Company continued to assure investors that FMC's channel inventory issues were resolving and performance was improving as demand rebounded in increasingly normalized channel. In July 2024, Brondeau reported increased demand and volumes, stating that he "***expect[s] demand to increase as the year progresses***" as "***[t]he markets have begun to recover***" and "***channel inventories are starting to normalize***." In September 2024, Brondeau, like his predecessor, attributed India's channel

inventory issues (and lagging destocking progress compared to other regions) to weather events, and reaffirmed that view in October 2024, stating that "***[d]estocking in [India's] channel is making good progress, aided by favorable weather***." Also in October 2024, FMC reported strong quarterly growth, which it attributed to the Company's "***improved channel inventory levels***." In December 2024, Brondeau highlighted progress in Latin America, singling out Brazil, "***where we see product going through the channel with the season, which is turning out . . . pretty good***."

94. Investment analysts continued to widely acknowledge and accept FMC's efforts to bring channel inventories to more sustainable levels. For example, on September 24, 2024, a Wells Fargo analyst reported that: "[t]he markets have begun to recover as channel inventories are starting to normalize." On October 23, 2024, a Citi analyst reported that "the company guides to demand recovery in [North America] and LatAm given channel inventory normalization which will trickle down to both top-line and bottom-line growth."

95. In a report issued on October 30, 2024, Seaport Research Partners credited FMC's guidance, stating that "FMC is generally seeing what it anticipated, which is that channel inventories in North America and Europe have returned to more normal levels" and that "Latin America inventories are progressing toward normal." Similarly, on October 30, 2024, a KeyBanc analyst parroted FMC's confidence for 2025, stating that "[m]anagement believes pricing is most closely correlated to channel inventories, which are expected to normalize in 2Q25."

### E. In Reality, FMC's Sales Far Exceeded Market Demand as Defendants Directed the Use of Manipulative Sales Practices That Worsened, Rather Than Improved, FMC's Unsustainable Channel Inventory Buildup

96. Despite assurances from the Company that FMC was setting down a new path, Defendants' short-sighted sales practices of pushing unneeded product into an already overstuffed market flourished during the Class Period. As former FMC employees confirm below, during the Class Period, FMC: (1) employed unsustainable and manipulative sales practices to push product

into the already congested market, leading to dangerously inflated inventory levels that the Company had publicly committed to reducing (*infra* Section IV.E.1); (2) forced through sales that the Company knew would be returned in ensuing quarters through essentially unlimited return policies, and reconfigured and delayed returns of unused product to avoid reporting returns and reversing recorded revenue, in order to inflate quarterly revenues (*infra* Section IV.E.2); (3) exploited FMC's APAC market, specifically India, in keeping India's channel inventory elevated and inflating the Company's revenues (*infra* Section IV.E.3); (4) recorded large sales to known high-risk and financially strapped customers, even where certain customers' bankruptcies left those debts unpaid (*infra* Section IV.E.4); and (5) pulled sales forward to achieve the Company's quarterly sales goals at the expense of later quarters (*infra* Section IV.E.5). All of these practices were directed or allowed to continue by senior management, including the Individual Defendants, worsened the Company's financial health, and were in stark contrast to the statements made to investors about FMC's supposed inventory reduction and rebalancing the channel.

97. Specifically, FMC forced excess product into its own distribution channel through high-pressure and high-risk sales tactics that included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory

by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically.

98. Although Defendants at times acknowledged the use of some of these sales practices in certain SEC filings and earnings calls, they never disclosed the true magnitude, scope, frequency, or risk profile of these practices. For example, Defendants acknowledged offering discounts and incentives, representing that they employed one of two specific accounting methodologies and drew on historical experience to determine the amount of such incentives and the amount recorded as revenue in transactions involving such incentives—and not that they offered near-unbridled discounts and rebates to stuff inventory into the channel. *See infra* Section IV.E.1. Defendants acknowledged that, although most of their payment terms "generally rang[e] from 30 to 90 days" and they "do not typically give payment terms that exceed 360 days," they offered extended payment terms in "limited circumstances" and in "certain geographical regions"—and not that terms of more than a year were routinely provided, terms were regularly extended interest free, and that sales of product were routinely recorded without any payment or physical exchange of product at all. *Infra* Sections IV.E.1, IV.E.2, IV.E.5. Defendants also

acknowledged that they offered a limited right of return in instances where "product does not conform to specifications"—and not that the Company offered an essentially unlimited return policy to inflate revenues and offered customers incentives to retain unwanted product so its reported results would remain inflated. *Infra* Section IV.E.2. The Company's statements concerning its employment of these tactics painted a picture to the market of adherence to discipline and restraint and a respect for the market's need to normalize and reduce inventory in the channel. As discussed *infra* Section IV.E.1-5, that picture did not match reality.

#### 1. FMC Employed Manipulative Practices to Report Sales That Far Exceeded Market Demand, Worsening FMC's Channel Inventory Buildup

99. Numerous former FMC employees describe how leading up to and throughout the Class Period, while Defendants assured investors that FMC had embarked on a global restructuring plan to "fundamentally transform our operating model, including how we're organized, where we operate and the way we work," FMC employed aggressive sales tactics to generate sales in excess of market demands. These practices perpetuated and worsened FMC's channel inventory buildup—the very inventory buildup Defendants had publicly committed to reduce and reported that FMC was reducing—during the Class Period.

100. The use of these undisclosed manipulative sales tactics was particularly widespread in FMC's LATAM market, the bulk of which was centered in Brazil, a country that historically generated nearly 30% of FMC's total annual revenues.

101. FE-1, a senior level sales manager working out of Brazil who reported to FMC's Brazil Commercial and Business Director, recalled that FMC used all available methods to facilitate sales, including rebates, discounts, longer payment terms (which could exceed a calendar year), and the ability of customers to return product within a year of purchase. Over time, FE-1 explained, these incentives increased depending on the length of the crop cycle.

102. While these aggressive sales tactics began prior to 2023, they increased in 2023 at the same time Defendants were signaling to the market that the Company would allow the market to reset and reduce inventory. Years before the Class Period, FE-1 stated that FMC offered to pay customers' storage, transportation, and insurance costs in an effort to convince them to take on more product. Although the market was already adequately supplied with product and large distributors in Brazil were experiencing inventory buildup, according to FE-1, FMC continued to push its customers to buy additional product. FE-1 explained that while this practice occurred prior to the appointment of former CEO Defendant Douglas, the practice increased once he became CEO (in 2020), as Douglas was more aggressive in his pursuit of sales goals. FE-1 recalled there were "many" more meetings occurring under Douglas to discuss sales than his predecessor.

103. FE-1 explained that between 2022 and 2024, the Company increased the number of incentives that were offered to customers when the market was already adequately supplied with product and the large distributors in Brazil were experiencing inventory buildup. This included, for example: (i) protection against exchange rate fluctuations between the U.S. dollar and the Brazilian real; (ii) guaranteed right of return for product that the customer could not sell; and (iii) payment for storage and insurance costs at a third-party logistics company so the customer could take on additional product. Another incentive, FE-1 stated, was to extend payment terms without interest whereas a payment term originally for 90 to 100 days was extended to 120 or 180 days, and a payment term originally for 12 months was extended to 18 months. This was a big risk because this practice put FMC further down the line for payments due from farmers.

104. FE-1 stated that during the final week of each fiscal quarter or year, FMC approached customers to strike deals specifically aimed at meeting year-end sales targets. Under these arrangements, customers filled out the paperwork necessary for sales, allowing FMC to

record sales before the quarter closed. However, many times customers did not honor these payment agreements at all or only honored them partially and returned the remaining product.

105. Former employees described how, in these types of deals, the Company recorded a sale even though the product was never received by the distributor. This practice directly conflicted with the Company's repeated representations in its SEC quarterly and annual filings that sales were only recorded and revenue recognized once control of the product transferred to the buyer. In these end-of-quarter deals, FE-1 explained, there was an exchange of paperwork and issuance of a document whereby the customer assumed ownership of the product ***without any physical exchange of the product***. Instead, FMC sent the products to a distribution center, where the products sat unused. FMC paid the cost of transporting, insurance, and storage of the product at a third-party distribution center on behalf of the customer. Some of the products sat in storage for over a year, while other products expired while sitting in the distribution center. According to FE-1, FMC only asked customers to pay for the unused products if there was a product shortage. In the case of a shortage, FMC would ask customers to pay for the unused products and would sell the products to other customers if they refused. FE-1 explained that there was no guarantee that the customers would honor these end-of-the-quarter deals. As noted below, *infra* at ¶¶168-69, in India, FMC often did not even ship product to a third-party distribution center, but kept the "purchased" product in its own warehouse without shipping product out at all, while recording a sale and reporting revenue for the sale, in conflict with its own stated practices.

106. FE-1 recalled that these practices grew more common throughout his tenure in 2023 and 2024, as the Company began selling customers far more product than was needed at lower prices and in higher volumes. Eventually, the distribution centers informed the Company they had

run out of space and could no longer accept FMC's excess product. FE-1 explained that FMC lost money on sales where customers did not end up paying for the product or the product expired.

107. FE-3, a Regional Sales Manager in Brazil until his departure in January 2024, confirmed FE-1's accounts of aggressive sales tactics leading up to and continuing into the Class Period, explaining that FMC used aggressive tactics and personal relationships between Sales Representatives and the Company's customers to force through new sales on products that customers simply did not need. For example, FE-3 recalled how FMC became aggressive with the rebates offered to customers to further entice them to take on product. According to FE-3, for example, FMC offered sales on credit so customers did not need to pay for product; FMC then sold that credit to banks. FE-3 explained that in Brazil, both FMC and the client were liable for payment for these types of transactions, but that FMC reported these transactions as paid sales immediately.

108. FE-3 further explained that it is his understanding that FMC's current CFO for LATAM (and beginning in March 2024, also for the Americas), William Mills, was aware of these rebate practices because such transactions required financial expertise and CFO approval, explaining that although credit notes with lower dollar figures were authorized by the Finance Department, for which Mills was responsible, as the value of credit notes increased above a certain dollar figure, these transactions required approval from Mills.

109. As another example of manipulative sales and revenue reporting tactics, FE-3 said that FMC routinely booked long-term sales agreements as short-term. According to FE-3, this was not only fraudulent but also led to extra costs for FMC. For example, instead of paying 3% interest to banks on short-term sales, the Company was paying 7% interest on long-term sales. According to FE-3, while this conduct was partially brought to light in the Blue Orca Report a few weeks

before the start of the Class Period (*see supra* ¶¶76-77), this behavior continued at FMC after the start of the Class Period. In fact, FE-3 explained that following the publication of the Blue Orca Report, FMC sent a notice to all employees instructing them to ignore the report, and Pereira led a meeting with the entire Commercial and Marketing Teams where he reiterated the same.

110. FE-3 also explained how FMC attempted to persuade distributors to take on more products through rebates and incentives, such as, for example, offering rebates of $2 or $5 for every liter a distributor sold down the channel. While rebates were a common practice in the crop protection industry, FMC began offering what FE-3 described as "rebates over rebates," which were not officially reported because they would not have been approved by FMC's compliance function. FE-3 also recalled that there was a limit on the percentages of sales that FMC was able to give as a rebate, but the Company found alternative ways to get around these limitations while maintaining compliance. For example, the Company classified additional rebates or discounts ("rebates over rebates") in other categories of expenses for reporting purposes to take away the focus of compliance, such as by classifying a trip offered to a distributor as marketing fees.

111. According to FE-3, both incentives and pressure increased in 2023 as customers became more reluctant to take on additional product, causing FMC to come up with creative ways to close sales, including additional benefits, covering the customer's taxes, and restructuring rebates. FE-3 explained that FMC commonly offered distributors trips, such as major soccer games or fishing trips, and other benefits such as sponsored events at a distributor's offices and paying for employee training, as incentives. FE-3 recalled that the Company offered benefits and exemptions to customers to entice them to buy more products and, if customers did not agree to those terms, they were promised additional benefits.

112. FE-2, a Regional Sales Manager in Brazil until late 2024, corroborated the above accounts and confirmed the impact and escalation of the Company's use of aggressive sales tactics to force through sales of products that the market did not need. According to FE-2, sales practices at FMC were "normal" in 2018 and 2019, but beginning in 2020, the Company's CFO for LATAM, William Mills, personally called FE-2 to pressure him to increase his sales. FE-2 recalled that Mills, who was responsible for financial reporting and financial analysis, participated in meetings with the Commercial Team at least once a quarter, and demanded results from Brazil Business Director, Marcelo Magurno, who reported to then Head of Americas, Defendant Ronaldo Pereira, and the Commercial Team.

113. FE-2 described how in 2023, the existing inventory levels in Brazil were valued at approximately $1 billion (meaning that $1 billion of unused inventory was already out in the market), and this information was reported to Pereira. FE-2 recalled becoming aware of inventory levels reaching $1 billion in Brazil during 2023. FE-2 explained that he knew the total Brazil inventory levels because while his own region contributed to that $1 billion figure, he knew of the total inventory levels through his access to databases available to him as well as through discussions in meetings with other members of the sales teams where inventory levels throughout Brazil were discussed. FE-2 explained that, with respect to the databases, in his role he had access to inventory data for all of Brazil, as did the rest of the sales team. According to FE-2, teams in the field collect inventory data and input them into FMC's internal systems which are then reported to the Marketing Team working in Campinas, Brazil. According to FE-2, inventories remained built up in 2024. For example, in FE-2's region alone, the market was worth approximately $120 million, but there was already $120 million worth of inventory buildup. FE-2 recalled that while

the sales goal was set lower at $60 million, that was a huge challenge when the channels were already full.

114. FE-2 further recalled meetings in 2023 and 2024 attended by Defendant Pereira, other Regional Managers in Brazil, and other senior management, where discussions occurred about lowering inventory figures. FE-2 continued to say that each Regional Manager discussed inventory levels in their territory which added up to approximately $1 billion.

115. FE-2 recalled that while Defendant Pereira was not present in meetings where pressure was placed on the Commercial Team, it was known he was placing pressure on "high management," which included Brazil's Country Manager and FMC's CFO for LATAM (and beginning in March 2024, also for the Americas), Mills, for results, demanding that they had to make "sales, sales, sales." Mills personally called FE-2 to pressure him to increase his sales. FE-2 confirmed that pressure to increase sales very much increased in 2023 and 2024 (during the Class Period).

116. FE-2 explained that the pressure to increase sales included offering incentives to distributors in the form of rebates, discounts, cost adjustments, and price matching. FE-2 added that non-financial incentives were also offered in the form of days in the field showcasing products. According to FE-2, to entice customers to take on more product, the Company had to offer very big discounts, some as high as 30%, as well as provide generous rights of return. FE-2 confirmed that the problem he faced was the pressure of meeting these sales goals while trying to sell to customers who already had inventory and were paying FMC's high prices. FE-2 explained that while commercial pressure is normal, the illegitimate practices deployed by FMC were bad and not normal.

117. According to FE-2, the Company also set sales goals for bonuses and commissions. One indicator was lowering inventory and employees were made aware of rising inventory levels. FE-2 explained that incentives that were being offered to sell more products were a sign that the Company was aware of inventory issues. According to FE-2, FMC was no longer competitive on price with the introduction of Chinese competition in the market and in turn inventory continued to build up. FE-2 added that this was further exacerbated by the Company allowing customers to return product that they took on.

118. According to FE-2, the Company's claims that products such as Onsuva and Cyazypyr were experiencing positive sales figures and growth in 2024 was due to the already-high inventory buildups for Rynaxypyr and Bifentra. FE-2 explained that FMC wanted the Commercial Teams to push Onsuva and Cyazypyr in Brazil as alternatives in order to meet sales targets.

119. FE-2 described FMC's sales practices as a big discomfort for him in 2023 and 2024 because sales growth was insufficient to offset returns and still meet the overall sales targets. According to FE-2, based on his decades of experience in the industry, although it was difficult to acknowledge when sales targets could not be met, it was even more damaging to inflate inventory levels only to have the product returned later, as was happening at FMC. FE-2 added that not only was this practice potentially illegal, but it also affected the Company's ability to make future sales, as ultimately occurred in 2024.

120. FE-10, who served as a Supply Chain Manager from September 2022 through spring 2025, recalled that when he joined FMC, he was told that FMC does not "worry about inventory" and that the Company's emphasis was on having enough product on hand to ensure that FMC did not miss out on any sales. FE-10 disagreed with this approach, explaining that FMC

needed more long-term planning even if it meant sacrificing some sales, but that the Company did not want to do this.

121. According to FE-10, FMC was a "very short-sighted" company with a "very commercial focus." FE-10 further explained that the Company's focus was always on the next quarter or the next reporting period. According to FE-10, FMC's employees "crave[d]" longer-term strategy and foresight from the Company's senior managers.

122. FE-12, a former senior officer in one of FMC's APAC regions until spring 2024, confirmed that although the Commercial Team had informed leadership that the market could not take on any more product, the Commercial Team was instructed to continue to sell. For example, when FE-12 directly communicated to Defendant Douglas that he was unable to meet sales targets, FE-12 was told, "no, no, no, somehow you will." FE-12 described leadership at FMC as "morally corrupt people" and noted that they acted "brazenly" with their improper behavior for their own personal benefit. According to FE-12, FMC enticed employees to participate in bad business practices by offering them much higher salaries than competitors such as Bayer and Syngenta. FE-12 explained that this is done to force employees to decide to either follow the Company line or accept a lower salary elsewhere.

123. FE-13, a member of one of the Company's four regional leadership teams who attended monthly S&OP meetings, raised concerns about inventory in various locations, including India, from 2020 through the end of FE-13's tenure. FE-13 explained that in the time just prior to the Class Period, FMC was taking "loading [the channel] to another level relative to competitors" in various countries. While FE-13 was at the Company, "top-down forecasting" was common and FE-13 stated that employees shared a common view that the goals that were set by executive leadership exceeded forecast information coming from individual countries and were "a stretch

that was eventually going to collapse." As a result of the Company needing to push product and meet these unattainable goals, FE-13 recalled that customers in various regions started waiting for quarter end deals to buy their goods.

124. Heavy pressure to push sales through despite the lack of demand was also prevalent in the European markets. FE-9 described how he participated in weekly meetings to discuss progress during the quarter and produced written reports providing high-level analysis of the current situation to headquarters in Philadelphia. FE-9 added that he had access to customer inventory data when making his assessment and that "we [the European market] raised the red flag" that sales were going to be difficult and that inventory levels were too high. FE-9 explained that he was responsible for Austria, Germany, and Switzerland, but "everyone else" in Europe was in the same situation.

125. According to FE-9, his direct supervisor, Sebastià Pons, who reported directly to the CEO, also had direct communication with headquarters in Philadelphia about the issues that Europe was facing. FE-9 explained that the messaging they received in return from leadership was that they "recognized" the difficulty that teams in Europe were facing and to "be creative" and to continue to "push" sales.

126. FE-9 explained that "bottom up" budgets were presented to leadership and Europe and then "top down" responses were provided by headquarters in Philadelphia, including from former CEO Defendant Douglas. FE-9 recalled that when presenting the forecasts, opportunities and risks for what may impact the forecast positively or negatively were also presented. FE-9 further recalled that leadership wanted to hear more about opportunities for increasing sales and less about possible risks.

127. According to FE-9, Country Heads in Europe met to establish yearly targets, and then produced forecasts based on what was deemed realistic. According to FE-9, forecasts were reviewed weekly based on progress during the quarter and adjustments were made accordingly. FE-9 explained that messaging such as that it was very unlikely that markets in Europe would reach their sales targets was communicated and the response from the "top down," including from Defendant Douglas, was "we hear you but try to get more."

128. According to FE-9, Country Heads began "underbudgeting" or setting lower targets. Yet, regardless of what targets were set, FMC's senior leadership "always added on top" of that number and Country Heads were responsible for trying to make up the difference. FE-9 said the Country Heads attempted to reach these unrealistic targets through additional meetings with customers during which they made "special offers" and conducted marketing promotions.

129. FE-9 described 2023 as a "perfect storm," so meeting goals for 2024 became "impossible." Because FMC failed to meet its targets in Q1 and Q2 of 2023, "pressure mounted" to make pre-sales in the second half of the year. FE-9 added that these issues were raised to management, but FMC continued working towards established targets.

130. According to FE-9, FMC started "pushing too much product" to wholesalers to hold in their warehouses at the end of 2023. FE-9 added that wholesalers took on product during this period because they were able to benefit from receiving product early at current prices and also benefit from rebates and other discounts offered by the Company. FE-9 recalled that during this period in 2023, interest rates were increasing and taking on more inventory was becoming more expensive for wholesalers and the Company had to utilize further rebates and adjusted payment terms to entice them to take on product.

131. FE-9 also recalled his region experiencing "huge build ups" of inventory and explained that inventory buildups at the end of one year impacted sales for the following year since some sales that would have been made in 2024 were made in 2023 and a "perfect agricultural season" was then required to meet targets.

132. According to FE-9, the Company had the ability to monitor inventory levels at wholesale, retail, and farm levels through reports employees received, and he informed EMEA headquarters in Geneva about concerns regarding the "huge stockpile" of inventory he was observing. FE-9 explained that he participated in weekly calls with Country Heads and Geneva, where stock/inventory levels were discussed. FE-9 added that he produced monthly reports based on information he was receiving from down the channel. FE-9 recalled that he noted in his report at the end of 2023 that there was "excess stock in warehouses" which in turn would "put pressure on Q1 targets."

133. Regional leaders from around the world expressed concerns about the unattainable sales targets and unmanageable inventory, and those concerns were discussed with FMC's CEOs Defendant Douglas and Defendant Brondeau. According to FE-10, he understood that in strategy meetings among all regional leadership and former CEO Mark Douglas or current CEO Pierre Brondeau and current President Defendant Pereira, forecasted projections brought forth by European and other leaders were ignored in favor of higher, less obtainable forecasts produced for reporting purposes.

134. The rising inventory was communicated to leadership throughout the Company on a regular basis. According to FE-10, beginning in early 2024, and possibly during 2023, Regional Commercial Leaders and Supply Chain Leaders were provided monthly inventory projection reports that were automatically generated by FMC's central system, which included information

on sales forecasts and results, inventory levels, and "slow-moving inventory." FE-10 explained that Leaders in each region were responsible for responding to these reports and providing action items for how slow-moving inventory was going to be addressed, and that these responses were sent to the Company's headquarters in Philadelphia.

135. FE-10 explained that the Company instituted a "robust scorecard dashboard" in 2024 which showed slow-moving inventory both regionally and globally, and provided month-over-month figures. According to FE-10, despite small steps taken to improve supply and demand planning, during Q4 2024 the same short-sighted approach was echoed by the new Executive Vice President, Integrated Supply Chain and Chief Sustainability Officer Thaisa Hugenneyer, who stated in a meeting, "I don't want to hear anything beyond this quarter," and further stated that if FMC failed to meet targets for 2024, the Company "won't survive."

136. FE-6, who was employed by FMC throughout the Class Period until his departure in January 2025 as a Supply Chain Management Lead and who oversaw aspects of FMC's supply chain, similarly described increased sales pressure and targets for 2024 within North America that exceeded actual demand. FE-6 noted how FMC was "pleading with customers" to take on product to meet its targets, yet the Company nonetheless ***increased*** its sales targets for 2024." FE-5, a U.S. sales representative responsible for marketing FMC products to retailers, wholesale distributors and distributor-owned retailers during the Class Period until his departure in spring 2025, explained that in order to reduce inventory in the channel and increase revenue in 2023 and 2024, FMC management wanted its sales representatives to "get it [product] out the door" at any cost, such as by making "price more favorable by offering additional rebate programs."

137. FE-5 heard from his colleagues at FMC and from his retailer clients that the Company pushed its distributors to clear out inventory so it could sell them new products,

regardless of their actual needs. In order to achieve this goal, FE-5 described how he heard from his colleagues at FMC and from his retailer clients that FMC product was being sold "cents on the dollar" to the "tin shed market." FE-5 described the "tin shed market" as retailers that would agree to purchase product from distributors and retailers without any assurances—no returns, no financing, and no ability to file a performance claim. In exchange for the foregoing assurances, the retailers paid significantly less for FMC's products.

### 2. FMC Offered Essentially Unlimited Return Policies, Sold Product Knowing It Would Be Returned in Subsequent Quarters, and Slowed Down and Reconfigured Returns of Unneeded Product to Avoid Reporting the Hit to Revenues

138. Contrary to Defendants' representations to the market, FMC engaged in manipulative practices relating to product returns, as recounted by numerous FEs. Although FMC publicly represented that, per the description of its return policy included in annual filings with the SEC, it "offer[s] customers a right of refund or exchange in case delivered product does not conform to specifications," and, "in certain regions and arrangements . . . offer[ing] a right of return for a specified period," in reality, FMC routinely offered customers an unlimited return policy, encouraging and accepting returns irrespective of whether product "conform[ed] to specifications" and without regard to any "specified [return] period." As recounted by multiple FEs, FMC sold product with the intent and expectation that it would be returned, knowing at the time of sale that there was not underlying customer demand. In many instances, FMC did not even ship product or require or receive payment for such sales. FMC used these generous, often unlimited return rights to induce customers to accept volumes of product far exceeding actual demand and recorded these transactions as sales to meet internal forecasts. Afterward, FMC offered customers incentives to retain this product so its reported results would remain inflated, and took steps to delay, discourage, and prevent returns to avoid reversing recognized revenue.

These manipulative return practices, which were concealed from the market, exacerbated FMC's channel inventory overhang and directly contradicted Defendants' representations that they were working to reduce inventory levels during the Class Period.

139. FMC's improper return practices were widespread. As FEs recounted, FMC routinely sold product with the knowledge that it would be later returned without penalty. FE-12 described how in APAC and in India specifically, "everyone knows" that sales contracts allowed for returns if the product cannot be sold. According to FE-12, FMC exploited this right to return to the fullest extent. FE-12 added that because APAC farmers will not carry inventory, generally, the inventory, if not sold through to farmers, would be sent back to distributors who returned the product to FMC. According to FE-12, FMC exploited this right to return option to convince distributors to take on more product than was needed and, if data for each quarter is analyzed for sales and returns, FMC's exploitation of this right to return will be clear to see. FE-12 further explained that there are built-in assumptions for what percentage of sales will be returned for reporting purposes, but this figure was far exceeded in India.

140. FE-12 specifically recalled conversations in person and via chat messages with former Asia Finance Director, Sujit Mukherjee, towards the end of quarters where FE-12 informed Mukherjee that he would be unable to sell additional inventory to meet forecasted figures. According to FE-12, Mukherjee instructed him to sell to customers anyway and then take the product back following the quarter. According to FE-12, distributors would not pay FMC until product was sold and knew the additional inventory could not be sold within six months. FE-12 continued to explain that in these instances the transaction was still reported as a sale, despite the fact that there was no demand for the product and a return was all but guaranteed. Mukherjee told FE-12 that he had to sell enough product to meet forecasts and that the Company would then take

the product back following the quarter end. FE-12 wondered, "how can we do business like this?" meaning recording deals that were complete on paper, while legitimate sales were not occurring.

141. India's "Goods and Services Tax" or "GST," provided another avenue for exploitation. FE-12 explained that India's GST enabled FMC to claim the value of the tax paid from the government if the product was returned within six months (*i.e.*, $18 GST on a $100 product). FE-12 stated that the same product was sold, returned, and sold again to meet sales numbers while qualifying for taxes paid to be claimed by FMC a vast majority, or 95%, of the time. FE-12 further explained that the 18% GST tax was only recoverable if product was returned within six months, which provided FMC with approximately two quarters to facilitate the return of product.

142. According to FE-12, FMC's sales tactics went beyond a little excess inventory. For example, FE-12 explained that while yearly revenues in Vietnam were approximately $20+ million, there was $30+ million in outstanding receivables due to inventory in the channel. According to FE-12, $4 million to $7 million worth of inventory would have been acceptable, with $8 million in inventory as the worst-case scenario. According to FE-12, however, there was "no way" to grow that much (meaning $30+ million) in a single year in Vietnam, and this was reflective of the fact that the "greed was too high" at FMC. FE-12 described these sales (which were expected to be returned) as "worse" than inventory just sitting in the channel, because it was very unlikely that FMC would see money from any eventual sales of this product.

143. FMC also sold product with the knowledge that it would be later returned—and without shipping it first—in Brazil. FE-2 explained that the practice of issuing an invoice of sale while FMC maintained possession of the sold product was very common at FMC, especially towards the end of the fiscal year when sales were needed in order to meet sales targets. FE-2

explained that customers then returned the product, which had never been shipped, after the quarter ended. According to FE-2, the reason customers accepted excess inventory was due to the financial incentives that FMC offered, including no-cost returns.

144. Further, according to FE-2, in his region in Brazil, FMC did record sales of product to customers only on paper, while the physical inventory that appeared to be sold remained in the possession of FMC. FE-2 explained that while this process is known as "bill and hold," and is legal under Brazilian accounting regulations, FE-2 opined that it is misleading when the Company has publicly noted that they only recognize sales when product is shipped to a customer.

145. FE-2 recalled that FMC had generous right of return deals with a number of large distributors.[7] According to FE-2, these distributors were responsible for large sales and subsequent large returns. FE-2 explained that senior management, including Mills, CFO for LATAM (and after May 2024 also CFO for the Americas), was aware of these deals, that Defendant Pereira (President, Americas and since June 2024, President of FMC) had requested that these deals occur, and that, in 2024, Bruno Pereira Lopes Giudicissi (Magurno's successor and current Brazil Business Director) requested that FE-2 resume offering these deals to distributors after a brief pause. FE-2 was present in meetings where these deals were discussed, and the instructions from Mills, Giudicissi, and Ferreira were to have these conversations verbally and not in writing, and to be careful with emails. According to FE-2, everyone was aware of these deals, and they have continued since his departure from the Company. FE-2 confirmed that the sales team was not allowed to document the instructions employees were being given to reach sales targets, so they were shared with employees verbally. FE-2 explained that the Company delivered these

[7] Some of FMC's largest distributors in Brazil included AHL, TCHÊ Produtos Agrícolas, and Cooperfarms.

instructions in a very cautious way, and he personally heard these directives come directly from Pereira and Mills.

146. FE-2 recalled that in order to keep the P&L position, he was instructed by Directors, including Mills, Ferreira, Giudicissi, and others that for each $1 of product returned, FE-2 needed to sell $2 of new product. FE-2 explained that Mills, Ferreira, Giudicissi, and current Business Finance Associate Director Fabiana Coimbra, who reported directly to Mills, all attended and participated in direct negotiations with distributors regarding right of return agreements, which FE-2 also attended. These deals persisted until FE-2 left the Company and continued, noting that even after FE-2's departure, FE-2 learned from colleagues that FMC had offered customers at AHL a deal with the right of return for 2025, approved by Giudicissi.

147. In September 2024, FE-2 recalled that Giudicissi pressured him to increase inventory and improve sales for Q3 2024, but FE-2 refused. FE-2 discussed these issues with Giudicissi and explained that these deals with these rights of return were a big risk and compliance problem. When FE-2 departed the Company, Giudicissi brought in a replacement, current Regional Sales Manager, Bruno Alves, to conduct these types of deals. FE-2 further recalled directly clashing with current President of FMC Brazil Renato Guimarães about approaching customers and offering guaranteed returns to increase inventory. FE-2 added that Giudicissi was knowingly doing deals of this nature.

148. FE-2 is aware, through conversations with customers in his current job, that Giudicissi is currently carrying out the same practices to reach sales targets in 2025. Once FE-2 left FMC in late 2024, FMC went back to customers and made the same risky deals they had previously, further increasing inventory levels, which FE-2 knows from his current role in which he sells to the same customers. FE-2 explained that inventory in all of Brazil increased overall in

2024, including in his region following his departure. FE-2 recalled one customer explaining that once FE-2 left FMC, the Company had begun offering that customer the deals that FE-2 had refused to offer before his departure.

149. According to FE-2, Defendant Pereira and Mills knew to be careful not to mention these deals in writing. FE-2 explained that former CEO Defendant Douglas would have been aware of these deals due to Douglas's very close relationships with Pereira and Mills, and FE-2 explained that he discussed these issues with his direct supervisor.

150. FE-3, a Regional Sales Manager in Brazil until his departure in January 2024, and FE-12 confirmed FE-2's account of how sales representatives were instructed not to put deals with improper customer incentives in writing. Marco Faria, Sales Director for the Eastern Region in Brazil and FE-3's direct supervisor, instructed FE-3 to not put anything in writing and to only verbally agree to these conditions, noting specifically that Faria instructed him to tell customers that in exchange for not returning product, FMC would pay the associated taxes and storage costs related to that product. Rather than write down terms and to avoid a written record, according to FE-3, Sales Representatives would tell clients: "Trust me, I always deliver what I promise."

151. FE-12 also recalled that executive leadership were careful to never put anything in writing and always had directions come from other employees. FE-12 added that this was a "very regular practice" at FMC, especially in reference to instructions to sell product and then take it back following the quarter end.

152. FE-10, who served as a Supply Chain Manager from September 2022 through spring 2025 and was responsible for supply and demand planning as well as supporting the efficiency of processes in multiple regions, confirmed the accounts of FE-2, FE-3, and FE-12, and recalled observing returns occurring in Latin America a month or two following the end of each

quarter. FE-10 explained that he observed a lot of pressure on Latin America given how important that region was to FMC. FE-10 added that it is his understanding that pressure on sales teams is even greater now. FE-10 also noted that FMC "overload[ed]" employees in an attempt to reach sales targets, and the Company's approach was sales over everything else. FE-10 recalled that FMC placed "huge pressure" on the sales teams, with a lot of pressure falling on teams in Latin America. FE-10 further recalled that commercial and marketing teams were so overloaded and focused on sales that they were not able to contribute any effort or time to collaborating on supply and demand planning.

153. FMC faced similar issues with product returns not being recorded as returns (*i.e.*, revenue remaining recognized even after a return occurred) in North America. FE-4 was an internal audit analyst at FMC from June 2023 until July 2024 at the Company's Philadelphia headquarters. FE-4 reported to John Mulcahy, who was the Chief Audit Executive at FMC. FE-4 was part of a team of internal auditors responsible for auditing financials and inventory, including product inventory and assets inventory.

154. As part of FMC's audit team, FE-4 visited FMC facilities in the United States to conduct inventory audits at the Company's U.S. locations. FE-4 was aware of audits conducted by his overseas colleagues at FMC sites in China, Italy, Brazil, and other countries. According to FE-4, inventory was "always a problem" at every FMC location audited, including "a lot of product returns and invoices" that were not recorded as returns.

155. FE-4 stated that the Company's audits were not conducted for the purpose of fixing any problems with inventory or tracking. According to FE-4, "The whole reason we were doing these audits, it was my impression, was they were making sure we completed the audit." FE-4 elaborated and explained that he never felt like the audits were conducted for the purpose of fixing

any problems at the company, but instead to "check the box" that the audit had been conducted. "There were no consequences" for sites when auditors identified discrepancies in reporting. "There was no impact if a negative audit rating" was issued, explaining how the same problems occurred at every audit at every site over and over again.

156. FE-4 explained how, at the end of every audit, FE-4 and his colleagues would create a report and meet with FMC Chief Audit Executive, John Mulcahy, to discuss their findings. However, as described above, FMC never acted on the discrepancies the audit team identified. According to FE-4, there were "no consequences" for the inventory discrepancies that the audit team identified. FE-4 observed that inventory "was always a problem" at the FMC sites he audited, yet no site was held accountable. According to FE-4, FMC had a "lax attitude" about inventory discrepancies, which FE-4 described as "significant."

157. Former employees also described how, after sales were made that were likely (or certain) to be returned, FMC then employed tactics aimed at stalling or slowing down returns to avoid taking the inevitable revenue hit in the present quarter. FE-3 explained that since 2022, sales numbers at FMC in Brazil were all inflated and artificial due to the manipulative sales practices that were implemented. FE-3 explained that asking customers to take on more product than they needed was a normal practice, and part of the culture at FMC. However, FE-3 recalled how FMC put pressure on distributors and clients to keep and not return the unneeded products because sales had already been reported, and they did not want to reverse the sale on its books and subtract the revenue.

158. FMC had a policy to avoid returns and customers were compensated to minimize returns in the form of benefits that conflicted with the Company's written policies, FE-3 explained. In order to prevent returns from being recorded on FMC's books, according to FE-3, FMC

instructed Sales Representatives to use their special relationships with customers by asking customers to retain products rather than make returns, on top of already existing pressure to buy more products than the customers needed. For example, Faria instructed FE-3 to tell customers that in exchange for not returning product, FMC would pay the associated taxes and storage costs related to that product.

159. FE-2 provided additional details about the Company's efforts to slow or stop returns of unneeded inventory. FE-2 explained that there was a clear understanding with customers to accept a sale and agree to increase their inventories in exchange for a promise from FMC for support, which included the right of the customer to return product or seek additional discounts. FE-2 added that the promise of a right of return was a problem because of the risks associated with these types of agreements. According to FE-2, sales of this nature (*i.e.*, with a similar delayed payment and right of return) are considered to be a non-completed sale, but these sales were reported as complete for the financial health and stock price of the Company.

160. As FE-2 explained above, in order to meet sales goals, senior management made deals with distributors whereby sales were recorded, but the distributors were not liable for payment and were able to return product after the quarter ended. As a result of these deals, product returns became more common, and distributors regularly returned products before payment was due. FE-2 recalled an incentive for the Commercial Team to find alternatives to prevent returns. FE-2 claimed that senior management instructed distributors to make returns slowly so that FMC would have time to sell to other distributors, such that it could still log the sales for that quarter. According to FE-2, these deals were done "exclusively" as a tactic to record orders as sales at the end of each quarter. Further, FE-3 confirmed that these returns and rebate practices required approval from Mills.

161. However, the Company's attempts to stop or slow down returns faced significant hurdles during the Class Period. FE-2 explained that in those circumstances where deals were agreed upon, booked as sales, and the customer was not liable for payment, the customer had up to a year in some instances to make payment. According to FE-2, this gave customers time to sell, but also presented a risk that if the customer could not make the sale, they would not pay for and would ultimately return the product with no exchange of money (despite the same being recorded as FMC revenue). FE-2 recalled instructions to have customers make returns slowly, which FE-2 described as "dangerous," because these instructions were often given verbally and informally. FE-2 explained that FMC made an effort to delay returns until after the quarter end to try to make up the sales in the interim, yet problems arose when they could not make enough new sales to cover the returns. FE-2 explained that the Company's attempts to stop or slow down returns faced significant hurdles during the Class Period.

### 3. FMC Exploited Its Asian Market and Relationships with Super Distributors in India to Inflate FMC's Results

162. Due in part to the structure of the sales channel in India, FMC exploited the right of return to convince distributors to take on more product than was needed. FE-11, who worked out of FMC's Corporate Headquarters in India as the Digital Channel Strategy Lead from July 2022 until April 2024, observed that inventory buildup persisted throughout 2023, after FMC announced Project Focus. According to FE-11, FMC "couldn't just burn the product off," yet the Company continued to pump the market with product. FE-11 further recalled that from early 2023 through the end of his tenure in April 2024, he "always" heard that sales were low and that there were a lot of returns.

163. FMC's standard practice in India is to sell its product to a handful of "Super Distributors." These Super Distributors, in turn, sell FMC products to distributors, who then sell

the products to retailers, who then sell the products to growers and other end-users. FE-12 identified that four Super Distributors operated in India.

164. FE-11 explained that 30-40% of sales from "Super Distributors" to distributors were returned, yet FMC nonetheless was able to book the sale because the product was not actually returned to the Company as FMC only reflected sales to the Super Distributors (and not the returns from distributors to their Super Distributors) on the Company's books. FE-11 confirmed that FMC had visibility into inventory levels, including returns at India's Super Distributors.

165. According to FE-14, a Commercial Manager in APAC from 2022 through mid-2024, in India, it was common practice that the majority of sales took place in the third month of the quarter and FMC received high levels of returns during the first two months of the following quarter. FE-14 stated that in India, this occurred to such a large degree that at times during the first two months of a reporting period, there were "negative sales" for some quarters due to the volume of returns. FE-14 explained that sales for the entire quarter were conducted in the third month, and the channel was loaded to report earnings and then returned following the conclusion of the quarter. For example, in Q1, the entirety of FMC's quarterly sales were pushed through in March and, after FMC reported Q1 earnings, that inventory would be brought back or returned in April (during the following quarter).

166. FE-12 stated that the Super Distributors are essentially third-party logistics services that are used to hold and shift inventory as instructed by FMC. FE-12 explained that Super Distributors operated as "C&F" or "carry and follow" agents and operated at the direction of FMC, and not at arm's length as required by rules of revenue reporting. Although Super Distributors are made responsible for collection of payment per the contract, in reality, FMC still held that responsibility, according to FE-12.

167. FE-12 corroborated FE-11's account that a significant amount of sales to Super Distributors were returned, and that FMC exploited this right to return option. According to FE-12, the North American and South American business model differed significantly from the business models in Asia. FE-12 explained that in APAC and in India, specifically, "everyone knows" the sales contract allows for returns if the product cannot be sold. FE-12 added that farmers will not carry inventory, so if not sold, the retailer will send the inventory back to the distributor and Super Distributor, who will return the product to FMC. According to FE-12, FMC exploited this right to return option to convince distributors to take on more product than was needed. According to FE-12, Super Distributors in India were "not at arm's length" and FMC kept "pumping" inventory into the channel although FMC knew what inventory was already going to come back to them in the form of returns.

168. According to FE-14, another tactic used by FMC in India, similar to the practice described by FE-2 in Brazil, was to not physically move the inventory that was sold or returned in India. FE-14 stated that the inventory was removed from FMC's books for accounting purposes, but never left their warehouse and FMC paid the corresponding warehouse fees. FE-14 raised concerns about this practice.

169. FE-14 explained that similar tactics were used with Super Distributors in India, who also held product in their warehouses that had been supposedly sold. FE-14 explained that sales and returns occurred on paper, but without the physical movement of inventory. FE-14 stated that returns in India were also done on a "no strings attached" basis. This practice was in direct conflict with FMC's repeated statements that revenue for sales was only recognized once control of the product was actually complete.

170. FE-12 described how FMC was "completely different" from other American corporations and was "all about moral corruption." FE-12 stated that former CEO Defendant Douglas and current CEO Defendant Brondeau wanted to generate business in order to achieve their bonuses. FE-12 explained that Thota, the former President of the APAC region, acted as a "point man" for Defendant Douglas, meaning that Thota was tasked with executing the bad schemes orchestrated by FMC in the region.

171. According to FE-12, things at FMC started to change for the worse after the beginning of 2023. FE-12 recalled that FMC was in a "vicious cycle" when Project Focus was announced (in November 2023), and that cycle continued as the Company continued making promises to the market and was not operating in true reality. FE-12 continued to say that Project Focus "was a story for the market and FMC failed to address the real problems impacting the Company," which still have not been addressed. FE-12 explained that Project Focus impacted APAC by March 2024, and was used as a means to remove employees from the Company who disagreed with the Company's sales practices under the pretense of cost cutting. FE-12 added that the Company had to "kick everybody out," including Thota, former President of the subset Association of Southeast Asian Nations ("ASEAN") region, and former President, FMC India and SW Asia. According to FE-12, the Company started with the employees who disagreed with the Company's business practices during Project Focus, but have since kicked out many more senior employees since then.

172. FE-12 described how FMC "inflated" sales through channel inventory by keeping two to three years of inventory in the channel and did not follow market practices in terms of returns. FE-12 recalled that "everyone pretty much knew" that inventory would not be sold. FE-12 stated that FMC's business plan was to inflate results, inflate sales prices, but result in no actual

business. FE-12 added that this scheme was "bought" by American investors on Wall Street who did not understand market dynamics in the country and looked at it from their point of view. FE-14 confirmed that there were times when FMC had nine to twelve months of inventory in the channel. FE-14 explained that this volume of inventory in the channel raised concerns around the shelf-life of products given the seasonality of the industries they sell to. FE-14 stated that by providing favorable rights to return and holding inventory in their own warehouses that FMC was taking on all the financial risk.

173. FE-12 explained that FMC paid for transportation and warehouse costs for the Super Distributors in India to entice them to take on more product. Notably, FE-12 explained that the joke in India was that Super Distributors can make money through the warehouse rent that FMC was paying on their behalf, or essentially paying in the form of discounts, without actually selling any product. According to FE-12, who was aware of these business practices from his experience doing business in the country, the Super Distributors made 4-5% margin on these transactions without actually selling any product. FE-12 added that both warehouse and transportation expenses were means for Super Distributors to earn revenue without selling actual product. FE-12 further explained that transportation costs were inflated by Super Distributors and a lot of money was earned through both warehouse and transportation costs.

174. According to FE-12, FMC was selling two or three times the actual product demand and kept that inventory in the market, and then later blamed channel build-up on poor farming seasons. FE-12 added that this was all done only to inflate results of the Company and noted that these practices were carried out in India to a "big extent."

175. Regarding FMC's commentary about weather impacts in India, FE-12 explained that the Company stating that monsoons and the weather in most APAC regions contributed to

inventory buildup was "just an excuse." According to FE-12, the weather situation never reached a point that would justify over a year's worth of inventory sitting in the channel. FE-12 explained that most crops in the region (peanuts, rice, wheat, cotton, tomatoes, potatoes, etc.) have three- to five-month growing seasons and chemicals are purchased early in that process. FE-12 stated that the customers would not hold inventory for longer than six months and would begin making returns if it had not been used following the season. FE-12 further explained that what has occurred in India, one of FMC's largest markets, was a problem the Company created for themselves. Moreover, FE-12 explained that FMC's behavior has also been occurring "everywhere," and not solely in India.

176. FE-12 further recalled that executive leadership were careful to never put anything in writing and always had directions come from other lower-level employees—a "very regular practice" at FMC, especially in reference to instructions to sell product and then take it back following the quarter end. Another way that FMC leadership tried to cover their tracks in India was to, according to FE-12, have product sales documented on paper in the name of the Super Distributors to help conceal FMC's return sales tactics. According to FE-12, FMC created the picture of demand in India, but the ultimate responsibility for collecting payment was with FMC. FE-12 described how FMC would send an order to the Super Distributor, who then would sell to a distributor with instructions from the FMC employee in the field. As a result, FE-12 explained that if a distributor purchased FMC product from a Super Distributor, and then had a return, that the return was handled by FMC, but on paper, it looked like the financing and payment responsibility was with the Super Distributor. FE-12 made clear that in reality, all returns and claims were settled by FMC, regardless of whether the Super Distributor appeared as the seller on

paper, and the Super Distributors were "not at arm's length" from FMC as required by rules of revenue reporting.

177. FE-12 recalled that the Commercial Team had informed leadership that the market could not take on any more product, but the Commercial Team was instructed to continue to sell anyway.

178. FE-12 explained the "reality" that FMC's sales practices led to regions having more inventory than could be sold in an entire year. FE-12 noted that at FMC, the "greed was too high."

179. FE-12 explained that in India, days sales outstanding ("DSO") was exceeding 18 to 24 months, and there was more than 18 to 24 months of inventory in the channel. FE-12 continued to say that "no company does this" and FMC just wanted to continue inflating results. Regarding the DSO in India, which was greater than 1.5 years, FE-12 added that it was "common sense" that customers would not keep product for this duration under normal circumstances.

180. According to FE-12, FMC's India business is "so underwater" they cannot just begin writing things off given that the problems are so significant they would require public acknowledgement at each instance due to materiality. FE-12 explained that instead the Company is essentially sacrificing the India market as a whole and FMC elected to sell off their India business and take a one-time charge in October in order to avoid having to report material return figures. FE-12 explained that "everyone knows FMC is going down" and noted that this knowledge makes customers outside of the United States reluctant to pay FMC. According to FE-12, in countries outside of the United States, where FMC's legal pathway is less clear, customers will not make payments or will make false claims against FMC because of the Company's current financial condition and limited recourse options. FE-12 further explained that while FMC could

pursue recourse on paper, they are unable to enforce the law, and recovery is a long and tedious process.

181. FE-12 provided a vivid example of how reliant FMC became on illusory sales that would be quickly returned. FE-12 described how FMC actually altered its production volumes in order to make returns of products sold to inflate quarterly results easier. According to FE-12, returns of product in India needed to comply with India's GST (Goods and Services Tax), explaining that sales in India were accompanied by both an invoice and an E-Way bill, which is filed directly with a government portal in India. FE-12 explained that for the small farms in India, the most popular FMC product was between 150mL and 300mL in size, a relatively small volume product that had very high reprocessing costs when returned. FE-12 explained that to make FMC's process of intentionally overselling product to inflate revenue simpler, and to more easily navigate returns to satisfy India's GST, FMC created a 200L drum version of their product (666 to 1,333 times greater than the units commonly sold in that market). According to FE-12, there was a very limited market for a product of this size (200L) in India, and FMC knew that farmers would not purchase a drum of this size in India but it was cheaper to accept returns for this size and to reprocess to sell again. FE-12 explained that the introduction of the 200L drum product was a "needs-based decision to make up and inflate numbers," and FMC exploited that opportunity. FE-12 explained that a serious risk to FMC's unfettered return policy and practice was the two-year shelf-life of chemicals, meaning once they expire they cannot be repurposed or resold and the only option is to dispose of it via incineration at a total loss.

182. FE-12 recalled this large volume product practice beginning in approximately 2022 and continuing throughout his tenure. FE-12 noted that he and others who would not participate in

this scheme "paid a price" for refusing to implement these practices in other countries. FE-12 continued to say that an audit of FMC's records will expose this practice.

183. FE-13 likewise recalled rampant channel inventory issues in India. FE-13 raised concerns about inventory in various locations, including India, from 2020 through the end of FE-13's tenure. FE-13 stated that the "Super Distributor" model in India led to "very dramatic growth," but before the start of the Class Period, there was too much inventory in the channel. FE-13 also recalled problems with cash collection and late payments, which became a challenge, remedied through rebates. FE-13 noted that S&OP records and financial statements would show that this was occurring very clearly. FMC continued selling into India, and other major markets such as Brazil, as quarterly results indicate, since that period.

184. FE-13 further explained that the reality of the situation in India is what has come out in recent months with the Company announcing the write-down of the India business. According to FE-13, it was quite evident what had occurred there and that level of write-down does not happen in one or two quarters and it was clear that the behavior had been ongoing for years.

#### 4. FMC Leadership Recorded Large Sales to High-Risk Customers Suffering Known Financial Difficulties Who Soon Filed for Bankruptcy, Leaving Those Debts Unpaid

185. Multiple former employees based in Brazil described how senior executives at the Company, desperate to report sales in the challenging Class Period market, signed large deals worth tens of millions of dollars with companies suffering from significant known financial difficulties, making it unlikely that those customers would ever follow through with payment on those sales. Indeed, at least two companies filed for bankruptcy before payment on the already recorded sales was due.

186. FE-2 believed that the worst decision made by FMC in 2023 was a deal invoiced in December 2023 with AgroGalaxy for $50 million. AgroGalaxy is a Brazilian company engaged in the sale of crop protection products and other agricultural products, as well as services like seed origination and the storage and sale of grains.[8] In late 2024, AgroGalaxy was Brazil's second-largest crop retailer. At this point, AgroGalaxy had already signaled that it was experiencing financial difficulties, and FE-2 voiced concern about selling products to the company to former Credit and Receipt Manager (Barter Operation), Elisa Gomes. Nevertheless, Defendant Pereira and Mills met with AgroGalaxy's CEO to complete the deal and a sale was reported. FE-2 recalled wondering at the time how Mills could have ever approved the deal. According to FE-2, under the terms of the deal, AgroGalaxy's payment was due in approximately October or November 2024. However, AgroGalaxy filed for bankruptcy prior to the payment due date.[9] At the time FE-2 left the Company in 2024, no payment had been made, nor had AgroGalaxy returned any of the purchased products.

187. FE-2 explained that, following his departure, he learned that Defendant Pereira, Mills, and Giudicissi had entered into a similar deal with another company, AHL, as well as with a company called Lavoro, which has also since filed for bankruptcy while owing debts of approximately $50 million to FMC.

188. FE-3 confirmed that FMC sold to customers that it knew were in bad financial health, including because of concerns regarding their ability to pay. For example, FE-3 confirmed FE-2's account that FMC frequently sold to AgroGalaxy, a large distributor that was widely known

---

[8] *Corporate Profile*, AGROGALAXY, https://ri.AgroGalaxy.com.br/en/about-AgroGalaxy/corporate-profile-and-history/ (last visited July 23, 2025).

[9] Richard Mann, *AgroGalaxy Files for Judicial Recovery Amid Financial Turmoil*, THE RIO TIMES, Sept. 18, 2024, https://www.riotimesonline.com/AgroGalaxy-files-for-judicial-recovery-amid-financial-turmoil/ (last visited July 25, 2025).

to be experiencing financial difficulties. According to FE-3, AgroGalaxy presented many indicators of financial distress, such as unsustainable expansion, mass layoffs, and decreased sales. Even as other competitors backed away from doing business with AgroGalaxy, FMC persisted, and even increased sales to fill the void left by other competitors.

189. FE-3 recalled that the customer-facing members of the Commercial Team wanted to stop selling to AgroGalaxy, but Commercial and Finance Team leadership instructed these teams to continue making sales and explained that, as a result of a meeting it had with AgroGalaxy, it was fine to continue sales as normal. FE-3 added that AgroGalaxy ultimately declared bankruptcy with a debt owed to FMC of approximately $30 million.

190. FE-3 explained that it was FMC executives' strategy to continue to make sales or lend credit to financially unstable customers. Specifically, FE-3 recalled an "unprecedented" meeting in February or March 2023 led by Mills and current National Head of Credit & Collection Brazil Francisco Francisco, where Commercial and Finance Teams' leadership were convincing the entire sales force to sell to AgroGalaxy. This included, FE-3 recalled, Regional Directors for the North, South, East and West Regions, all of whom reported to Magurno.

191. Following this meeting, FE-3 recalled that Sales Representatives discussed the inversion of roles. Typically, Sales staff want to sell and the Finance Team presents an obstacle to selling to risky customers. At FMC, however, FE-3 recalled Sales Representatives describing it as the "banana eating the monkey," and the meeting caused discomfort among Sales staff.

192. FE-1 confirmed FE-3's and FE-2's accounts of how FMC sold product and provided credit to companies known to have financial issues, including specifically AgroGalaxy and Lavoro, two of Brazil's largest agrobusiness companies. FE-1 described how these two companies were so large that FMC did not require them to provide guarantees for payment.

According to FE-1, payments from AgroGalaxy and Lavoro became delayed by the end of 2023 and by the end of Q1 2024, payments from both companies had stopped and they began defaulting on payments. According to FE-1, FMC also knew that these companies sold product on credit to farmers with a history of defaulting on payments and who displayed signs of financial distress, such as selling off equipment. Nevertheless, the Company continued selling to AgroGalaxy and Lavoro until they had already defaulted on multiple payments. Eventually, Lavoro declared bankruptcy in 2025 and FMC is one of the company's three largest creditors.

### 5. FMC Pulled Sales Forward to Make Quarterly Sales Goals at the Expense of the Following Quarters

193. Several former employees described how the Company manipulated its recording of sales in order to report inflated quarterly sales revenues at the expense of future quarters.

194. This process of pulling sales forward was very notable in the EMEA region, as described by several former employees. FE-9 was employed by FMC as the Business / Managing Director for Austria-Germany-Switzerland from December 2020 until May 2024. He reported to the current FMC Vice President & President Europe, Middle East and Africa Sebastià Pons, who reported directly to the CEO.

195. According to FE-9, FMC was known as the "most aggressive" company in the crop protection industry in terms of pushing to reach ambitious sales targets. FE-12 corroborated FE-9's account, stating that FMC was "completely different" from other American corporations and was "all about moral corruption."

196. FE-9 explained that FMC had an approach to increase inventory with pre-sales hoping that if conditions were good the next season would be better in terms of sales. FE-9, who had experience working at FMC competitors in the region, including Bayer and BASF, compared FMC to a competitor such as Bayer, and explained that FMC pushes to meet targets each quarter

rather than taking the following year or following three years into consideration. FE-9 further explained that the Company pushed distributors to take product that was not in season, which along with pushing sales in the "Pre-Sale Season," diminished the sales potential in future quarters. FE-9 described how there was a widespread mentality to "keep accumulating" and "keep pushing" inventory. For example, FE-9 explained that FMC allocated 25% to 30% of sales to be made in Q4, called the "Pre-Sale Season," and how putting so much emphasis on sales in Q4 diminishes sales that can be made in Q1 of the following year.

197. According to FE-9, Q1 2024 was "not good" for FMC because of high product inventory levels in 2023. FE-9 further explained that even though many 2024 sales had already been recorded in 2023 through pre-sales, the Company still increased its sales targets.

198. FE-7, a European-based Supply Chain Management Lead during the Class Period until the end of his tenure in spring 2024, confirmed FE-9's accounts of pulling sales forward, and described how, despite encouraging customers to take product early and changing production plans, FMC still fell short of sales targets—and yet continued to increase them.

199. FE-7 recalled that in 2023, the Company was internally saying "we're going to hit budget" but in reality, the Company already "had the numbers" and knew that it was not going to make its stated goals. FE-7 further explained that the forecasts in Europe were "wrong" and throughout 2023, going into 2024, there were downward revisions each quarter to decrease forecasts, yet FMC did not even meet these reduced goals.

200. FE-7 explained that initial forecasts exceeded what was possible and were based on historical figures plus additional increases, which employees "knew they couldn't hit." FE-7 stated that FMC always had a "short-term vision" by looking at the current quarter without any long-term planning.

201. FE-7 recalled that the routine pulling forward of sales in each quarter of 2023 negatively impacted year end as farmers already had sufficient product. FE-7 likened FMC's method of pulling forward sales, which eventually left them short at year end, to "the snake who eats its own tail." FE-7 explained that at FMC, there was a consistent "race to the next quarter" to fill gaps in the forecast by pulling forward sales to meet targets and then doing the same the following quarter.

202. FE-7 further explained that the Company asked customers to take orders in advance and to adjust terms to accept product early. FE-7 recalled, for example, that this occurred with customers in Africa.

203. Similar accounts were given by FE-8, who was employed by FMC as a Rebate and Commissions Analyst from April 2023 until January 2024, worked out of FMC's office in Cork, Ireland, and was personally responsible for the reconciliation of the ledgers in various countries, including Ukraine, Romania, the Netherlands, and the Czech Republic, with other countries under his team's purview including the United Kingdom, Italy, Spain, Hungary, and Bulgaria.

204. FE-8 confirmed that executives at multiple levels implemented improper formal and informal processes to increase short-term revenue at the expense of the Company's long-term health, including by leaving the books open beyond the quarter end to record more sales. FE-8 recalled that a particular market had a big sale coming in January and was told to leave the books open so that sales could be recorded during the current year.

### F. An Independent Analysis of FMC's Class Period Financials Finds "Fundamental Deterioration Masked by Aggressive Financial Practices"

205. On May 28, 2025, CFRA, a global leader in independent equity research that applies sophisticated forensic analysis and fundamental equity research, issued a research report on FMC titled "FMC Corporation: Fundamental Deterioration Masked by Aggressive Financial

Practices" (the "CFRA Report") that reflected on CFRA's key takeaways in the wake of the Company's Q4 2024 financial disclosures.

206. The CFRA Report concluded, based on an analysis of several factors including CFRA's mathematical modeling, that the Company's financials at the end of 2023 through 2024 (*i.e.*, the Class Period) revealed "aggressive revenue recognition practices and potential financial manipulation" by FMC. CFRA further highlighted how FMC's "leadership exodus"—including the unexpected June 2024 departure of Defendant Douglas and reinstatement of the Company's previous CEO Defendant Brondeau—coincided with "mounting operational challenges" and pre-Class Period allegations of securities fraud.

207. CFRA also pointed out how FMC's signs of financial distress and "fundamental deterioration" compared to the financial condition of a chief competitor during the Class Period, weakening any claims by FMC that its problems were market-driven. CFRA reported that FMC competitor Corteva's "financial strength (negative leverage, cash surplus, efficient collections) compares sharply with FMC's concerning metrics (high debt, cash deficit, extended payment periods), highlighting fundamental differences in business execution."

208. Alarmingly, CFRA opined that "FMC poses significant risk to investors" because CFRA's "analysis indicates that ***these challenges are not temporary setbacks but rather symptoms of fundamental business deterioration that will likely lead to significant shareholder value destruction***."

209. CFRA's analysis independently corroborated the impact of the manipulative sales and pricing practices described by FMC's former employees. CFRA had no access to the detailed accounts of the FEs herein that describe a system of pricing manipulation and inorganic and shortsighted use of "rebates over rebates," extreme discounts, recording sales without the physical

exchange of product or payment, large sales to high-risk clients in financial distress with extended payment plans, sales of products piling up in distribution centers with no end-user sales, and exorbitant return policies without penalty or payment. *See supra* Section IV.E.

210. Nonetheless, CFRA applied a mathematical model to FMC's financials called the Beneish Model that was developed by Professor Messod D. Beneish in 1999 and that is "designed to detect financial statement manipulation." The Beneish model has been described as a "useful technique that can be employed to identify the presence of earnings management" and that "is widely used by financial analysts and forensic accounting investigators to assess the probability of earnings manipulation." *See* SPECIAL REPORT: Evaluating the Quality of Financial Statements—A Guide for Audit Committees, SEC Accounting and Reporting Update, 2008 WL 11502620 (Oct. 2016). This model assigns a "score" to a company's financials, and according to CFRA, "flags scores above -1.78 as indicating an elevated probability of earnings manipulation."

211. CFRA applied the Beneish model to FMC's financials and determined that:

> Through our analysis, ***we have identified several red flags indicative of "channel stuffing," a practice of enticing customers to order products that they may not otherwise order in advance***. ***The overall effect of channel stuffing inflates revenues in the current period by pulling forward future sales, which could eventually lead to decreased demand as inventory channels become flooded with product***. Red flags related to channel stuffing include significant increases in customer incentives, receivables increasing faster than revenue, significant differences between net income and cash flows from operations, and increasing DSO [Days Sales Outstanding] over time or a high DSO relative to peers.

212. CFRA also calculated FMC's M-score, which "reached concerning levels multiple times in 2023-2024, hitting -1.81 (3.5% likelihood of manipulation) in Q4 2023," the start of the Class Period, "before worsening to the critical threshold of -1.78 (3.8% likelihood) in Q3 2024." Notably, "[t]hese elevated risk levels marked a significant departure from historical norms, as the score had consistently remained below -2.20 in prior years."

213. CFRA noted that the period following Q4 2022 indicated that FMC's "receivables as a percentage of sales grew substantially, potentially signaling inappropriate revenue recognition practices," while the "dramatic decline in sales growth, coupled with other concerning metrics like accruals quality and leverage changes, created significant pressure on management to manipulate financial statements to maintain the appearance of stability."

214. In its report, CFRA focused on "[i]ndividual components of the M-score [that] provide deeper insight into specific areas of deterioration" that supported the "***red flags indicative of 'channel stuffing.'***"

215. ***First***, CFRA noted that FMC's Days Sales Outstanding ("DSO") "has more than doubled from 107 days in 2011 to 242 days in 2024, and further deteriorated to 253 days in Q1 2025, far exceeding industry norms." CFRA explained that FMC's growing DSO "***stands in stark contrast to industry peers and raises serious questions about the quality of reported revenues***." FE-12 echoed CFRA's sentiments, specifically with respect to FMC's India business. FE-12 explained that in India, DSO was exceeding 18 to 24 months and there was more than 18 to 24 months of inventory in the channel. FE-12 continued to say that "no company does this" and FMC just wanted to continue inflating results.

216. Moreover, FMC's "***accounts receivable to revenue ratio reached 70.4% in Q1 2025, up from 68.4% in 2024, dramatically surpassing peer ratios of 9.5%-43.3%, suggesting potential channel stuffing or aggressive revenue recognition practices***." A graphic comparing FMC to its peers shows this stark discrepancy:




Source: S&P Global Market Intelligence.

217. ***Second***, CFRA discussed how a "sharp increase in customer incentives" in 2023 and 2024, "with accrued rebates and advance payments averaging 21% of revenue in 2021-2024 compared to 15.5% in the prior decade . . . suggests FMC may be pulling forward future sales through aggressive incentive programs, potentially masking underlying demand weakness," as reflected in the below figure:

**Figure 3: FMC DSO and Customer Incentives**




Source: Company filings, S&P Global Market Intelligence.

218. ***Third***, CFRA compared cash flow from FMC's operations to its reported net income, noting that "operating cash flow is generally less susceptible to manipulation than net income, with large differences potentially signifying manipulation." CFRA then presented a graphic demonstrating the "severe divergence between cash and accrual earnings" beginning in 2022 and extending through 2024:

**Figure 4: Cash Flow from Operations vs. Net Income (in $ millions)**




Source: S&P Global Market Intelligence.

219. ***Fourth***, CFRA examined FMC's "expanded use of supply chain financing [that] increased dramatically from $71.9 million as of December 31, 2023 to $227.4 million as of December 31, 2024," as well as "FMC's two receivables factoring programs [that] have significantly increased following the inception of the programs in Q3 2022, with receivables factoring increasing by 86% from $163 million in 2022 to $303.3 million in 2023, with a 4% increase in 2024 to $315.9 million." CFRA noted that: "[t]hese financing arrangements appear increasingly necessary to maintain the appearance of normal business operations, even as underlying fundamentals deteriorate."

220. ***Fifth***, CFRA reviewed FMC's "mounting debt burden and repeated need for lender accommodations," reporting that "FMC's leverage ratio has risen to 4.77x [in Q1 2025], up

significantly from 3.72x in Q4 2024" and "[t]he company has required three covenant amendments since 2023 to avoid violations, with limits being repeatedly raised from 3.5x to the current 5.25x." CFRA concluded that: "[t]hese frequent amendments, along with continued restrictions on share buybacks and rising net debt ($3.69 billion from $3.01 billion), indicate ongoing concerns about FMC's financial stability."

221. ***Sixth***, CFRA described how the Company incurred substantial charges in 2024, totaling over $305 million, which "suggest possible 'big bath' accounting, where current period charges may include expenses that should have been recognized in prior periods," and noting that "[t]he timing of these charges, coinciding with management turnover and deteriorating metrics throughout 2024, ***raises serious questions about the quality of previous period reporting***."

222. ***Finally***, CFRA attempted to discount any reliance on mere market factors for these concerning benchmarks of financial manipulation by comparing FMC to competitors in the fertilizers and agricultural chemicals (crop protection) sub-industry. Focusing on competitor Corteva "due to their shared specialization in proprietary crop protection products," CFRA compared FMC's Beinish M-score and other metrics to Corteva (CTVA), CF Industries (CF), Mosaic (MOS), and Nutrien (NTR), revealing the disparity between FMC's Beneish M-Score of -1.9% and its competitors' significantly lower scores:

**Table 1: Competitors**

| 2022-2024 (Annual Data) | FMC | CTVA | CF | MOS | NTR | Average |
|---|---|---|---|---|---|---|
| **Average Beneish Model Manipulation Likelihood** | 1.9% | 0.5% | 0.5% | 0.6% | 0.5% | 0.8% |
| **Average Net Debt/Adjusted EBITDA** | 3.0x | -0.2x | 0.3x | 1.2x | 1.7x | 1.2x |
| **Three-year Revenue CAGR** | -5.6% | 2.5% | -3.2% | -3.4% | -2.3% | -2.4% |
| **Three-year Adjusted EBITDA CAGR** | -12.0% | 9.4% | -5.9% | -15.0% | -9.1% | -6.5% |
| **Average Days Sales Outstanding** | 213 | 90 | 23 | 33 | 62 | 84 |
| **Average Cash Flow from Operations – Net Income from Continuing Operations (in $ millions)** | -$594.63 | $600.33 | $931.33 | $906.53 | $2,373.00 | $843.31 |

Source: CFRA, S&P Global Market Intelligence.

**Relative Performance**




Source: S&P Global Market Intelligence (May 28, 2020 to May 27, 2025).

223. Ultimately, based on its independent analysis and modeling—as well as FMC's own public statements and allegations lodged against the Company in legal proceedings—CFRA concluded that FMC's problems posed a "significant risk to shareholder value" and expressed "serious concerns about FMC's business trajectory and financial reporting quality."

## V. INVESTORS WERE HARMED AS A SERIES OF PARTIAL DISCLOSURES CONNECTED TO DEFENDANTS' FRAUD TRIGGERED MASSIVE DECLINES IN THE PRICE OF FMC SHARES

224. As set forth below, a series of disclosures between February 4, 2025 and October 29, 2025 triggered significant declines in the price of FMC's common stock that were causally connected to the facts that Defendants misrepresented and concealed during the Class Period concerning Defendants' unrealistic, manipulative, and high-risk sales practices and mounting inventory position.

### A. First Loss Causing Event: February 4, 2025

225. On February 4, 2025, new information was released that partially corrected Defendants' prior misrepresentations and omissions of material fact, when FMC reported its Q4 2024 financial results, missing consensus revenue estimates by $90 million and revealing that "growth was below [the Company's] expectations as [it] learned during the quarter that customers in many countries sought to hold significantly less inventory than they have historically." Among other things, FMC disclosed a 10% decline in sales for Latin America, FMC's most significant region.

226. In addition, FMC disclosed surprisingly disappointing guidance for 2025, stating that the Company expected revenue to remain essentially flat due to "weaker demand in the channel as customers in many countries prioritize holding lower-than-historical levels of inventory." As to Q1 2025 specifically, the Company stated it expected a low first quarter "as we aggressively start the correction process early in the year," projecting that "[s]ales are expected to be $750 million and $800 million, a decline of 16% against prior year." This lower volume was attributed in part to "excess levels of FMC inventory in the channel in many countries, which [wa]s amplified by customers prioritizing much lower-than-historical inventory levels." The Company

also forecasted free cash flow for 2025 to be $200 million to $400 million, a 51% decline at the midpoint of FMC's prior outlook of $400 million to $500 million.

227. The disappointing performance and guidance contradicted the Company's repeated assurances during the Class Period that FMC's distributors and retailers were "bringing their inventories back to more normal levels" and that the Company's channel would "normalize pretty quickly," even going so far as to launch an entire initiative, Project Focus, at the outset of the Class Period aimed at resetting and normalizing FMC's channel inventory levels. *See supra* Section IV.D. Indeed, as set forth above, multiple former employees described how channel inventory did not normalize during the Class Period because, contrary to what FMC told investors, demand was not increasing and inventory was not reducing throughout 2024—but instead demand was waning and inventory levels remained significantly elevated due to Defendants' ***own*** manipulative, self-inflicted practices. *See supra* Section IV.E. Indeed, FMC drove its sales during that period through risky and undisclosed aggressive sales practices that forced through sales that not only far exceeded actual organic demand, causing distributor inventories to remain inflated, but were known to be highly risky, if not illusory, sales that were expected to be returned in the near term or that faced likely risk of default and nonpayment. *See supra* Section IV.E.

228. Discussing these results in an earnings call that same day, on February 4, 2025, Defendant Brondeau admitted that "[t]he company needs a stronger reset" and that he had "modified [his] view of what needs to be done for FMC." Brondeau admitted that the Company's channel inventory had not improved in the prior quarters, stating: "[a]bove all, we need to significantly lower FMC inventory in the channel much beyond what we were expecting." He echoed this sentiment repeatedly during the call. These efforts, Brondeau stated, "will have [a] pronounced negative impact on 2025 financial performance."

229. Also during the earnings call, Defendant Brondeau attributed "disappointing" Q4 sales in Latin America in part to the "channel inventory situation." Further, Brondeau revealed that the channel inventory issues extended more broadly, stating that the Company saw "***lower-than-expected demand across most region[s]*** as customers lowered the amount of inventory they were willing to hold versus historical level[s]" and, even further, that given "the current high levels of FMC product in the channel, ***we now believe we have elevated channel inventories in some countries in LatAm, including Brazil, Asia, including India, as well as Canada and Eastern Europe***."

230. Defendant Brondeau further explained that "beyond inventory level, ***we missed the impact of an evolving distribution channel in LatAm***, which will require us to invest to expand a sales organization to explore new routes to market in that region." Thus, FMC would pursue new routes to market—including directly to growers—"where channel inventory is not an issue." Brondeau described this pivot as a "critical part" of FMC's 2025 strategy, "as it generates growth without impacting our efforts to lower FMC channel inventory." This partially revealed the truth concealed by Defendants' Class Period statements assuring that, *e.g.*, "demand improved . . . despite customers continuing to actively manage inventory," and that FMC "expect[ed] demand to increase as the year progresses even as customers maintain a careful approach of managing inventory." In fact, as Defendants admitted, the Company now needed to pursue an entirely different selling strategy in its most important region in order to counteract the ongoing channel inventory issue and, as represented, "generate[] growth without impacting our efforts to lower FMC channel inventory."

231. In response to an analyst question regarding FMC's channel visibility and the Company's strategy on the inventory side to "get a better handle on the channel," Defendant

Brondeau confirmed that although "most of our inventory actions are going to take place in the first half [of the year]. I think that it will take more than one quarter" to remedy. Brondeau elaborated that there was a "country-per-country set of action[s]" that would go "in depth to tackle the inventory issue" and, in doing so, will impact the Company's operations in India, Brazil, Eastern Europe, and Asia.

232. Analysts reacted to this news with shock. For example, analysts at KeyBanc Capital Markets cut price targets on FMC stock from $69 to $55, noting that: "[w]hile normally a one-quarter inventory adjustment would not be such a shocking development, ***we are quite surprised to see a fresh inventory correction amid what should have been a recovery year***." Analysts at Wells Fargo similarly described it as a "***shock to the system***," and analysts at Morgan Stanley expressed surprise that "there is still FMC-specific elevated levels of inventory in some countries." Morgan Stanley further noted that while "[o]verall crop chemical markets remain challenging, [ ] the ***vast majority of our estimate reductions are FMC specific***." Analysts at Bank of America downgraded its rating on FMC stock from "Neutral" to "Underperform" and cut its price target from $61 to $48, further stating that "yesterday's earnings release highlighted additional broader and ***company-specific challenges*** which in our view ***raise FMC's risk profile substantially***, warranting our downgrade." Gordon Haskett analysts noted that following its "miserable" Q1 2025 outlook, FMC "catalyzed a 33% selloff," and further stated that because FMC "had by far the smallest market cap in the S&P 500 . . . we can't see FMC remaining a member of the S&P 500."

233. On February 5, 2025, CFRA—who would later issue its detailed report analyzing FMC's Class Period financials (*supra* Section IV.F)—issued a report stating that "***[w]e think FMC poses significant risk to investors***," with "***several indicators suggest a high likelihood of earnings manipulation***," and further concluded that the sharp rise in "accrued customer rebates and advance

payments from customers as a percentage of sales" was "***consistent with 'channel stuffing' practices***."

234. On this news, FMC's stock price dropped $18.12 per share, or 33.5%, to close at $35.92 per share on February 5, 2025. FMC's investors thus lost over $2 billion in market capitalization in a single day. As a result of FMC's dramatic loss of market capitalization, FMC was removed from the S&P 500 index in March 2025.

235. However, the price of FMC stock continued to be artificially inflated because the disclosures that day mitigated the market's negative reaction and did not reveal the full negative financial consequences and risks concealed by Defendants' fraud. For example, among other things, Defendant Brondeau assured investors that "we're going to have a very, very prudent approach to the market with a high focus on preparing the following quarters" which "should make us successful to deliver what we are planning in the second half of the year." Likewise, Defendant Sandifer previewed a "stronger Q2 through Q4" attributable to "the back-end weighted new product growth that [Brondeau] mentioned, the actions we're taking earlier in the year, broadly speaking, to reduce channel inventories."

236. These assurances about the Company and its inventory correction assuaged analysts and investors. For example, on February 6, 2025, analysts at Barclays issued a report concluding that: "[e]ven with this week's news on prolonged destocking and channel issues, we believe FMC continues to be relatively undervalued," crediting Defendants' assurances of "progress" following the Company's first and second quarter results.

**B. Second Loss Causing Event: April 30, 2025**

237. The truth was further partially revealed on April 30, 2025, after the market closed, when FMC issued its Q1 2025 financial results, reporting $791 million in revenue, down 14% from the year prior, and adjusted EBITDA of $120 million, down 25% from the year prior, driven

in part by lower pricing and reduced volume. Further, FMC disclosed that cash from operations was negative $545 million, a decline of $402 million from 2024, "due primarily to a ***smaller reduction in inventory levels as compared to the prior year period***"; and negative free cash flow of $596 million, a decline of $408 million as compared to Q1 2024 and a decline of $984.5 million as compared to the prior quarter, which the Company attributed to its lower cash from operations. Finally, the Company surprisingly announced further reduced guidance for Q2 2025, reducing expected EBITDA from $235 million to $175 million. The Company released its Q1 2025 Form 10-Q the following day, and held an earnings call the following morning.

238. These results contradicted Defendants' assurances from just the preceding quarter and partially revealed more of the truth about the persistent inventory hangover and other issues plaguing the Company that had been concealed by Defendants' fraud. For example, analysts at Bank of America wrote in their May 5, 2025 report that the "Q2 outlook is light and well-below our forecast, making this year's earning cadence even more back half-weighted than we previously expected. We see significant risk that the volume/mix benefit may not materialize as both new products and routes to market"—*i.e.*, the pivots Defendants had announced as the means to overcome the overstocked distribution channel—"require some time to be established." Likewise, Seaport Research wrote in its May 5, 2025 report:

> What we didn't like: still working to get channel inventories lower. We didn't anticipate when ***severe inventory destocking began in Q2:23*** that FMC ***would still be working to reduce channel inventories a year later***. ***We think the soft Q2 outlook is related to a combination of further inventory rationalization efforts by FMC***, as well as sluggish hand-to-mouth order patterns in North America.

239. As a result, the price of FMC stock dropped from $41.92 per share when the market closed on April 30, 2025 to $38.45 per share on May 1, 2025, a decline of 8.28%.

240. However, the disclosures that day still failed to fully reveal the truth and concealed the full negative consequences and risks concealed by Defendants' fraud, and the Company's

common stock price continued to be artificially inflated. Among other things, in reaffirming the Company's full-year 2025 guidance ranges, Defendants assured that the Company was "continu[ing] to prudently sell into the channel." Likewise, Defendant Brondeau assured investors of "strong progress" during Q1, including specifically that "[p]rudent selling" by Defendants had "allowed the company to approach appropriate levels of channel inventory in all regions, excluding Asia." Brondeau also assured the market that "destocking is nearly complete in most countries" and that the Company would "maintain the same deliberate sales strategy that we had in Q1 during Q2 for countries where we have not yet reached targeted [destocking] level," which would "put us in a strong position for the second half of the year." He stressed that "we will continue to carefully manage sales into the channel, particularly in countries where FMC channel inventory remains elevated."

241. Defendant Brondeau also spoke highly of the Company's setup for growth for the remainder of 2025. He previewed that, "[b]y the end of the first half, we will have completed the most critical step of a reset, which will allow us to enter the second half of the year in a strong position." He noted that "I think I would qualify the level of confidence in H2 as very high" and told analysts, "[i]f anything – if we don't get to the number we're forecasting, it's because we're going to be higher."

242. Later during the call, when asked by an analyst to expand on FMC's "steps . . . to reduce the inventories in the channel"—and specifically whether those efforts included "significant rebates or discounts to customers or for future orders" and whether Defendants "have to kind of write off any of your own inventory"—Defendant Brondeau acknowledged that the question was "very, very important" and answered by claiming that the Company "***do[es] not have to act on price or give rebates***" because Defendants focused on "promotion of a product at the

level of the end user"—*i.e.*, creating more demand from end-customers to the retailers—"[a]nd then what we did is we replenished those products extremely carefully to avoid to rebuild inventories [*sic*]."

243. The market credited these and other false assurances by Defendants, which continued to artificially inflate the value of FMC common stock. For example, analysts at Jefferies wrote favorably that "destocking is expected to largely end in Q2 . . . and the 2025 outlook is unchanged, implying a ***significant sequential lift into Q3***." Likewise, in its May 5, 2025 report, analysts at Goldman Sachs credited Defendants' assurance that "the channel inventory alignment in all regions excl. Asia is completed," concluding that "the FMC turnaround story [i]s a compelling one to buy" with the Company in "the final innings of a destock period."

**C. Third Loss Causing Event: July 30, 2025**

244. The truth was further partially revealed in connection with FMC's Q2 2025 earnings release on July 30, 2025, after the market closed, which revealed that, "[i]n response to challenges in India, the FMC Board of Directors has ***approved divesting the company's commercial business in the country***." This divestment was particularly stunning as India was the Company's third-largest country market. The release further reported (among other things) a 17% decrease in sales in Asia, which the Company attributed to "to lower pricing as well as reduced volume driven by ongoing destocking activity in India." The Company also reported free cash flow of just $40 million, a decline of $241 million from Q2 2024, "primarily due to lower cash from operations."

245. The news surprised the market; indeed, months earlier, FMC had promised a "country-per-country set of action[s]," including for India and Asia more broadly, "where we went in depth to tackle the inventory issue." Now, however, Defendants announced that they were abandoning the India commercial business—their third-largest market—altogether, indicating far

deeper problems in India than Defendants had communicated. For example, in an alert dated July 30, 2025, analysts from KeyBanc wrote: "[w]hile the sale [of India] could raise cash with seemingly little EBITDA headwind, ***it marks impairment of what formerly was one of the key markets for FMC***." Similarly, a report by Wolfe Research on July 30, 2025 noted that: "[i]t's not ideal to divest a high growth CPC region, but it's likely w/ ***good reason***—and a functionality of IP law (or lack thereof)."

246. Defendants provided additional context around the India divestiture during the Company's earnings call the following day (July 31, 2025). Despite having previously stated that Defendants were "seeing [ ] improving conditions" and that destocking was "making good progress" in India, Defendant Brondeau explained that Defendants had "***made the decision to change how we operate in this market*** [India]" by first selling the India business altogether and then later attempting to "regain commercial momentum in India via a business-to-business model." Brondeau and Defendant Sandifer further revealed that the Company would be excluding India from the Company's revenue guidance "given the uncertainty of managing that business while selling it."

247. As a result of this news, the price of FMC stock dropped from $41.33 per share when the market closed on July 30, 2025, to $39.04 per share when the market closed on July 31, 2025, a 5.54% decline.

248. Nonetheless, these disclosures still failed to fully reveal the truth about the negative financial consequences and risks concealed by Defendants' fraud, and the price of FMC stock remained artificially inflated. Indeed, even though Defendants announced the India sale, they did not at that time announce any impairment to assets from the sale, but instead stated at most only that impairment "is possible" and that they were still "evaluat[ing]." Thus, as analysts at KeyBanc

wrote on July 31, 2025, while the "surprising sale of the India business add[ed] to the sense of uncertainty and reduces the earnings recovery potential . . . [it is] not a clear negative, ***and could even be a positive development*** (extracting cash without loss of EBITDA)."

249. Further, Defendants also mitigated the negative consequences from the disclosure by forcefully assuring investors that, with this sale, they had now fixed the broader issues plaguing the Company. For example, Defendant Brondeau stated:

> We believe the level of FMC products in the distribution channels has normalized in most countries, which will enable the implementation of our growth strategy . . . . We view channel destocking for our products as completed in most countries, as we believe customers have reached their targeted levels of inventory. In the first half of the year, ***our active management of FMC product sales into the channel, combined with strong use of products on the ground, laid a solid foundation for growth in the second half***.

250. Later in the call, Brondeau stated even more definitively: "[t]he reset of the company announced at the beginning of the year is essentially done. We have met all of the objectives we set for the first half of the year. ***The execution of the India plan will complete the turnaround of the company***."

251. The market credited Defendants' assurances. For example, analysts from KeyBanc wrote on July 31, 2025: "Pricing is stable, as expected, aside from volume-driven rebates. . . . Demand and inventory are healthy in most regions globally. Orders in Brazil are tracking ahead of recent years." On August 4, 2025, following this news as well as an investor meeting with Defendant Brondeau, Goldman Sachs issued an analyst report noting that: "[p]roceeds from sale of the India commercial business will be meaningful given current breakeven EBITDA is not representative of its potential." Goldman Sachs further supported its "Buy" rating and $50 per share target price, reporting that FMC's "[c]ompletion of inventory reset sets stage for meaningful inflection in 2H" 2025.

**D. Fourth Loss Causing Event: October 29, 2025**

252. The truth was fully revealed on October 29, 2025. That day, after the close of trading, Defendants issued a press release reporting the Company's Q3 2025 financial results. The results stunned investors, with FMC reporting revenue of $542 million, a 49% decrease compared to Q3 2024, which Defendants stated primarily related to "***significant one-time commercial actions taken in India*** to position the business for sale." Specifically, while Defendants had previously only suggested vaguely that impairment related to the India business was "possible," Defendants now revealed that it was slashing the carrying value of the India business nearly in half to match its true fair value, which was now $450 million down from approximately $960 million, and consequently recognizing a shocking $510 million in charges and write-downs.

253. Defendants specified that, of this $510 million write-down, $227 million reflected an impairment charge to reflect the true fair value of the business, while the remaining $282 million was a one-time adjustment related to "***product returns and pricing changes*** designed to accelerate receivables collection and optimize the working capital mix of receivables and inventory." In other words, Defendants were forced to take hundreds of millions of dollars of negative charges in Q3 2025 that were directly attributable to the high-cost and high-risk practices that Defendants had assured investors they had not been doing.

254. Indeed, Defendants explained during an earnings call held the following day (October 30, 2025) that the Company took "actions . . . intended to support the sale of our India commercial business," including that, "***[o]ver the course of the third quarter, we made the decision to take back a substantial amount of channel inventory in the form of returns. To further clear inventory from the channel, we offered pricing credit to distributors encouraging faster movement of products***." Defendant Sandifer elaborated, expressly describing the $282 million adjustment:

> During the quarter, we took several onetime actions to prepare the business for sale. ***These included physical product returns, taking provisions for additional product returns that will be completed in the fourth quarter, and granting price credits to customers on the remaining channel inventory to encourage faster clearing of that channel inventory. Each of these actions have the effect of reducing revenue, as well as receivables***. The net result was negative revenue for India for the quarter. This will also result in a substantial reduction in inventory held in the channel to ***much more normalized levels***, with excess inventory to be held directly on FMC India's books as FMC-owned inventory.

255. In other words, the distribution channel in India alone was so overstuffed that returning inventory to "normalized levels" ***cost hundreds of millions of dollars***—only now fully revealing for the first time the full scope of issues plaguing India.

256. This revelation stunned the market. For example, analysts at Goldman Sachs wrote in their October 30, 2025 report that, while they expected some impairment, "the total charges/write-downs incurred [for India] were ***much more significant than the street expected***."

257. In addition, Defendants also disclosed on October 29, 2025 unexpectedly poor financial results ***beyond*** India. While Defendants had guided investors throughout the year to expect "pretty significant growth, both top-line and bottom-line" in the second half of the year, Defendants now disclosed disappointing revenue, with much of the shortfall driven by sales in Latin America, which fell 8% year-over-year. What is more, Defendants further reduced the Company's guidance for the rest of 2025.

258. Defendants expanded on these developments during the earnings call the next day, during which Defendant Brondeau bluntly admitted that the "results reflect the challenges we're facing***, most prominently in Latin America***," including "***constrained credit for our customers in Brazil and Argentina as a result of lower liquidity***." Brondeau further stated that: ***"[t]he market landscape in that region is more challenging than we expected*** due to . . . low liquidity leading to constrained credit for our customers in Brazil and Argentina . . . ." He further added that

"[a]bout half of our sales shortfall in Latin America was driven by an unwillingness on our part to sell full volumes to customers with credit risk. The other half were due to lost sales, mainly to mega farmers, where we were not willing to lower price to levels offered by generics for off-patent product."

259. Defendant Sandifer also admitted that the Company's free cash flow was "significantly impacted" by collection delays, explaining, "***[i]n Latin America, these delays are a result of both reduced liquidity in the channel, as well as delays in growers monetizing the cotton crop***." In other words, Sandifer admitted that the Company's inability to collect in its most important region was directly and adversely impacting the Company's free cash flow.

260. Finally, while Defendants had earlier assured investors that FMC's inventory level was "appropriate for the sales we have planned for the second half" of 2025, Defendant Sandifer now admitted that the lower reported sales would cause FMC to "end [] the year with a bit more inventory now than what we had originally contemplated."

261. Thus, the disappointing results and lowered guidance disclosed on October 29, 2025 connected directly to the exact actions that Defendants had undertaken and concealed during the Class Period—*e.g.*, pushing product into the channel, irrespective of risk of payment—which now needed to be undone by agreeing to further product returns, provisions, and price credits and which Defendants now fully admitted for the first time had a significant, negative impact on revenue and exacerbated collection delays.

262. Further, FMC's free cash flow was negative $233 million, a decline of $365 million as compared to Q3 2024, which the Company attributed "primarily due to lower cash from operations." In connection with its full year outlook, FMC drastically lowered its free cash flow forecast from $200 to $400 million to negative $200 million to $0, reflecting a decline of $714

million at the midpoint from the prior year. FMC also slashed its quarterly dividend from $0.58 to $0.08 per share, "[a]s part of a broader response to the challenges the company is facing and to further prioritize debt reduction." Going forward, any future dividend would only be payable when declared by the Board of Directors.

263. The market reacted negatively to this news. For example, Goldman Sachs analysts noted in their October 31, 2025 report, "[a]dditionally, FY25 FCF guidance was reduced by $400mn at the midpoint to -$100mn to reflect the lowered earnings outlook and ***delayed receivables collections in Latin America due to extended terms***." Bank of America analysts reiterated this sentiment in their November 2, 2025 report, stating, "[d]espite the inline print, the forecast is falling precipitously, with implied 4Q EBITDA of $265-$305mm lower than the street's $356mmE. ***The culprit is lower product prices and extended payment terms in LatAm*** . . ." Citi analysts added that FMC's "FCF guidance cut was primarily attributed to weaker collections due to lower H2 sales and liquidity constraints," and lowered their estimates for Asia and LatAm organic sales.

264. Analysts also reacted with disbelief at the collapse of Defendants' narrative and credibility. For example, analysts at Mizuho stated in their October 30, 2025 report: "[w]e believe ***management has more work to do to convince investors that the worst is over***…" KeyBanc analysts likewise wrote that they "lack confidence in FMC's collection and inventory management at this stage . . . [and] step away until risks subside." And finally, Bank of America analysts wrote that the news left the analysts "***wondering how FMC could be as far off market as they were***."

265. Defendants dropped yet another bombshell on October 29, 2025, issuing a second press release revealing that the Company's President, Defendant Pereira, would depart FMC after thirty years. The market reacted to Pereira's departure skeptically, given that Pereira had been

discussed as Brondeau's likely successor following his promotion to President. For example, in its October 30, 2025 report, Gordon Haskett analysts wrote:

> ***Other things FMC cut last night*** **were** its FY25 outlook and ***Ronaldo Pereira's role as president of the company***. He is a 52-year-old who was promoted in June of 2024 when the board bounced Mark Douglas as CEO and gave his seat to FMC's former CEO, Pierre Brondeau. The 67-year-old Brondeau will now have to come up with a new succession plan at the same time he is redesign[ing] FMC's manufacturing footprint.

266. As another example, Bank of America acknowledged that Pereira's departure "left a managerial vacuum," while UBS analysts recognized that Pereira's departure and the Company's 85% slash to its dividend "reflects a more challenging outlook." Lastly, CFRA analysts stated that "[e]xecutive instability continues with President Pereira's departure, extending the leadership turnover we identified."

267. All told, the corrective disclosures on October 29, 2025 finally and fully revealed the truth that had been concealed by Defendants' fraud, as the market understood that FMC's channel inventory position was much worse than previously disclosed and that the growth story Defendants previously touted was not realistic.

268. As a result of this news, the price of FMC stock collapsed to its lowest since 2009, falling from $29.04 per share when the market closed on October 29, 2025, to $15.53 per share on October 30, 2025, a ***46.52% decline*** on unusually high trading volume of 45 million shares.

269. What is more, in a Form 8-K filed on December 12, 2025, FMC disclosed that "[a]s a result of the recent significant decrease in [FMC's] stock price, the Company is required under generally accepted accounting principles to test its goodwill and other intangible assets for impairment," and further acknowledged that, "[a]bsent a recovery in the Company's stock price," FMC expects to record a "significant non-cash impairment within goodwill and other intangible

assets" beyond the already significant write-downs and impairment charges announced at the end of the Class Period.

270. To date, FMC's share price has not recovered, with FMC trading at $15.20 per share at market close on January 9, 2026, down ***77.9%*** from its Class Period high closing price of $68.72 per share on May 13, 2024.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

271. During the Class Period, Defendants FMC, Douglas, Sandifer, Brondeau, and Pereira made materially false and misleading statements and omissions about the Company's efforts to balance and reduce its channel inventory, achieve massive cost savings, and increase productivity to foster organic, sustainable growth. In reality, FMC had actively undermined these goals by: (1) employing unsustainable and manipulative sales practices to push product into the already congested market, leading to dangerously inflated inventory levels that the Company had publicly committed to reducing (*supra* Section IV.E.1); (2) forcing through sales that the Company knew would be returned in ensuing quarters through essentially unlimited return policies, and reconfiguring and delaying returns of unused product to avoid reporting returns and reversing recorded revenue, in order to inflate quarterly revenues (*supra* Section IV.E.2); (3) exploiting FMC's APAC market, specifically India, in keeping India's channel inventory elevated and inflating the Company's revenues (*supra* Section IV.E.3); (4) recording large sales to known high-risk and financially strapped customers, even where certain customers' bankruptcies left those debts unpaid (*supra* Section IV.E.4); and (5) pulling sales forward to achieve the Company's quarterly sales goals at the expense of later quarters (*supra* Section IV.E.5).[10] Attached hereto as

[10] Throughout this section, false and misleading statements are identified with bolding and italics, and additional portions of each statement are provided for context.

Appendix A is a chart organizing all of Defendants' alleged false and misleading statements and omissions.

### A. False Statements Concerning FMC's Sales Practices

#### 1. False Statements in FMC's SEC Filings Concerning Revenue Recognition Being Conditioned on an Exchange of Control

272. On February 27, 2024, FMC filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2023 (the "2023 10-K"), which was signed by Defendants Douglas and Sandifer. Throughout the 2023 10-K, the Company repeatedly stated that revenue is recognized only when it satisfies a performance obligation by transferring the promised goods to the customer, which is when the customer obtains control of the good or service. These statements communicated to the market that FMC recognized revenue on sales only when sales were confirmed and completed.

273. Specifically, in describing its Critical Accounting Policy and Estimates, and again in Note 1 to the Consolidated Financial Statements, the Company stated: "***We recognize revenue when (or as) we satisfy our performance obligation which is when the customer obtains control of the good or service***." Note 3 to FMC's Consolidated Financial Statements similarly stated: "***Revenue is recognized when (or as) the performance obligation is satisfied, which is when the customer obtains control of the good or service***," and "***[r]evenue from product sales is recognized when (or as) we satisfy a performance obligation by transferring the promised goods to a customer, that is, when control of the good transfers to the customer***."

274. The Company's First Quarter 2024 10-Q ("Q1 2024 10-Q"), filed with the SEC on May 7, 2024 and signed by Defendants Douglas and Sandifer; Second Quarter 2024 10-Q ("Q2 2024 10-Q"), filed with the SEC on August 1, 2024 and signed by Defendants Brondeau and Sandifer; and Third Quarter 2024 10-Q ("Q3 2024 10-Q"), filed with the SEC on October 30, 2024

and signed by Defendants Brondeau and Sandifer (together, the "Fiscal Year 2024 Forms 10-Q") each adopted, repeated, and/or incorporated by reference the above 2023 10-K statements in ¶¶272-73 concerning FMC's revenue recognition policies. These same statements were then repeated in FMC's Annual Report on Form 10-K, reporting the Company's financial and operating results for the year ended December 31, 2024 (the "2024 10-K"), which was filed with the SEC on February 28, 2025 and signed by Defendants Brondeau and Sandifer. The Company's First Quarter 2025 10-Q ("Q1 2025 10-Q"), filed with the SEC on May 1, 2025 and signed by Defendants Brondeau and Sandifer; and Second Quarter 2025 10-Q ("Q2 2025 10-Q"), filed with the SEC on July 31, 2025 and signed by Defendants Brondeau and Sandifer, each adopted, repeated, and/or incorporated by reference the 2024 10-K statements concerning FMC's revenue recognition policies.

275. The statements described above concerning FMC's revenue recognition in its 2023 10-K, 2024 10-K, Q1 2024 10-Q, Q2 2024 10-Q, Q3 2024 10-Q, Q1 2025 10-Q, and Q2 2025 10-Q, which represented that "***[r]evenue is recognized when (or as) the performance obligation is satisfied, which is when the customer obtains control of the good or service***" (and substantively identical statements), were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, because at the time of the statements, the Company regularly recognized revenue on sales where product (*i.e.*, "the good[s]") were not shipped or otherwise transferred to the buyer such that the buyer never obtained control of the goods. Instead, and as recounted by multiple FEs, the Company routinely recorded revenue for sales of product without any physical delivery or receipt of the product. *See supra* Section IV.E. For example, as FE-2 recalled, in Brazil, FMC recorded sales of product to customers only on paper, while the physical inventory that appeared to be sold remained in the possession of FMC;

further, the Company approached customers and offered them guaranteed returns to increase inventory, and customers returned product, which had never been shipped, after the quarter ended. *Supra* ¶¶143-44. FE-1 additionally stated that during the final week of each fiscal quarter or year, customers filled out the paperwork necessary for sales, allowing FMC to record sales before the quarter closed. In these end-of-quarter deals, FE-1 explained, there was an exchange of paperwork and issuance of a document whereby the customer assumed ownership of the product without any physical exchange of the product. *Supra* ¶105. In addition, according to FE-14, another tactic used by FMC in India, similar to the practice described by FE-2 in Brazil, was to not physically move the inventory that was sold or returned in India. FE-14 stated that the inventory was removed from FMC's books for accounting purposes, but never left their warehouse and FMC paid the corresponding warehouse fees. FE-14 raised concerns about this practice. FE-14 explained that similar tactics were used with Super Distributors in India, who also held product in their warehouses that had been supposedly sold. FE-14 explained that sales and returns occurred on paper, but without the physical movement of inventory. *Supra* ¶¶168-69. FE-12 recalled being instructed that he had to sell enough product to meet forecasts and that the Company would then take the product back following the quarter end, which made him wonder, "how can we do business like this?"—meaning recording deals that were complete on paper, while legitimate sales were not occurring. *Supra* ¶140. This practice was specifically implemented in India and Brazil, including for sales that were pushed through at quarter end with the intention that the distributor would "return" the unneeded product in the ensuing quarters. In addition, CFRA's analysis acknowledged and supported FMC's improper revenue recognition practices, reporting that FMC's Class Period practices "potentially signal[ed] inappropriate revenue recognition practices," including that "receivables as a percentage of sales grew substantially" and the "dramatic decline in sales growth,

coupled with other concerning metrics like accruals quality and leverage changes, created significant pressure on management to manipulate financial statements to maintain the appearance of stability." *Supra* Section IV.F. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as legitimate, organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

### 2. False Statements in FMC's SEC Filings Concerning Rights of Return

276. In the 2023 10-K, in Note 3 to the Consolidated Financial Statements, the Company included a section discussing its Right of Return, stating:

> ***We extend an assurance warranty offering customers a right of refund or exchange in case delivered product does not conform to specifications. Additionally, in certain regions and arrangements, we may offer a right of return for a specified period. Both instances are accounted for as a right of return and transaction price is adjusted for an estimate of expected returns.*** Replacement products are accounted for under the warranty guidance if the customer exchanges one product for another of the same kind, quality, and price. We have significant experience with historical return patterns and use this experience to include returns in the estimate of transaction price.

277. The Fiscal Year Forms 2024 10-Q each adopted, repeated, and/or incorporated by reference the above 2023 10-K statement in ¶276 concerning FMC's Right of Return. This same statement was then repeated in the 2024 10-K. The Q1 2025 10-Q and Q2 2025 10-Q each adopted, repeated, and/or incorporated by reference the 2024 10-K statements concerning FMC's Right of Return.

278. These statements concerning the Company's Right of Return in its 2023 10-K, 2024 10-K, Q1 2024 10-Q, Q2 2024 10-Q, Q3 2024 10-Q, Q1 2025 10-Q, and Q2 2025 10-Q, which represented that the Company offered customers "***a right of refund or exchange in case delivered***

***product did not conform to specifications***" and that, "***in certain regions and arrangements, we may offer a right of return for a specified period***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, because at the time of the statements, the Company's returns were not limited to product that "did not conform to specifications" or to a "specified period" of time. Instead, as multiple FEs explained, the Company offered an essentially limitless return policy to incentivize customers to take on more inventory so the Company could record these transactions as sales and inflate revenue. The Company also routinely sold product with the intent and expectation that it would be returned and, after securing sales to pull revenue forward at quarter end, the Company then balked at effectuating returns, offering rebates and other incentives for customers to retain unwanted product and keep the Company's financial figures inflated. *See supra* Section IV.E.2. For example, as described by FE-12, in APAC and in India specifically, contracts allowed for returns if the product could not be sold, and FMC exploited its right to return option to convince distributors to take on more product than was needed. *Supra* ¶139. FE-12 further recounted instances in which a transaction was still reported as a sale, despite the fact that there was no demand for the product and a return was all but guaranteed, and where FMC kept "pumping" inventory into the channel although FMC knew what inventory was already going to come back to it in the form of returns. *Supra* ¶167. FE-14 also stated that returns in India were done on a "no strings attached" basis, and that it was common practice that FMC received high levels of returns during the first two months of a quarter to such a large degree that at times during the first two months of a reporting period, there were "negative sales" for some quarters due to the volume of returns. *Supra* ¶¶165, 169. FE-2 explained that the practice of issuing an invoice of sale while FMC maintained possession of the sold product was very common at FMC, especially towards the end of the fiscal year when sales were needed in

order to meet sales targets; customers then returned the product, which had never been shipped, after the quarter ended. *Supra* ¶143. Additionally, according to FE-2, the reason customers accepted excess inventory was due to the financial incentives that FMC offered, including no cost returns. *Id*. Further, according to FE-4, inventory was "always a problem" at every FMC location audited, including "a lot of product returns and invoices" that were not recorded as returns. *Supra* ¶154. FE-3 additionally recalled instructions to tell customers that in exchange for not returning product, FMC would pay the associated taxes and storage costs related to that product, and FE-2 recalled instructions to have customers make returns slowly. *Supra* ¶¶158, 160-61. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as legitimate, organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically.

### 3. Bank of America Securities Global Agriculture and Materials Conference — February 29, 2024

279. On February 29, 2024, during trading hours, Defendants Douglas and Sandifer participated in the Bank of America Securities ("BofA") Global Agriculture and Materials Conference. During the question-and-answer portion of the conference, the BofA analyst asked Defendant Sandifer to comment about pricing in the market, specifically in Brazil, asking: "And besides demand and volume, how would you assess the outlook in Brazil for competition from generics? … Is that a factor that's looking greater than you had in the past, and why? And what about pricing?" Sandifer responded that while "we have seen some pricing pressure in Brazil" related to FMC's "inventory correction," "[w]e ***have been pretty disciplined about limiting price discounting and not pursuing volume in a weak demand environment***." Sandifer later stressed that while the Company was "providing some accommodations to customers in the form of rebates

or credits that help them offset high-cost inventory that they're carrying," the Company's positive EBITDA margin for 2023 was due in part to "***our discipline around managing pricing***."

280. Defendant Sandifer's statements, including that the Company had been "***pretty disciplined about limiting price discounting and not pursuing volume in a weak demand environment***" and that FMC's 2023 financial results were due to "***a discipline around managing pricing***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, because at the time of the statements, FMC was not disciplined in its pricing or discounting and knowingly increased and overloaded inventory volumes despite weak demand through high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was

little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See Supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See Supra* Section IV.F. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

**4. First Quarter 2024 Earnings Call — May 7, 2024**

281. On May 7, 2024, before trading began, the Company hosted an earnings call for the first quarter of 2024 (the "Q1 2024 Call"). During the Q1 2024 Call, an analyst posed a question to Defendant Sandifer about FMC's receivables, asking him: "You talked a lot about getting inventories down and payables and working with those. I was just wondering what's in terms of receivables, if they're where – you're comfortable where they are? Is that something that's to be worked on as well?" Sandifer responded, "Yeah, I think we're comfortable with receivables." Sandifer continued:

> [W]e have been managing very carefully our balance sheet and I think if you look at how we've chosen to manage through this correction period as opposed to some of our peers, ***we have been disciplined about pricing and about not chasing volume that wasn't there, so as not to build up receivables and longer term collection risk***.

282. Defendant Sandifer downplayed there being any concerning risks to the collection of the Company's receivables, noting that:

> [T]here's always collection risk . . . ***we are in a very good position.*** We understand what our risks are, we understand – ***we've taken some lumps by, again, not pursuing extra volume when there really wasn't volume in the market to be had. And instead, working through this so that we can comment to what will be an upturn here in the second half and into 2025 with a strong balance sheet with healthy receivables.***

283. Defendant Sandifer's statements, including that the Company had "***been disciplined about pricing and about not chasing volume***" and was "***not pursuing extra volume when there really wasn't volume in the market to be had***," and that the Company made efforts to "***not build up receivables and longer-term collection risk***" and was "***in a very good position***" with respect to receivables, were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, FMC was recklessly pursuing extra sales volume where there was no demand, was not "disciplined" about pricing or chasing volume, and was building up high-risk receivables through high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange,

leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

### B. False Statements Concerning FMC's Channel Inventory Normalization

#### 1. False Statements in FMC's SEC Filings Concerning Customer Liquidity

284. On February 27, 2024, FMC filed its 2023 10-K with the SEC. In Item 1A to the 2023 10-K, the Company enumerated various "factors that could have an impact on our ability to achieve operating results and meet our other goals." These factors were incorporated by reference in each of the Fiscal Year 2024 Forms 10-Q. The 2024 10-K, filed with the SEC on February 28, 2025, also included Item 1A thereto enumerating various "factors that could have an impact on our ability to achieve operating results and meet our other goals." These factors were incorporated by reference in the Q1 2025 10-Q and Q2 2025 10-Q.

285. In both the 2023 10-K and 2024 10-K, one such factor stated:

> Fluctuations in commodity prices - Our operating results could be significantly affected by the cost of commodities such as chemical raw material commodities, energy commodities, and harvested crop commodities. We may not be able to raise prices or improve productivity sufficiently to offset future increases in chemical raw material or energy commodity pricing. Accordingly, increases in such commodity prices may negatively affect our financial results. We use hedging strategies, where available on reasonable terms, to address energy and material commodity price risks. However, we are unable to avoid the risk of medium- and long-term increases. Additionally, fluctuations in harvested crop commodity prices could negatively impact our customers' ability to sell their products at previously forecasted prices resulting in reduced customer liquidity. ***Inadequate customer liquidity could affect our customers' abilities to pay for our products and, therefore, affect existing and future sales or our ability to collect on customer receivables.***

286. These statements concerning customer liquidity in FMC's 2023 10-K, 2024 10-K, Q1 2024 10-Q, Q2 2024 10-Q, Q3 2024 10-Q, Q1 2025 10-Q, and Q2 2025 10-Q, which represented that "***[i]nadequate customer liquidity could affect our customers' abilities to pay for our products and, therefore, affect existing and future sales or our ability to collect on customer receivables***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, because at the time these statements were made, this risk had already materialized, as the Company had recorded large sales to known high-risk and financially strapped customers with inadequate liquidity, and, as described by multiple FEs, regularly engaged in such transactions and extended risky credit as a part of its routine business practices in order to inflate revenue and meet sales targets. *See supra* Section IV.E.4. For example, FE-1, FE-2, and FE-3 each described how selling product to companies known to have financial or credit issues was part of FMC's overarching strategy and routine business practice. *See supra* Section IV.E.4. FE-13 also recalled problems with cash collection and late payments, which became a challenge. *Supra* ¶183. Further, as described by FE-2 and FE-3, in December 2023, FMC signed and recorded as revenue approximately $50 million in high-risk sales to AgroGalaxy, which represented approximately 4.3% of FMC's total Q4 2023 reported revenues. *Supra* ¶186. FE-2

explained that AgroGalaxy filed for bankruptcy prior to the payment due date. *Supra* ¶186. AgroGalaxy filed for the Brazilian equivalent of Chapter 11 bankruptcy protection in September 2024. Payment was due to FMC in approximately October or November 2024; however, according to FE-2, no payment was ever made by AgroGalaxy and, by the time FE-2 left FMC in October 2024, AgroGalaxy had not returned any of the purchased products. *Id*. Further, FE-2 explained that, following his departure, he learned that Defendant Pereira, Mills, and Giudicissi had entered into a similar deal with another company, AHL, as well as with a company called Lavoro, which has also since filed for bankruptcy while owing debts of approximately $50 million to FMC. *Supra* ¶187. Lavoro declared bankruptcy in 2025 and FMC is one of the company's three largest creditors. *Supra* ¶192. Defendants' practice of selling to high-risk customers with inadequate liquidity artificially inflated FMC's reported sales and revenue, which Defendants portrayed as legitimate, organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

**2. False Statements in FMC's SEC Filings Concerning Channel Inventory Behavior**

287. In both the 2023 10-K and 2024 10-K, another of the "factors that could have an impact on our ability to achieve operating results and meet our other goals" stated:

> Channel inventory behavior – The Company relies in many countries and in varying degrees on distribution channels to access the market and reach farmers or other end use customers. ***An abrupt and widespread shift in purchasing behaviors (e.g., the current inventory destocking phenomenon) by channel partners and end use customers has and may continue to negatively and materially impact the Company's volumes across important markets, which has adversely affected and may continue to adversely affect our results of operations.*** Such adverse effects could include but not be limited to materially reduced volumes purchased by customers, resulting in not only reduced sales, but also the Company bearing higher

volumes of unsold product inventory, excess raw materials, and correspondingly increased carrying costs.

288. These statements concerning channel inventory behavior in FMC's 2023 10-K, 2024 10-K, Q1 2024 10-Q, Q2 2024 10-Q, Q3 2024 10-Q, Q1 2025 10-Q, and Q2 2025 10-Q, which represented that "***[a]n abrupt and widespread shift in purchasing behaviors (e.g., the current inventory destocking phenomenon) by channel partners and end use customers has and may continue to negatively and materially impact the Company's volumes across important markets, which has adversely affected and may continue to adversely affect our results of operations***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because this risk factor—the Company's only channel inventory-related risk factor—misleadingly signaled to the market that the only potential risk to the Company's distribution channel was an "abrupt and widespread shift in purchasing behaviors (*e.g.*, the current inventory destocking phenomenon) by channel partners and end use customers," and not the Company's channel stuffing, as perpetuated by high-cost and high-risk sales tactics implemented to inflate revenues and demand, which, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of

inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. Further, acknowledging a "shift in purchasing behaviors" and "widespread . . . channel inventory destocking" as a risk factor does not suffice to disclose the Company's aforementioned specific and extensive manipulative practices that were employed in furtherance of overstuffing FMC's channel. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

### 3. False Statements in FMC's SEC Filings Concerning Project Focus

289. In the 2023 10-K, the Company described Project Focus, its restructuring initiative. In Item 1A to the 2023 10-K, the Company described Project Focus as a "global restructuring plan" that is "***designed to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity in light of the precipitous drop in demand across the crop protection industry in 2023***."

290. Similarly, in both the 2024 Cash Flow Outlook section of the 2023 10-K and Note 8 to the 2023 10-K's Consolidated Financial Statements, the Company described Project Focus as "***designed to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity***." Both sections also described Project Focus as being initiated "***[i]n response to the unprecedented downturn in the global crop protection market that resulted in severe channel destocking***[.]"

291. These statements were repeated in the Fiscal Year 2024 Forms 10-Q, the 2024 10-K[11], the Q1 2025 10-Q, and the Q2 2025 10-Q.

292. These statements concerning Project Focus in FMC's 2023 10-K, 2024 10-K, Q1 2024 10-Q, Q2 2024 10-Q, Q3 2024 10-Q, Q1 2025 10-Q, and Q2 2025 10-Q, which represented that Project Focus was "***designed to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity***" in response to "severe channel destocking" (and substantively identical statements), were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, FMC was not utilizing Project Focus to respond to, address, and "right-size" its cost base in the wake of market-wide channel destocking, but rather was engaging in high-cost and high-risk sales tactics to inflate revenues and demand that prevented destocking from running its course and overstocked the channel, which, as reported

---

[11] Specifically, in Item 1A to the 2024 10-K, the Company described Project Focus as a "global restructuring plan" that is "***designed to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity in light of the precipitous drop in demand across the crop protection industry in 2023.***" In Item 7 to the 2024 10-K, in the section describing the Company's 2024 Highlights, Project Focus is described as "***designed to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity***," initiated "***[i]n response to the unprecedented downturn in the global crop protection market during 2023***[.]"

by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Additionally, in reality, as FE-12 stated, Project Focus "was a story for the market and FMC failed to address the real problems impacting the Company," which still have not been addressed. *See supra* ¶171. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were

exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

#### 4. FMC Investor Day 2023 — November 16, 2023

293. On November 16, 2023, during trading hours, the Company held its FMC Investor Day 2023, during which the Company introduced strategic initiatives to normalize the channel in the wake of global destocking. During this Investor Day conference call, Defendant Douglas outlined FMC's path forward and stated that: "We are maintaining or gaining market share at the grower level in all regions, while continuing to see good traction for our new products. ***We fully expect the destocking reset is transitory and that the channel will begin to rebalance and ease back into somewhat more normal patterns as we enter mid-2024***."

294. Defendant Sandifer added that the Company's focus would be on keeping inventory at "***lower targeted levels***," stating:

> ***Our focus this coming year will be on returning working capital to more normal levels. This means converting inventory to receivables by selling product on hand and then collecting those receivables***. ***This further means cautiously ramping up production to keep inventory at lower targeted levels, rebuilding payables in the process.***

295. These statements, including that the Company "***fully expect[s] the destocking reset is transitory***;" it was allowing the channel to "***rebalance***" and "***ease back into somewhat more normal patterns***," and it "***expect[s]***" rebalancing and normalization "***as we enter mid-2024***"; it was organically "***converting inventory to receivables by selling product on hand and then collecting those receivables***;" and it was "***cautiously ramping up production to keep inventory at lower targeted levels***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, FMC was not rebalancing or normalizing the channel, and was not keeping inventory at lower levels or

letting destocking run its course such that rebalancing could occur, but rather was implementing high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were

exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

296. Also on November 16, 2023, during Investor Day, an analyst asked Defendant Douglas about his "view that channel inventory levels might be below normal now at least in some regions," and "[w]hat gives you that visibility? Are you doing anything differently now than you have earlier in the year? And if so, what gives you that?"

297. Defendant Douglas responded:

> Yeah. Certainly ***when you think about where the industry is today, we're spending a lot more time talking to distribution, retail and where we have access to growers, talking to growers.*** That's happening in Asia, it's happening in Europe, certainly happening in the US and Brazil.
>
> Ronaldo and I were just – we'd literally just come back from Brazil over the last few days. And we spent a lot of time with very large co-ops talking about where are your inventory levels now versus where you expected them to be and as you look forward? I do think there are certain places and Brazil will get to that point where we see pockets of people drawing their inventories down below normal. That's going to happen. There are some places where it won't be below normal. But I do think in the U.S., we certainly know that at the grower level and at retail, the inventory levels are way below normal. But at the distribution level, as we enter the season, they're high.
>
> ***So that material will flow through the channel. It's already starting to flow through the channel. So we expect that to normalize pretty quickly.***

298. These statements, including that "***material will flow through the channel. It's already starting to flow through the channel. So we expect that to normalize pretty quickly***" based on "talking to" customers, including distributors, retail, and growers—particularly in Brazil—were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, FMC was not rebalancing or normalizing the channel, but rather was implementing high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns

of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

299. Analysts accepted Defendants' statements about the normalization of its channel inventory. For example, one Morningstar report dated November 17, 2023, maintained its $110 per share fair value estimate for FMC and reported that "[w]e view FMC shares as materially undervalued," explaining that "[w]e think the market is overly focused on the near-term decline in FMC's profits due to industrywide inventory destocking." The report further elaborated: "we see a strong margin of safety in the current share price, with much of the bad news already priced in."

**5. Form 8-K — December 18, 2023**

300. On December 18, 2023, after the close of trading, FMC filed a Form 8-K, signed by Defendant Sandifer, describing the goals of its Project Focus cost restructuring and inventory rebalancing plan:

> ***In response to the unprecedented downturn in the global crop protection market that resulted in severe channel destocking***, which has materially impacted volumes in 2023, the Company has initiated a global restructuring plan, which we refer to as "Project Focus." ***This program is designed to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity.*** The Company's objective for Project Focus is to deliver $50 to $75 million in contributions to adjusted EBITDA in 2024. The Company is further targeting annual run-rate savings of $150 million or more by the end of 2025 from the program once fully implemented.

301. These statements, including that the Company, through Project Focus and in response to "severe channel destocking," was trying to "***right-size our cost base and optimize our footprint***" in order to "***driv[e] significant cost improvement and productivity***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, FMC was not utilizing Project Focus to respond to, address, and "right-size" its cost base in the wake of market-wide channel destocking, but rather was engaging in high-cost and high-risk sales tactics to inflate revenues and demand that prevented destocking from running its course and overstocked the channel, which, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate

revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Additionally, in reality, as FE-12 stated, Project Focus "was a story for the market and FMC failed to address the real problems impacting the Company," which still have not been addressed. *See supra* ¶171. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts,

these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

302. Analysts widely acknowledged Defendants' statements about FMC's Project Focus as a mechanism to drive profitable growth. As one CFRA Research Report published on December 30, 2023 explained, "[o]ur hold rating is driven by projected global crop protection demand, offset by the disclosed inventory reductions . . . [w]e also view grower inventory depletion and stock-to-use ratios which sit lower vs. historical averages as a nice tailwind for FMC's top line." In an Equisights Research report published on January 1, 2024, Equisights reported that: "despite the challenges faced by FMC in the third quarter of 2023, including global supply chain disruptions and destocking activities, the company has demonstrated resilience and adaptability to navigate the market." A Morningstar report published on January 10, 2024 stated that FMC shares "are materially undervalued as 2024 recovery and strong pipeline drive long-term growth."

**6. Fourth Quarter 2023 Financial Results — February 5-6, 2024**

303. On February 5, 2024, FMC issued a press release titled "FMC Corporation announces fourth quarter and full-year 2023 results within guidance ranges, provides 2024 outlook," in which the Company announced its results for Q4 and full year ended December 31, 2023 (the "Q4 2023 Press Release"). The Q4 2023 Press Release touted that FMC's "[n]ew products and branded diamides delivered ***strong results despite continued destocking***." Moreover, Defendant Douglas was quoted as stating that: "***[d]uring the fourth quarter we observed continued channel destocking in all regions***, while drought in Brazil also amplified challenges in Latin America."

304. These statements, including that the Company was allowing organic "***continued channel destocking***" in all regions and reporting "***strong results***" due to the sale of new products and branded diamides, were false or, at a minimum, misleading when made and omitted material

facts necessary to make the statements not misleading because at the time of the statements, FMC's touted "strong results" were due in substantial part to the Company's active prevention of necessary destocking, and were the byproduct of the Company engaging in high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Additionally, although the Company attributed its financial results in Q4 2023 to "continued

channel destocking," those results would have been materially worse absent the manipulative sales practices employed by FMC, at the direction of the Individual Defendants, that continued to overstock the channel. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

305. The next day, on February 6, 2024, before trading began, the Company hosted its earnings call for the fourth quarter of 2023 (the "Q4 2023 Call"). During the question-and-answer section of that call, an analyst asked Defendant Douglas "what you're seeing with channel inventories in India." Douglas stated:

> Yeah. Listen, channel inventories are high. ***We are carrying high channel inventories***. We are not the only ones. ***Other people on earnings calls have highlighted India. You had at least three years of bad monsoons as well as low pest pressure. So there is a lot of inventory that needs to be worked through there.***
>
> ***We'll take all of 2024 and probably into 2025 to work that down, depending on what the weather patterns look like. If they look good, then we may get some acceleration.*** If not, it's going to take a while. So you're probably going to hear us talk about India pretty much every quarter as we go through this year and certainly into early next year. I doubt we'll be the only ones talking about that either.

306. Defendant Douglas's statements, including that the Company was "***carrying high channel inventories***" because of "***at least three years of bad monsoons as well as low pest pressure***," and that "***work[ing] that down***" will "***depend[] on what the weather patterns look like***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, the Company's elevated inventory in India was due in substantial part to FMC engaging in high-cost and high-risk sales

tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. Further, FE-12 explained that the Company stating that monsoons and the weather in most APAC regions contributed to inventory buildup was "just an excuse," the weather situation never reached a point that would justify over a year's worth of inventory sitting in the channel, and what has occurred in India, one of FMC's largest markets, was a problem the Company created for themselves. *See supra* Section IV.E.3. The misleading nature of Defendant Douglas's statement attributing the Company's elevated channel inventory in India to monsoons and weather events is further supported by the absence of comparable disclosures from the Company's primary competitors—including Syngenta, Bayer

AG, BASF AG, and Corteva Agriscience—around this time. Additionally, these practices, which were concealed from investors, caused and exacerbated the Company's high channel inventory, and ultimately led to the sale and $510 million write-down of the Company's India business, of which $282 million was attributable to the foregoing concealed conduct as revealed by Defendants. *See supra* Section V.D. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

307. Also during the Q4 2023 Call, Defendant Sandifer was asked by an analyst about the Company's expectations that "EBITDA contraction [] turn to growth mid-year" and whether he had any information "to help us bridge how we go from contraction to back to growth." Sandifer responded:

> Sure, Joel. Look, I would put it this way. We've long said that ***we think that this channel inventory correction takes a full year in every market to reach sort of a bottom***. We have not gotten to that full year yet. This phenomenon really started in the latter part of Q2 of 2023.
>
> Thus, this brought the Q1 revenue drop pretty much in line with the previous three quarters where we've been going through this channel destocking trend. So, I think as we think about trajectory for 2024, Q2 is the real transition.
>
> ***We expect a shift to growth in Q2. May not be significant growth, but we do expect a growth as we anniversary the initial drop that started this phenomenon.*** And as you pointed out, I mean, certainly in that that last – Q2 through Q4, our guidance implies about 16% top line growth – or excuse me, 15% top line growth and about 32% bottom line growth.
>
> ***That starts in Q2 where you have this inflection and then accelerates in the second half. And as Mark commented on his prepared comments, it's really***

> ***driven by new product introduction, right***. And I can't emphasize enough when $200 million of year-on-year growth of new product introduction in a year where we're only forecasting $115-million-ish total revenue growth at the midpoint, it's a significant mix benefit and it's very much tilted in the second half.
>
> So I do understand it's a bit of a very back-end loaded profile, but I think there is a clear logic to it. ***Q1 we're finishing out the first year of this channel inventory correction getting past the anniversarying of it. We have this hangover from high cost inventory from the prior year. Q2 we see a transition back to positive comparisons and then an acceleration in the second half driven by new product introduction.***

308. Defendant Sandifer's statements, including that he "***expect[s] a shift to growth in Q2 . . . where you have this inflection and then [growth] accelerates in the second half***" that is "***really driven by new product introduction***," that "***channel inventory correction takes a full year in every market to reach sort of a bottom***," and that "***we're finishing out the first year of this channel inventory correction getting past the anniversarying of it***" such that FMC is seeing "***a transition back to positive comparisons and then an acceleration in the second half driven by new product introduction***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, FMC had prevented and was actively preventing "channel inventory correction" and the Company's results were due in substantial part to the Company engaging in high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on

payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Additionally, although the Company attributed its financial results to "channel inventory correction," those results would have been materially worse absent the manipulative sales practices employed by FMC, at the direction of the Individual Defendants, that continued to overstock the channel. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

309. Analysts' reports following FMC's February 5, 2024 press release and its February 6, 2024 earnings call underscore the market's reliance on Defendants' statements. For example, a Morningstar Equity Analyst Note published on February 6, 2024 reported that "as inventory

destocking ends by midyear, we expect FMC will see markedly improved results by the end of the year." A Roth MKM report published on February 6, 2024 similarly explained that "as we exit 2024, concerns over inventory destocking in the channel and generic pricing will have abated and sentiment and valuation will be based on this more favorable long-term outlook."

#### 7. Bank of America Global Agriculture and Materials Conference — February 29, 2024

310. On February 29, 2024, during trading hours, Defendants Douglas and Sandifer participated in the BofA Global Agriculture and Materials Conference. During the question-and-answer portion of the conference, an analyst requested "a bit of an update on how things are going" in Brazil, asking Defendant Sandifer: "You're two months into the quarter, is it going better or worse than you thought? And what's your near-term outlook?" Sandifer responded that while "[w]e expected a challenging quarter," visibility was increasing, and that was "the first step towards what we think is coming around midyear, sometime in Q2, a real turn in the business," adding "***specifically what are we seeing? I think, one, sales through the first two quarter – two months of the quarter have been pretty much in line with our internal forecast. That's the first time that's happened in three quarters.***"

311. Defendant Sandifer's statements, including that the Company's sales in the first two quarters "***have been pretty much in line with our internal forecast***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because, at the time of these statements, FMC's sales were only able to "be[] . . . in line with" its inflated sales targets and forecasts not through wholly organic demand, but through high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter;

(3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

312. Later during the conference, Defendant Sandifer explained that FMC's supply chain necessitated detailed conversations with distributors to plan production; however, according to Sandifer, these conversations stopped around June 2023. He then explained that they were restarting:

> We need to have an ongoing dialogue with our customers well ahead of the growing and new season to understand what their needs are, where they think demand is going to be, what the mix of crops is going to be, what the – what on the ground intelligence they have around where they think pest pressures are going to be, to be able to effectively plan demand and to plan commercial activity.
>
> And starting about June of last year, those conversations shut down. Our industry went very much to a buying hand-to-mouth kind of operation and an industry with very long supply chains where you just can't operate like that in the long run. So as we started to burn down channel inventory, we are starting to see people recognize that that buffer they've been living off of for the last year, yes, excess channel inventory, it gives you a little bit of more security of supply. You don't have to plan as far ahead. ***But as our customers are – the distributors and retailers downstream of us start bringing their inventories back to more normal levels, they know and they're starting to have that dialogue with us again.***

313. Defendant Sandifer also discussed how FMC was "clearing out the channel inventory" in Brazil so that the Company could start the next growing season "from a more healthy base":

> But it does mean that we're – as we're looking ahead to the next growing season in Brazil starting in September, our expectations are the same, that ***we are clearing out the channel inventory***. It might still be a bit high in places or in specific products, but it's ***getting more normal such that when we get into the new selling season, the new growing season in Q3, we'll be starting from a more healthy base.***

314. Defendant Sandifer's statements, including that, based on "dialogue" with distributors and retailers, FMC's customers "***are . . . start[ing to] bring[] their inventories back to more normal levels***," the Company was "***clearing out the channel inventory***," and channel inventory was "***getting more normal such that when we get into the new selling season, the new growing season in Q3, we'll be starting from a more healthy base***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not

misleading because at the time of the statements, FMC's channel inventory was not being cleared or "getting more normal" organically; instead, FMC was pushing product and stuffing the channel through high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when

Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

315. Defendants' statements boosted FMC's stock price, which increased $5.10 per share, or 9.94%, to a closing price of $56.39 per share on February 29, 2024.

**8. First Quarter 2024 Financial Results and 10-Q — May 6-7, 2024**

316. On May 6, 2024, FMC issued a press release titled "FMC Corporation delivers first quarter earnings at higher end of guidance range, maintains full-year outlook." In this press release, FMC announced its results for the first quarter ended March 31, 2024. Defendant Douglas was quoted in the press release as stating:

> Free cash flow improved significantly, and we delivered adjusted EBITDA at the high end of our guidance range during the first quarter. As expected, sales continued to be impacted by inventory management actions by customers in all regions. ***Our results benefitted from our restructuring actions and the continued resilient sales of our new products, particularly in Latin America***.
>
> . . .
>
> ***Our second quarter revenue outlook includes volume growth for the first time since global destocking began in the second quarter of 2023***. We expect the market to continue to improve as we progress through the year and transition to more normal conditions in 2025. ***The combination of steady on-the-ground application, demand for our innovative and differentiated portfolio and a more efficient cost structure places FMC in a strong position as the market recovers.***

317. These statements, including that the Company had benefitted from "***restructuring actions***," including Project Focus, and was experiencing "***resilient sales***," "***volume growth***," "***steady on-the-ground***" application, and "***demand for [its] innovative and differentiated portfolio and a more efficient cost structure***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the

statements, rather than "benefitt[ing] from" the Company's "restructuring actions"; organic, "resilient sales" and "demand"; and "a more efficient cost structure," in truth, the Company's "results" were the byproduct of the Company engaging in high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Additionally, in reality, as FE-12 stated, Project Focus "was a story for the market and FMC failed to address the real problems impacting

the Company," which still have not been addressed. *See supra* ¶171. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

318. The next day, during the Q1 2024 Call, Defendant Douglas stated:

> ***Data from third parties as well as input from our commercial teams shows that the inventory reduction actions in the channel are making good progress.*** On a regional basis, the pace of destocking is varied. We see North America furthest along with inventories at the retail and grower level back to normal, while distributors are still working to reduce their level of inventory.
>
> EMEA is in a similar condition, except in countries hit by unfavorable weather. In both these geographies, ***our customers are now targeting to operate with inventories at lower than normal*** levels. In Latin America, ***inventories are materially lower and are expected to trend towards more normal levels as we move through the rest of the year***. ***We expect India destocking to persist well into 2025, but parts of Asia, such as ASEAN and Pakistan, have made strong progress in destocking in Q1***.
>
> ***While these activities continue to run their course, we're encouraged by the first signs that customers are starting to return to historical order patterns***.

319. These statements, including that "***inventory reduction actions in the channel are making good progress***" based in part on on-the-ground "***data***"; that "***inventories are materially lower and are expected to trend towards more normal levels as we move through the rest of the year***"; that FMC's customers were "***return[ing] to historical order patterns***"; that "***[w]e expect India destocking to persist well into 2025, but parts of Asia, such as ASEAN and Pakistan, have made strong progress in destocking in Q1***"; and that FMC was allowing destocking "***activities [to] continue to run their course***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the

statements, FMC was not rebalancing or normalizing the channel, allowing for "inventory reduction" to take place, and was not letting destocking run its course, but rather was implementing high-cost and high-risk sales tactics to inflate revenues and demand and actively counteract destocking that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. With respect to India specifically, these practices, which were concealed from investors, caused and exacerbated the Company's high channel inventory, and ultimately led to the sale and $510 million write-down of the Company's India business, of which $282 million was attributable to the foregoing concealed conduct as revealed by Defendants. *See supra* Section V.D. In addition, as reported by CFRA Research, FMC's Class Period practices and

financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Additionally, although the Company attributed its results to continued destocking, those results would have been materially worse absent the manipulative sales practices employed by FMC, at the direction of the Individual Defendants, that continued to overstock the channel. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

320. During the question-and-answer portion of the Q1 2024 Call, Defendant Douglas was asked by an analyst about how the Company intends to meet its guidance. Douglas responded, with respect to Brazil:

> ***Brazil, our orders on hand today are significantly higher than where they were this time last year. In other words, growers have depleted much of their inventory. They are now asking distribution and retail and hence, FMC. We need materials going into the next season.*** Acreage is expected to increase in the 2024/2025 season in Brazil. So, they're expecting a good year. ***We now have those orders on hand.***

321. These statements, including that growers in Brazil had "***depleted much of their inventory***" such that the channel was rebalancing, demand was increasing, and the Company's situation and prospects had improved and normalized in Brazil, and that this renewed demand and the Company's increased "***orders on hand***" were organic, were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, FMC had not let the "deplet[ion] of inventory" necessary for rebalancing run its course organically, was not rebalancing or normalizing the channel, and had

not received "increased orders on hand" from wholly organic demand, but rather was engaging in high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were

exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

322. Also during the question-and-answer portion of the Q1 2024 Call, an analyst asked Defendant Douglas about FMC's "internal inventory" and "where you are now versus where you would like inventories to be." In response, Douglas touted the success of the Company's sales and inventory reduction efforts, stating that: "we peaked inventory basically around about August last year internally and ***we've been obviously on the track since we first came into this channel destocking to really remove inventory as fast as we could***. ***We're getting close to the point.*** We're not quite there yet. ***We're getting close to the point where at the macro level for our inventory we're going to be pretty much where we want to be***." Douglas added: "***I would say by the time we get through Q2 and into Q3, we're going to be in pretty good shape in terms of where our revenue is reset this year versus where the inventory needs to be***."

323. During the same call, an analyst asked Defendant Sandifer about whether the market should expect FMC's cash flow to "be more back half weighted in 2024." Sandifer responded affirmatively, stating that: "essentially all of the positive free cash flow for the year is going to come in the second half." Sandifer explained:

> ***What we are carefully balancing is continuing to bring down our absolute level of inventory while selling through at the higher rate we're expecting to sell in the second half new production***. So, it will be a staggered step as we go through the rest of the year to bring payables back up to a more reasonable level and to get inventory again a couple hundred million less than where we are today. So, there'll be the combination of those two and it really will take through the full second half to get the cash benefit from those actions.

324. These statements, including that the Company has "***been obviously on the track since we first came into this channel destocking to really remove inventory as fast as we could***";

that "***[w]e're getting close to the point where at the macro level for our inventory we're going to be pretty much where we want to be***"; that, in ensuing quarters, the Company is "***going to be in pretty good shape in terms of where our revenue is reset this year versus where the inventory needs to be***"; and that "***we are carefully balancing [] continuing to bring down our absolute level of inventory while selling through at the higher rate we're expecting to sell in the second half new production***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, FMC was not removing or bringing down inventory from the channel; letting "macro level" events, such as destocking, organically run their course; balancing both drawing down the Company's "absolute level of inventory" and ensuring that production matched the "higher rate" of expected sales later in the year; or engaging in sustainable practices to support a "back half weighted year," but rather was implementing high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical

exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

325. Also during the question-and-answer portion of the Q1 2024 Call, an analyst asked about "market expectations and performance in India." Defendant Douglas responded:

> Yeah, India is a – it's a very important market for us and one that is facing its own individual challenges, not necessarily related to the same reasons as the rest of the world is facing the channel inventories. I would say, ***India is almost unique in the sense of the channel inventory pressure that we face there is purely due to weather and dislocated monsoons over the last few years.*** We're not the only market participant to comment on this, others have also commented on it. It's an industry-wide phenomena and it's just time that takes us to get through that.
>
> The monsoon in the last season was not great. We're hoping for better weather conditions as we continue through the rest of the year. ***We are reducing channel inventory every quarter. Some quarters is faster than others, but it will take some time to remove what is a fair degree of channel inventory. The markets themselves are good in India for where the weather is good***.

326. Defendant Douglas's statements, including that the Company's "***channel inventory pressure that we face [in India] is purely due to weather and dislocated monsoons over the last***

***few years***" and that "***[t]he markets themselves are good in India where the weather is good***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, the Company's elevated inventory in India was due in substantial part to FMC engaging in high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. Further, FE-12 explained that the Company stating that monsoons and the weather in most APAC regions contributed to inventory buildup was "just an excuse," the weather situation never reached a point that would justify over a year's worth of inventory sitting in the channel, and what has occurred in India, one of FMC's

largest markets, was a problem the Company created for themselves. *Supra* Section IV.E.3. The misleading nature of Defendant Douglas's statement attributing the Company's elevated channel inventory in India to monsoons and weather events is further supported by the absence of comparable disclosures from the Company's primary competitors—including Syngenta, Bayer AG, BASF AG, and Corteva Agriscience—around this time. Additionally, these practices, which were concealed from investors, caused and exacerbated the Company's high channel inventory, and ultimately led to the sale and $510 million write-down of the Company's India business, of which $282 million was attributable to the foregoing concealed conduct. *See supra* Section V.D. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

327. Defendants' false and misleading statements again artificially inflated FMC's stock price. Indeed, after Defendants assured investors that its customers were "return[ing] to historical order patterns," FMC's stock price increased $5.77 per share, or 9.46%, to a May 7, 2024 closing price of $66.75.

### 9. BMO Global Farm to Market Conference — May 15, 2024

328. On May 15, 2024, Defendants Douglas and Sandifer participated in the BMO Global Farm to Market Conference. In the opening remarks, Defendant Douglas made the following statements about FMC's channel inventory levels:

> I think many of you are aware of all the issues we've had coming out of COVID with supply chains, with destocking. That's something that's on everybody's mind. Certainly is on Andrew and I's – with my mind, I think ***as we go through the rest of this year and as we certainly go into 2025, you're going to start to see more normalization***. It's not going to be smooth. It's going to be bumpy. ***But we're getting to the end of this destocking period, and I think that's an important facet for investors to recognize that supply chains can't empty forever and they have to replenish***. That's the phase we're in now. ***We call it a transition this year. I think that's an apt description***.

329. Defendant Douglas's statements, including that there would be "***more normalization***" to channel inventory over the course of the remainder of 2024 and into 2025, and emphasizing to "***investors***" that "***we're getting to the end of this destocking period***" such that supply chains "***have to replenish***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, FMC was not normalizing its channel or letting the "destocking period" organically run its course, but rather was implementing high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching

the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

330. Also during the BMO Global Farm to Market Conference, Defendant Douglas participated in the following exchange:

> Analyst: Why don't we talk about more regional, so we're talking more broad and maybe you can break down each region and talk about where the – how we're flipping from destocking to restocking? And how you see inventories in each region right now.
>
> Douglas: Yeah, I think I think there's been a lot of commentary around the different regions of the world. … ***Asia is a mixed bag. India inventories are very high, that – we have high inventory, others in the industry have high inventory. That's mainly due to weather***, though not necessarily the same dynamics as we see in the rest of the world**.**

331. Defendant Douglas's statements, including that "***India inventories are very high . . . mainly due to weather***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, the Company's elevated inventory in India was due in substantial part to FMC

engaging in high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. Further, FE-12 explained that the Company stating that monsoons and the weather in most APAC regions contributed to inventory buildup was "just an excuse," the weather situation never reached a point that would justify over a year's worth of inventory sitting in the channel, and what has occurred in India, one of FMC's largest markets, was a problem the Company created for themselves. *Supra* Section IV.E.3. The misleading nature of Defendant Douglas's statement attributing the Company's elevated channel inventory in India to monsoons and weather events is further supported by the absence of comparable disclosures from the Company's primary

competitors—including Syngenta, Bayer AG, BASF AG, and Corteva Agriscience—around this time. Additionally, these practices, which were concealed from investors, caused and exacerbated the Company's high channel inventory, and ultimately led to the sale and $510 million write-down of the Company's India business, of which $282 million was attributable to the foregoing concealed conduct as revealed by Defendants. *See supra* Section V.D. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

**10. Wells Fargo Industrials Conference — June 11, 2024**

332. On June 11, 2024, after trading began for the day, Defendant Sandifer participated in the Wells Fargo Industrials Conference. This was the first conference to occur following Defendant Douglas's unexpected departure from FMC, which had been announced that morning. Defendant Sandifer discussed how FMC was "anticipating growth" for 2024 and made the following statements about FMC's channel inventory levels:

> During this period of disruption and then leading to overbuying in 2022, too much inventory built up between the manufacturers and the growers. ***In the last 4 quarters, we've seen a very rapid and violent correction of that inventory build***. Depending on what part of the world and what stage of the channel and what type of product, ***we are seeing that correction come to an end. We're actually seeing [it] in places where inventories are well below what has been historically held in the channel.***
>
> We have a few places where we're a little slow to meet an order occasionally because we don't always have every single product on the shelf, someone might want. There's a reason these products are carried in inventory during the growing season. The demand for them can be fickle and hard to predict. When bugs show up in your field, you need an insecticide today. Not two weeks from now, not five

> weeks from now, you need it today. ***So we are seeing these things rebalance.*** The timing and the magnitude [of] that rebalancing through '24 is a complicated issue we're working through. ***But I think fundamentals here, the end market demand is still strong. As the channel inventory corrects and we get more in sync, the flow for manufacturers through the distribution channel into the growers' hands, we will see a rebalancing and a rebasing of the business***.

333. During the question-and-answer portion of the conference, the Wells Fargo analyst asked about FMC's channel inventory expectations for 2025. Defendant Sandifer responded:

> ***What we are seeing is improving conditions. We are seeing channel inventories reduced. We will see a rebalancing and resyncing of pull-through by growers from all the way back up the channel back to manufacturers, where that's been broken in the past 4 quarters as that channel – the inventory that built up in between needed to be drawn down***.

334. Defendant Sandifer's statements, including that the Company is seeing "***correction of that inventory build . . . come to an end***," "***seeing things rebalance***," "***seeing [] improving conditions***," and "***seeing channel inventories reduced***," and that the Company "***will see a rebalancing and resyncing***" of the channel, were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, FMC was not rebalancing or normalizing the channel; engaging in practices such that it would "see[]" "things rebalance," "improving conditions," or "inventories reduced; engaging in sustainable practices to support "a rebalancing and resyncing"; or letting any "correction of [] inventory build," *i.e.*, destocking, run its course and "come to an end" organically, but rather was implementing high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and

abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

335. Again, analysts acknowledged and credited Defendants' statements. For example, one Morningstar report published on June 12, 2024 explained that: "[o]ur thesis on FMC has been that the inventory destocking that began in the second quarter of 2023 and led to revenue and profit declines would prove temporary. We expect the company's second-quarter results will improve as

inventory destocking was largely completed in most of the company's geographies and the destocking in Brazil begins to wind down." Similarly, a Seaport Research Partners report issued on June 14, 2024 noted that: "[l]ower volumes would have the effect of prolonging FMC's headwinds associated with elevated channel inventories, which we still think are progressing toward more normal levels."

### 11. Second Quarter 2024 Financial Results — July 31, 2024 and August 1, 2024

336. On July 31, 2024, FMC issued a press release titled "FMC Corporation announces second quarter earnings at higher end of guidance range; updates full-year outlook," in which Defendants announced FMC's financial results for the second quarter ended June 30, 2024 (the "Q2 2024 Press Release"). In the press release, new CEO Defendant Brondeau was quoted as stating: "***Demand improved during the second quarter, resulting in a pronounced increase in our sales volumes***, most notably within the United States and Brazil, despite customers continuing to actively manage inventory." Brondeau further stated: "***We expect demand to increase as the year progresses even as customers maintain a careful approach of managing inventory***."

337. Defendant Brondeau's statements, including that "***demand improved during the second quarter, resulting in a pronounced increase in our sales volumes***" and that the Company "***expect[ed] demand to increase***" through 2024, were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, the Company was not experiencing wholly organic demand supporting such "increase[d] . . . sales volumes," or engaging in sustainable practices to support organic, increased demand or growth through 2024, but rather was implementing high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed

returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

338. The next day, on August 1, 2024, before trading began, the Company hosted an earnings call for the second quarter of 2024 (the "Q2 2024 Call"). During the Q2 2024 Call, Defendant Brondeau stated: "***We expect continued growth in Q3 and Q4 from demand recovery led by the Americas, where we expect channel inventory to approach normal levels by year-end***." Brondeau further stated:

> Q2 through Q4 also ***show higher revenue driven by volume*** with the rate of growth accelerating in Q4 as we shift into the next crop season. ***The markets have begun to recover as channel inventories are starting to normalize, even if not as fast as we had previously expected.***

339. Defendant Brondeau's statements, including that FMC projected "***higher revenue driven by volume***" for the remainder of 2024, that it "***expect[s] continued growth***" and "***channel inventory to approach normal levels by year-end***," and that "***[t]he markets have begun to recover as channel inventories are starting to normalize***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, FMC was not normalizing the channel, and the Company was not experiencing wholly organic growth or engaging in sustainable practices to support organic, increased growth through 2024, but rather was implementing high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling

forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

**12. Jefferies Global Industrial Conference — September 4, 2024**

340. On September 4, 2024, Defendants Brondeau and Sandifer spoke at the Jefferies Global Industrial Conference. In response an analyst asking about "[a]ny significant shifts in order outlooks or patterns or inventory levels, particularly for Latin America, since the second quarter call," Brondeau stated:

> ***I think for Latin America and most importantly Brazil, for us, things are going well.*** I know there is question about drought, there is question about fire. But all in all, ***what we see is what we were predicting with a situation in the inventory***, which will be maybe a bit later than Europe and North America, maybe call it toward the

end of the first quarter when the part two of the season of Brazil will happen. ***So by the end of the first quarter 2025, would be [a] normalized situation.***

341. Defendant Brondeau's statements, including that "***things are going well***" in Latin America and Brazil, and that "***what we see is what we were predicting with a situation in the inventory***" that was on track for a "***normalized situation***" by the end of the first quarter of 2025, were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, FMC was not normalizing the channel, and the Company was not experiencing wholly organic growth or demand or engaging in sustainable practices to support organic, increased growth through 2024 and into 2025, but rather was implementing high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market

demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.E. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

342. Defendants' false and misleading statements had the desired effect. FMC's share price increased $5.98 per share, or 10.25%, to a closing price of $64.34 per share on August 1, 2024. Moreover, analysts incorporated Defendants' statements about "demand recovery" and about channel inventory approaching "normal levels" into their reports. For example, one August 2, 2024 Wells Fargo report noted that one upside risk to its price target was a "sooner-than-expected demand recovery." The report further expected a strong Q4 recovery because "[m]anagement notes they have done extensive channel checks and are highly confident in achieving the guide." Furthermore, a Jefferies report published on August 2, 2024 explained that "normalized inventory level, new products and cost-cutting benefits will likely bolster sales." Finally, a CFRA report published on August 1, 2024 explained "[w]e believe that demand is recovering, as evidenced by volume growth across multiple regions during the quarter."

**13. Third Quarter 2024 Financial Results — October 29-30, 2024**

343. On October 29, 2024, FMC issued a press release titled "FMC Corporation reports strong growth in third quarter, confirms full-year outlook adjusted for expected sale of GSS

business," in which Defendants announced the Company's results for the third fiscal quarter ended September 30, 2024 (the "Q3 2024 Press Release"). In the Q3 2024 Press Release, FMC "report[ed] strong growth in third quarter [2024]" and stated: "***Revenue growth in the quarter of 9 percent was driven by a 17 percent increase in volume***, with some North America second half orders occurring earlier than expected ***due to improved channel inventory levels***." Defendant Brondeau was also quoted in this press release as stating: "***Strong volume growth in Latin America and North America more than offset lower pricing***, particularly in Brazil and Argentina which accounted for two-thirds of the total company price decline."

344. Then, on October 30, 2024, before the market opened, the Company hosted an earnings call for the third quarter of 2024 (the "Q3 2024 Call"). Defendant Brondeau began the Q3 2024 Call by addressing the Company's quarterly results. Brondeau noted that the Company "***reported strong third quarter with growth at the top and bottom line***," and further stated: "***Sales growth of 9% was above the midpoint of the guidance range, with organic sales growth of 12%. Volume grew by 17%, led by Brazil and the US***." Brondeau continued, stating: "***Latin America sales grew 8% with 15% growth***, ***excluding currency***." Brondeau attributed the LatAm sales growth to higher sales volume "mainly in Brazil," stating: "***Sales were higher across all product categories due to volume growth versus the prior-year period, mainly in Brazil more than offset lower pricing and FX tailwinds***."

345. These statements, including that the Company's "***growth***" and increase in "***volumes***" were occurring organically, were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, FMC was not normalizing the channel, and the Company was not experiencing wholly organic growth or "sales [] across all product categories," or engaging in sustainable practices to

support continued organic, increased growth, but rather was implementing high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped

dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

346. Further, the Q3 2024 Press Release discussed certain challenges in Latin America and specifically Brazil. It stated:

> Price was lower by 5 percent, driven primarily by Latin America due to challenging market conditions in Brazil and Argentina including delayed rains and elevated channel inventory. ***In addition, the bankruptcy of a large customer led FMC to offer additional incentives to replace lost volumes and maintain market share***.

347. Additionally, during the Q3 2024 Call, Defendant Brondeau noted that the Company "operated in a weaker-than expected market landscape in Latin America." Specifically, Brondeau explained that while "***Latin America faced some unanticipated challenges this quarter, [] we still delivered growth***." Brondeau then commented on the bankruptcy referenced in the press release, stating that "***[m]arkets in Brazil and Argentina were more challenging than expected due to the delayed rains and increased borrowing rates***" and that "***[t]he bankruptcy of a large customer in Brazil added specific challenges for FMC. Given that we believe we're only a couple of quarters away from a more normal market situation, we decided to take pricing actions to maintain our market position***."

348. These statements, including that "***the bankruptcy of a large customer led FMC to offer additional incentives to replace lost volumes and maintain market share***," and "***[t]he bankruptcy of a large customer in Brazil added specific challenges for FMC. Given that we believe we're only a couple of quarters away from a more normal market situation, we decided to take pricing actions to maintain our market position***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, and as described by multiple FEs, the Company engaged in a routine practice of entering into high-risk transactions with and recording sales to financially distressed,

high-credit-risk counterparties in order to meet sales targets, and FMC's channel inventory issues in Latin America and Brazil stemmed from and were exacerbated by such practice, which the Company concealed from the market. *See supra* Section IV.E.4. FMC's statements in ¶¶346-47 regarding the "bankruptcy of a large customer" refers to AgroGalaxy, a leading Brazilian distributor of agricultural products that filed for the Brazilian equivalent of Chapter 11 bankruptcy protection in September 2024. As described by FE-2, in December 2023, FMC signed and recorded as revenue approximately $50 million in high-risk sales to AgroGalaxy, which represented approximately 4.3% of FMC's total Q4 2023 reported revenues. *Supra* ¶186. FE-3 confirmed FE-2's account that FMC frequently sold to AgroGalaxy, which was widely known to be experiencing financial difficulties. *Supra* ¶188. FE-2 further recalled that AgroGalaxy filed for bankruptcy prior to the payment due date. *Supra* ¶186. Payment by AgroGalaxy was due in approximately October or November 2024; however, according to FE-2, no payment was ever made by AgroGalaxy and, by the time FE-2 left FMC in October 2024, no product sold to AgroGalaxy as a part of those deals had been returned. *Id*. Further, FE-2 explained that, following his departure, he learned that Defendant Pereira, Mills, and Giudicissi had entered into a similar deal with another company, AHL, as well as with a company called Lavoro, which has also since filed for bankruptcy while owing debts of approximately $50 million to FMC. *Supra* ¶187. Lavoro declared bankruptcy in 2025 and FMC is one of the company's three largest creditors. *Supra* ¶192. Additionally, FE-1, FE-2, and FE-3 each described how selling product to companies known to have financial or credit issues was part of FMC's overarching strategy and routine business practices. *See supra* Section IV.E.4. FE-13 also recalled problems with cash collection and late payments, which became a challenge. *Supra* ¶183. In addition, Defendants' statements that the Company "***offer[ed] additional incentives to replace lost volumes and maintain market share***" and "***decided to take***

***pricing actions to maintain our market position*** " due to the "***bankruptcy of a large customer***" were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because employing unsustainable and manipulative sales practices to push product into the market and inflate revenues, including "incentives" and "pricing actions," was a routine practice for the Company and not a response uniquely driven by a customer bankruptcy. *See supra* Section IV.E.1. Defendants' practices in selling to high-risk customers with inadequate liquidity artificially inflated FMC's reported sales and revenue, which Defendants portrayed as legitimate, organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

349. During the Q3 2024 Call, Defendant Brondeau further discussed the timeline for "channel inventory recoveries," noting that it remained "unchanged" from the previous quarter:

> Looking ahead, ***our view on the timeline of channel inventory recoveries is relatively unchanged from what we communicated during our August earnings call***. The US and most countries in Europe are normalizing the fastest and Latin America is expected to be much improved in the second quarter of 2025.

350. These statements, including that the Company's "***view on the timeline of channel inventory recoveries is relatively unchanged from what we communicated during our August earnings call***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, FMC was not normalizing the channel, and "channel inventory recoveries" were not underway or materially progressing in line with any given "timeline" thanks to actions taken by FMC to facilitate such "recoveries," but rather FMC was impeding such "recoveries" and implementing high-cost and

high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts,

these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

351. Also during the Q3 2024 Call, Defendant Brondeau stated that: "***Asia markets are still expected to be challenging in 2025, with no recovery expected until 2026 as India continues to work through excess channel inventory***." He further stated that: "In Asia, the 10% sales decline was mostly due to lower sales in India. ***Destocking in that country's [India's] channel is making good progress, aided by favorable weather***."

352. Defendant Brondeau's statements, including that "***India continues to work through excess channel inventory***" and "***[d]estocking in that country's [India's] channel is making good progress, aided by favorable weather***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, FMC was not letting destocking run its course or "mak[e] good progress," and the Company's elevated inventory in India was due in substantial part to FMC engaging in high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years'

worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. Further, FE-12 explained that the Company stating that monsoons and the weather in most APAC regions contributed to inventory buildup was "just an excuse," the weather situation never reached a point that would justify over a year's worth of inventory sitting in the channel, and what has occurred in India, one of FMC's largest markets, was a problem the Company created for themselves. *Supra* Section IV.E.3. The misleading nature of Defendant Brondeau's statement attributing the Company's "progress" in India to weather events is further supported by the absence of comparable disclosures concerning weather from the Company's primary competitors—including Syngenta, Bayer AG, BASF AG, and Corteva Agriscience—around this time. Additionally, these practices, which were concealed from investors, caused and exacerbated the Company's high channel inventory, and ultimately led to the sale and $510 million write-down of the Company's India business, of which $282 million was attributable to the foregoing concealed conduct as revealed by Defendants. *See supra* Section V.D. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock

price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

353. Defendants' false and misleading statements again artificially inflated FMC's stock price. Indeed, on October 30, 2024, FMC's stock price increased $6.44 per share, or 10.7%, to a closing price of $66.62. Analysts again widely acknowledged Defendants' statements in the Company's Q3 earnings call. RBC Equity Research increased its price target to $81.00 per share, and noted that "FMC's view on the timeline of channel inventory recovery is unchanged." Bank of America Global Research also reported on October 31, 2024 that "global channel destocking appears to have flipped to restocking."

**14. Goldman Sachs Industrials and Materials Conference — December 4, 2024**

354. On December 4, 2024, Defendants Brondeau and Pereira participated in the Goldman Sachs Industrials and Materials Conference. During the question-and-answer portion of the conference, an analyst asked Defendant Brondeau about channel inventory, asking him whether FMC was "where you want to be all the way through the chain, or do you think there's still some more inventory to come out?" Brondeau responded:

> I think it's very region dependent. ***We are pretty comfortable with North America and Europe. Things are happening well in Latin America and Brazil, Argentina, where we see product going through the channel with the season, which is turning out despite the delay in rain, pretty good. So we believe Latin America will get by a normalized channel toward the second quarter. Asia is more difficult, especially driven by India, which have the same cycle issue as everybody else, plus 3 seasons of bad weather. So India will drive Asia to be in a high channel inventory for I think most of '25***.

355. Defendant Brondeau's statements, including that "***[t]hings are happening well in Latin America and Brazil, Argentina***," that "***we see product going through the channel with the season***" such that "***Latin America will get by a normalized channel toward the second quarter***," and that India's situation was particularly "***difficult***" because of "***the same cycle issue as***

***everybody else, plus 3 seasons of bad weather***" were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, FMC was not normalizing the channel, product was not "going through the channel" due to wholly organic growth or demand, and the Company was not engaging in sustainable practices to support future organic, increased growth, but rather was implementing high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. Further, in India, the Company's elevated inventory was due in substantial part to such manipulative practices. Further, FE-12 explained that the Company stating that monsoons

and the weather in most APAC regions contributed to inventory buildup was "just an excuse," the weather situation never reached a point that would justify over a year's worth of inventory sitting in the channel, and what has occurred in India, one of FMC's largest markets, was a problem the Company created for themselves. *Supra* Section IV.E.3. The misleading nature of Defendant Brondeau's statement attributing the Company's elevated channel inventory in India to "bad weather" is further supported by the absence of comparable disclosures from the Company's primary competitors—including Syngenta, Bayer AG, BASF AG, and Corteva Agriscience—around this time. Additionally, these practices, which were concealed from investors, caused and exacerbated the Company's high channel inventory in India, and ultimately led to the sale and $510 million write-down of the Company's India business, of which $282 million was attributable to the foregoing concealed conduct as revealed by Defendants. *See supra* Section V.D. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

356. Several analyst reports underscore how Defendants' statements regarding normalization of channel inventory levels were widely received and acknowledged. For example, a KeyBanc Capital Markets report issued on January 1, 2025 reported that the Company "expect[s] destocking in LATAM to be over by mid-2025, resulting in strong volumes in 2H25." Bank of

America Global Research, on January 14, 2025, upgraded FMC to neutral from underperform, and noted that "volumes continue to improve and earnings benefit from cost-cutting and raws deflation, easing investors' concerns." A January 30, 2025 Barclays report projected that "[w]e should see a recovery in LatAm" in the Company's Q4 results, based on statements made by FMC in its Q3 results.

**15. Fourth Quarter 2024 Financial Results — February 4, 2025**

357. On February 4, 2025, after the market closed, the Company hosted an earnings call for the fourth quarter of 2024 (the "Q4 2024 Call"). During the question-and-answer portion of this call, an analyst asked about the Company "expecting volume growth of something like high-single digits for 2025 as a year" despite "a lot of the prepared remarks talk[ing] about weakness at the end of the year, more channel inventory you're dealing with in your 1Q guidance." The analyst observed that "it just seems really odd to us that you're increasing confidence in volumes when the near-term outlook looks a lot worse than you previously anticipated," and asked, "can you help us out there, please?" FMC's President, Defendant Pereira, responded:

> Josh, we are investing in expanding and exploring new routes to market. ***The combination of new products and new customers, that is really where the growth comes from.*** It is not from traditional products and traditional customers. ***As we just stated that our focus there is actually to decrease the existing inventory. So it's new products to new customer driving the volume growth.***

358. Defendant Pereira's statements, including that "***[t]he combination of new products and new customers, that is really where the growth comes from***," that "***our focus there is actually to decrease the existing inventory***," and that "***it's new products to new customers driving the volume growth***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, FMC was not focused on "decreas[ing] the existing inventory" and any growth reported by the Company was due in substantial part to the Company's active prevention of necessary destocking and was

the byproduct of the Company engaging in high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Additionally, although Pereira attributed the Company's positive growth to "new products to new customers," the Company's continued inventory buildup and manipulative sales practices employed by FMC, at the direction of the Individual Defendants, continued to overstock the channel and render his statements about the Company's ability to grow misleading.

Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

359. Also during the Q4 2024 Call, Defendant Brondeau reaffirmed these avenues to volume growth. He stated:

> First, ***we are committed to decreasing the level of FMC products in the channel. We will make certain that our products move from the channel to the ground faster than our sales to the channel. This will be a high priority for the company.*** Critically, ***this means the volume growth we are forecasting will be heavily driven by new routes to market and new products where channel inventory is not an issue.***

360. Defendant Brondeau's statements, including that "***we are committed to decreasing the level of FMC products in the channel***," that "***[w]e will make certain that our products move from the channel to the ground faster than our sales to the channel. This will be a high priority for the company***," and that "***this means the volume growth we are forecasting will be heavily driven by new routes to market and new products where channel inventory is not an issue***," were false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, FMC was not focused on "decreasing the level of FMC products in the channel" and any growth reported by the Company was due in substantial part to the Company's active prevention of necessary destocking, and was the byproduct of the Company engaging in high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there

was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product; (6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. Additionally, although Brondeau attributed the Company's positive growth to "new routes to market and new products," the Company's continued inventory buildup and manipulative sales practices employed by FMC, at the direction of the Individual Defendants, continued to overstock the channel and render his statements about the Company's ability to grow misleading. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts,

these statements lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

**C. False Statements Concerning FMC's SOX Certifications**

361. FMC's 2023 10-K, 2024 10-K, Fiscal Year 2024 Forms 10-Q, Q1 2025 10-Q, and Q2 2025 10-Q each contained certifications signed by Defendant Sandifer, Defendant Douglas (with respect to the 2023 10-K and Q1 2024 10-Q), and Defendant Brondeau (with respect to the Q2 2024 10-Q, Q3 2024 10-Q, 2024 10-K, Q1 2025 10-Q, and Q2 2025 10-Q) pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX," and each certification a "SOX Certification"). These SOX Certifications attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. In particular, Defendants Sandifer, Douglas, and Brondeau certified in their official capacities in each filing that "***the information contained in the [filing] fairly presents, in all material respects, the financial condition and results of operations of the Company***."

362. These sections of the 2023 10-K, 2024 10-K, Fiscal Year 2024 Form 10-Q, Q1 2025 10-Q, and Q2 2025 10-Q were materially false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading, as FMC did not disclose it was engaging in channel stuffing through high-cost and high-risk sales tactics to inflate revenues and demand that, as reported by FEs, included: (1) unconditional returns of unwanted product purchased at quarter end to inflate revenues; (2) postponement of guaranteed returns to avoid reporting a hit to revenues in a quarter; (3) reporting revenues for sales of products where there was no shipment, delivery, or receipt of the product by a distributor or customer; (4) reporting revenues for sales of products when there was no exchange of money for the product; (5) offering excessive and abnormal rebates and incentives to induce sales of unwanted and unneeded product;

(6) continuing to sell product and providing credit to companies FMC knew were exhibiting signs of financial distress, including defaulting on payments to FMC; (7) pulling forward sales to make quarterly sales numbers at the expense of future quarters; (8) artificially inflating channel inventory by keeping several years' worth of inventory in the channel despite knowing that it would not be sold, in order to inflate reported revenue and meet sales targets; (9) transferring title of product without any physical exchange, leading to products sitting idle (and often expiring) before reaching the customer; (10) misclassifying long-term sales agreements as short-term, leading to higher interest rates; and (11) manufacturing and selling oversized product formats for which there was little or no market demand because it was cheaper to accept returns for and reprocess larger product. *See supra* Section IV.E. In addition, as reported by CFRA Research, FMC's Class Period practices and financial metrics were consistent with financial statement manipulation, stood "in stark contrast to industry peers," and supported the "red flags indicative of 'channel stuffing.'" *See supra* Section IV.F. Defendants' practices artificially inflated FMC's reported sales and revenue, which Defendants portrayed as organic, sustainable, and driven by market demand. Ultimately, when Defendants' channel stuffing through these manipulative and misrepresented practices were exposed, FMC's stock price dropped dramatically. In light of these undisclosed material facts, Defendant Sandifer, Douglas, and Brondeau's statements in these SOX Certifications lacked a reasonable basis when made, and were materially false or misleading at all relevant times.

## VII. SUMMARY OF SCIENTER ALLEGATIONS

363. A host of additional facts, in addition to those discussed above, collectively support a strong inference that Defendants knew, or at minimum were reckless in not knowing, the truth and omitted facts about their scheme and concealed by their false and misleading statements and omissions.

364. The paragraphs below summarize and supplement the allegations that, when viewed holistically, give rise to a strong inference of scienter. *See, e.g.*, *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 268 (3d Cir. 2009) (allegations of scienter are to be reviewed "'holistically'" and not "'scrutinized in isolation'" (quoting *Tellabs v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323, 326 (2007))).

365. ***First***, Defendants Douglas, Brondeau, Sandifer and Pereira, and senior management reporting to Defendants directly, such as Mills and Thota, were well aware of—and often issued directives implementing—the Company's manipulative sales practices that inflated revenue and actively worsened the overstocking and stuffing of the channel that Defendants repeatedly told investors was destocking, normalizing, and free of undisciplined "price discounting" and the "pursui[t of] volume in a weak demand environment."

366. Indeed, as FE-14 recalled, Defendants Brondeau and Douglas gave "brutally blunt" directives to load the channel, and FE-12 described leadership at FMC as "morally corrupt people" who acted "brazenly" with their improper behavior for their own personal benefit. *See supra* Section IV.E.1.

367. In addition, key senior management who reported directly to the Individual Defendants knew about and approved FMC's aggressive "rebates over rebates," booking of long-term sales agreements as short term, heavy discounting, and other incentives offered to customers to further get the customers to take on more product than necessitated by organic demand. These practices perpetuated and worsened an unsustainable inventory buildup that harmed the Company and caused revenue losses and lowered guidance at the end of the Class Period.

368. Further, senior management knew of the impact of these aggressive tactics on FMC's sales. Mills, the Company's CFO for Latin America and the Americas who was responsible

for financial reporting and financial analysis, participated in meetings with the Commercial Team at least once a quarter, in which he demanded results from the Brazil Country Manager, who reported to Head of Americas, Defendant Pereira. According to FE-2, Pereira and Mills were absolutely aware of the aggressive sales tactics and were the source of pressure placed on the sales team in Brazil as they were present in those meetings discussing sales pressure. Pereira was similarly responsible for pressure on "high management," demanding that they had to make "sales, sales, sales." Indeed, according to FE-2, Pereira was a scapegoat when he was let go, and under a lot of pressure to reach sales goals.

369. Further, FE-14 explained that Defendants Brondeau and Douglas flew in for meetings with each leadership team, including the teams in APAC. FE-14 stated that the directive to frontload the channel was given specifically for India, adding that the culture at FMC was to be "extremely direct" in communications and describing FMC as a "brutal organization."

370. Senior executives, including Defendant Pereira, also knowingly signed large deals with companies with no immediate payment requirement when those companies—who soon thereafter filed for bankruptcy—were known to be in financial distress, posing a direct and unreasonable threat to FMC's ability to ever receive payment on those deals. *See supra* Section IV.E.4.

371. The sales pressure from management created an exodus of employees who objected to or raised concerns about FMC's business practices. For example, according to FE-14, the "pressure to forward load the channel" and to meet sales targets—which was driven specifically by Defendants Brondeau and Douglas—contributed to the high volume of departures from the Company over the past few years. According to FE-14, the expectation at FMC was to hit sales targets "at any cost," and employees who raised any concerns about FMC's business practices

were "exited quickly," or terminated, from the Company. This is confirmed by FE-13, who explained that past employees spoke openly that there was always an "undertone" of "don't under deliver" from FMC leadership regarding operations. Employees shared that threats of being fired if results were not achieved were common from the top down and in public forums. FE-13 recalled that past employees commented to him that even known top performers were at risk of dismissal or being forced out of the Company if quarterly demands were not acknowledged and targeted. FE-13 further explained that most key commercial leaders in fact have departed in North America, South America, and APAC over the past three years.

372. According to FE-12, former President, FMC India and SW Asia, left the Company shortly after he raised, in a meeting with Defendants Brondeau, Pereira, APAC leadership and others, that the former President, FMC India and SW Asia, had emails and communications of instructions he received from Defendant Douglas and Thota regarding FMC's business practices.

373. ***Second***, Defendants and senior management continued to push aggressive sales targets and manipulated and slowed or prevented returns of unneeded product to avoid a negative impact on revenue, as they were aware of FMC's elevated inventory levels.

374. For example, FE-2 described how in 2023, the existing inventory levels in Brazil were valued at approximately $1 billion, meaning that $1 billion of unused inventory was already out in the market, and this information was reported to Pereira. FE-2 knew of these total inventory levels through access to databases available to him and through discussions in meetings with other members of the sales team where inventory levels in Brazil were discussed. According to FE-2, there were discussions about lowering inventory figures during meetings in 2023 and 2024 attended by Defendant Pereira, other Regional Managers in Brazil, and other senior management.

375. These inventory issues also existed in FMC's other markets. For example, FE-9 (who was responsible for Austria, Germany, and Switzerland) recalled weekly meetings to discuss progress and "we [the European market] raised the red flag" that sales were going to be difficult and that inventory levels were too high. In response, however, FE-9's direct supervisor, Pons, who reported directly to the CEO, received messaging from leadership that they "recognized" the difficulty that teams in Europe were facing and to "be creative" and to continue to "push" sales. Further, according to FE-12, FMC was selling two or three times the actual product demand only to later blame the channel build-up on poor farming seasons. Indeed, FE-12 explained that the Company stating that monsoons and the weather in most APAC regions contributed to inventory buildup was "just an excuse," and the weather situation never reached a point that would justify over a year's worth of inventory sitting in the channel. *See supra* ¶175. FE-12 further explained that what has occurred in India, one of FMC's largest markets, was a problem the Company created for themselves. Moreover, FE-12 explained that this behavior has also been occurring "everywhere," and not solely in India.

376. FE-14 explained that typically, FMC should have analyzed the data to see what current demand forecast was and build a production schedule to produce the gap between that forecast and inventory in the channel. Instead, FMC forced production of total demand, "ignoring" channel inventory. According to FE-14, this was done with the intention to continue loading the channel with inventory. Indeed, FE-14 "never" saw a review of forecasts compared to existing inventory while at FMC and the Company only looked at the demand forecasts for future months because FMC's culture was to produce the forecasted amount in full, regardless of existing inventory, and then frontload the channel. FE-14 explained that FMC was always "building [producing] to forecast."

377. This sentiment of pushing sales at all costs was entrenched in the Company's Philadelphia headquarters, where FE-9 recalled that leadership wanted to hear more about opportunities for increasing sales and less about possible risks. In fact, FE-10 understood that in strategy meetings among all regional leadership and former CEO Defendant Douglas and, later, current CEO Defendant Brondeau, and then-President Defendant Pereira (who was abruptly fired without explanation at the end of the Class Period), forecasted projections brought forth by European and other leaders were ignored in favor of higher, less obtainable forecasts produced for reporting purposes. In light of its rising inventory, FMC sought to avoid or slow returns of unneeded inventory and even provided its Commercial Team with an incentive to find alternatives to returns. *See supra* ¶¶157-161.

378. According to FEs, senior management was well aware of the constantly and increasingly elevated inventory levels caused by a plethora of manipulative sales practices, and in fact ignored concerns from regional leaders who received monthly inventory reports on "slow-moving inventory." *See supra* ¶¶134-35. Specifically, FE-2 explained that CFO Americas Mills, former Business Director FMC Brazil Sinara Giombelli Ferreira, Brazil's Commercial Director Bruno Pereira Lopes Giudicissi, and current Business Finance Associate Director Fabiana Coimbra, who reported directly to Mills, all attended and participated in direct negotiations with distributors regarding right to return agreements, which FE-2 also attended.

379. Further, FE-1 confirmed that FMC's practice of pushing customers to take on additional product increased under Douglas after he became CEO in 2020, as Defendant Douglas was more aggressive in his pursuit of sales goals. In fact, FE-1 recalled there were "many" more meetings occurring under Defendant Douglas to discuss sales than under his predecessor. *See supra* ¶102. According to FE-14, the Company's willingness to participate in these business

practices came from "pressure" from Brondeau and Douglas. FE-14 explained that the frontloading of the channel and pulling back sales started to catch up with the Company in 2022 and 2023. FE-14 described Douglas's statements to the market during this time as "all rhetoric." FE-14 explained FMC was never experiencing global supply chain risk as Douglas had detailed in his statements, and the Company was at "no risk of supply disruption" during COVID. FE-14 stated that the Company was still stuffing the channel during this period.

380. Indeed, FMC's senior management had visibility into its existing inventory levels. Specifically, FE-14 explained that at the country level, FMC held the following meetings where existing inventory was discussed: (i) demand review meetings; (ii) supply review meetings; and (iii) supply and operations planning meetings (S&OP). According to FE-14, the information discussed in the supply and demand meetings culminated in the country level S&OP meeting with country level directors. FE-14 explained that the information discussed and planning conducted in the S&OP meetings then rolled up into an equivalent S&OP meeting on the regional level, which then further rolled up into a global level S&OP meeting attended by senior executives, including Defendants Brondeau, Douglas, and current CFO Andrew Sandifer. Through these meetings, Douglas, Brondeau, and Sandifer had insight into the Company's channel inventory and used information presented in those meetings to set unrealistic forecasts. For example, FE-14 stated that FMC had visibility into inventory held in the channel through monthly Demand Review Meetings that were held with the largest distributors in each country. According to FE-14, FMC "knew exactly" what each distributor had in the channel and how much they had reported in sales, as distributors reported sales figures to FMC to receive their rebates. FE-14 explained that demand forecasts for the following quarters and years were discussed during these meetings.

381. Indeed, following the global level S&OP meeting that senior executives attended, including Defendants Brondeau, Douglas, and Sandifer, FE-14 explained that those executives went back to the individual countries to address any projected shortfalls in revenue projected on a country level versus targets established by headquarters. FE-14 noted that the forecasts at FMC were "never bottom up" and were "always top down."

382. Senior management's knowledge and endorsement of manipulative sales and revenue recognition practices is further evidenced by former employee accounts describing how senior management instructed that certain deals remain undocumented.

383. For example, FE-12 confirmed that members of FMC's executive leadership were careful not to put anything in writing and always had directions come from other employees. Moreover, FE-12 described how in India, FMC leadership had everything documented on paper in the name of the Super Distributors to help conceal FMC's practice of selling unwanted product that would be returned after quarter end. According to FE-12, FMC created the picture of demand in India, but the ultimate responsibility for collecting payment was with FMC. FE-12 described how FMC would send an order to the Super Distributor, who then would sell to a distributor with oral instructions from the FMC employee in the field. As a result, FE-12 explained that if a distributor purchased FMC product from a Super Distributor, and then had a return, the return was handled by FMC, but on paper, it looked like the financing responsibility was with the Super Distributor. FE-12 made clear that in reality, all returns were settled by FMC.

384. This directive not to put anything in writing permeated FMC's senior leadership as, according to FE-2, Defendant Pereira and Mills knew to be careful not to mention certain deals in writing, and further explained that former CEO Defendant Douglas would likely have been aware of these deals due to his very close relationships with Pereira and Mills. FE-2 confirmed that the

sales team could not document the instructions employees were being given to reach sales targets, so they were shared with employees verbally. FE-2 explained that the Company delivered these instructions in a very cautious way, and he personally heard these directives come directly from Pereira and Mills.

385. FE-3 confirmed FE-2's account of how sales representatives were instructed not to put deals with improper customer incentives in writing. Faria, FE-3's direct supervisor, instructed FE-3 to not put anything in writing and to only verbally agree to these conditions, noting specifically that Faria instructed him to tell customers that in exchange for not returning product, FMC would pay the associated taxes and storage costs related to that product. Rather than write down terms and to avoid a written record, according to FE-3, Sales Representatives would tell clients: "Trust me, I always deliver what I promise."

386. The Company's aggressive sales tactics escalated to such an extent that FMC created larger product sizes to make their inevitable return easier to process, which enabled Defendants to more easily inflate sales numbers with less paperwork. For example, as described above at ¶181, *supra*, FMC created a version of their crop protection product that was up to 666 to 1,333 times greater than the one that was commonly sold in India for the express purpose of allowing FMC to "sell" this largely unsaleable volume of product to inflate revenues, and to easily process its return and comply with India's GST tax requirements in the following quarters.

387. ***Third***, Defendants' inventory channel was a significant focus for the Company (and investors), and Defendants spoke of it frequently on earnings calls and in other public statements throughout the Class Period.

388. For example, on the very first day of the Class Period, Defendant Douglas responded to an analyst question about channel inventory by admitting to personally visiting Brazil

alongside Defendant Pereira, and stating that they "***spent a lot of time with very large co-ops talking about where are your inventory levels now*** versus where you expected them to be." In fact, with respect to Brazil, FMC was keenly involved in inventory management there. *See supra* ¶¶71, 297.

389. Further, throughout the Class Period, Defendants repeatedly spoke about their focus on inventory. For example, during conference calls on February 29, 2024, May 7, 2024, and June 11, 2024, Defendants expressly assured investors that the channel inventory was "rebalancing" and "normalizing," and that FMC was "clearing out the channel inventory." Likewise, during FMC's Q1 2024 Earnings Call, Defendant Douglas told investors that "inventory reduction actions in the channel are making good progress," and later during the same call Defendant Sandifer further told investors that the Company was "continuing to bring down our absolute level of inventory" while FMC touted "improved inventory levels."

390. Defendants' direct involvement in FMC's inventory management persisted throughout the Class Period. In February 4, 2025, Defendant Brondeau acknowledged that leadership "spent a lot of time talking to our customers" about inventory targets, going so far as to give specific examples of targets in some regions on the call, and explaining how there were "a series of six or seven countries where we went in depth to tackle the inventory issue," including Brazil and India. Three weeks later, during a February 26, 2025 Bank of America Global Agriculture and Materials Conference, Defendant Brondeau admitted to having personally visited "with a team in Europe" when discussing inventory levels worldwide.

391. Further, analysts were sharply focused on FMC's channel inventory levels. On nearly every earnings call or presentation in which the Company participated during the Class Period, the Company fielded analyst questions about the Company's channel inventory. That the

market focused on this issue—and in turn Defendants spoke frequently and authoritatively about the issue—further bolsters the inference of scienter.

392. ***Fourth***, the LATAM market and diamide sales were critical to FMC's revenue. In 2023, diamide sales were $1.8 billion, and in 2024, FMC's leading diamide brands—Rynaxypyr and Cyazypyr—accounted for 75% of the Company's diamide sales. Indeed, leading up to the Class Period, Defendant Sandifer told investors that: "with good cause, ***there's a lot of focus on the diamide portfolio at FMC*** and there should be, ***it's a little more than a third of our total sales***, and it's more than that of our profit. It's been a big driver of our success." Additionally, throughout the Class Period, Latin America was the Company's largest market, generating 33% of total revenues—the largest of any one geographic region. Given the importance of diamides and the importance of the LATAM market, particularly Brazil, to FMC, it is implausible that Defendants were not aware of FMC's channel inventory and manipulative sales tactics impacting those products and regions.

393. ***Fifth***, each of the previously discussed false and misleading statements and omissions, *see supra* Section VI, concern "core matters of central importance" to FMC, bolstering the scienter inference by way of the core operations doctrine. *See Avaya*, 564 F.3d at 268, 271. That the Company unveiled a Company-wide strategy restructuring plan (Project Focus)—and reported on that plan continuously, including in public filings with their accompanying SOX certifications[12] signed by Defendants—establishes that these issues were core to FMC. Moreover, the LATAM and APAC markets—which accounted for $2.3 billion of annual revenues during the Class Period—were most directly impacted by Defendants' manipulative sales tactics and channel

[12] "SOX Certifications" are made pursuant to the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241, by which senior management certify the accuracy and completeness of a company's financial statements.

stuffing, as Brazil and India represented FMC's first and third largest country markets, and the largest in each of their respective regions. Supporting the scienter inference even further is the fact that channel inventory was discussed on nearly every Class Period earnings call (*supra* ¶391), and that Defendant Douglas personally traveled to FMC's key market to assess inventory levels (*supra* ¶¶71, 297). Finally, given that sales of insecticides made up nearly half of the Company's revenues leading up to and during the Class Period, Defendants' failure to disclose the issues affecting sales of diamide products implicated a "core matter" of central importance to FMC. *See supra* ¶¶63, 75.

394. ***Sixth***, as FMC's senior-most officers, the Individual Defendants exercised control over and were responsible for each of the previously discussed false and misleading statements and omissions by virtue of their positions within the Company. Accordingly, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse, undisclosed facts alleged herein had not been disclosed to the public, such that the representations made to investors were materially false and misleading, or omitted facts necessary to render those statements not misleading.

395. ***Seventh***, the steady stream of departures by executives and key members of senior management entangled in the Company's illicit practices further bolsters the inference of scienter.

396. First, Defendant Douglas's abrupt departure on June 11, 2024 supports scienter. While FMC's ongoing sales and inventory issues mounted, Defendant Douglas abruptly resigned as President and Chief Executive Officer. At the time of Douglas's "unexpected" and "immediate" resignation, AgroGalaxy's bankruptcy was imminent, FMC's inventory manipulation was becoming unsustainable, and FMC's Q2 2024 financial results showed continued deterioration. FE-12 explained that, in connection with Douglas's departure, Douglas received a "very handsome" severance package as he had all the evidence of FMC's wrongdoing.

In turn, Defendant Brondeau, who had previously served as the Company's CEO until his retirement in 2020, took over as CEO, and Defendant Pereira was appointed as President of FMC.

397. Following Douglas's departure, several employees entangled in the fraud exited the Company in succession. Notably, the former President, FMC India and SW Asia departed the Company shortly after a meeting during which he told Defendants Brondeau, Pereira, and APAC leadership that he had emails and communications of instructions he received from Douglas and Thota regarding FMC's business practices. According to FE-12, Thota and the former President, FMC India and SW Asia did "many wrong" things and were not held accountable at the Company but instead received "handsome" severance packages.

398. Finally, on the last day of the Class Period, the Company announced that longtime FMC leader Defendant Pereira would resign, effective December 15, 2025. Pereira's departure coincided with the Company's announcement that it would take a drastic $510 million in charges and write-downs related to its India business, and admitted to pronounced challenges in Latin America—a key region for the Company and for which Pereira had been primarily responsible. FMC offered no explanation for Pereira's abrupt departure, and the reasonable inference is that Pereira was terminated due to his oversight of the unresolved and persisting problems plaguing FMC.

399. As confirmed by FE-12 and FE-2, there was a "scapegoat" for every quarter, and FMC's systemic practice of axing employees at the center of the fraud, while awarding them "handsome" severance packages to stay quiet, supports scienter.

400. ***Eighth***, although Plaintiffs need not allege any motive to plead a strong inference of scienter, Defendants had strong financial incentives to engage in the illicit practices described above (*see supra* Section IV.E). Indeed, FE-12 recalled that numbers were manipulated to meet

projected figures for financial reporting purposes, characterizing FMC leadership as "artists of the numbers," and further described executives' actions as "morally corrupt" and "brazen" for their own personal benefit.

401. In particular, Defendants' scheme enabled them to meet (and even exceed) preestablished performance targets and thereby receive outsized "Short-Term Incentive" ("STI") bonuses that nearly doubled their take-home compensation in 2024. Specifically, in 2024, Defendant Brondeau had a base salary of $725,000; his 2024 STI award was an additional $1.124 million. Defendant Douglas had a base salary of $855,000; his STI award was $1 million. Defendant Pereira had a base salary of $653,000; his STI award was $675,000. Defendant Sandifer had a base salary of $783,000; his STI award was $731,000.

402. As described in FMC's March 2025 Proxy Statement, achieving these STI bonuses required Defendants to achieve predetermined targets in three metrics: adjusted earnings, free cash flow, and run-rate synergies. Defendants' illicit sales practices artificially inflated the Company's performance with respect to at least two of those metrics: adjusted earnings and free cash flow.

403. With respect to the earnings target, as discussed above, the Company routinely sold product with the intent and expectation that it would be returned and, after securing sales to pull revenue forward at quarter end, the Company then balked at effectuating returns, offering rebates and other incentives for customers to retain unwanted product and keep the Company's financial figures inflated. *Supra* Section IV.E.2. What is more, FE-12 explained that FMC's "commitment to the market" (*i.e.*, meeting established expectations) contributed to decisions to ***move rebate figures from accruals into revenue***.[13] For example, according to FE-12, if a $100,000 sale was

[13] An accrual is a recorded revenue or expense that has been earned or incurred but has not yet been received or paid in cash. Accruals ensure financial statements reflect a company's true

Footnote continued on next page

accompanied by a $10,000 rebate, the rebate figure should be included in FMC's accruals, but the Company moved that figure back into profit—in order to achieve numbers. This became a cycle, FE-12 explained, which reached the point at which it could no longer continue in India.

404. Indeed, consistent with FE-12's account, FMC revealed at the end of the Class Period a jarring $510 million in charges and write-downs related to the Company's India operations, including a $282 million adjustment that the Company admitted related in part to "***product returns*** and pricing changes designed to accelerate receivables collection."

405. Thus, due in part to this and Defendants' other illicit sales practices, Defendants achieved 83% of the adjusted earnings targets in 2024. Without Defendants' illicit practices, Defendants would have fallen further short of the target.

406. Second, even though Defendants did not fully meet the adjusted earnings target, they nonetheless still achieved significant STI bonus compensation in part from having purportedly met and even exceeded their free cash flow target by ***130%***. This performance likewise directly benefitted from Defendants' illicit sales practices, which significantly increased the Company's free cash flow in the short-term by cannibalizing future growth. Indeed, the dramatic collapses in free cash flow throughout 2025 as Defendants' scheme collapsed further confirm the significant extent to which Defendants' illicit practices drove the Company's free cash flow performance in 2024. *See, e.g.*, ¶¶226, 237, 244, 259, 262.

407. As a result, even without achieving the full adjusted earnings target, as described above, the short-term spike in free cash flow from Defendants' illicit sales practices inflated their

---

financial position during a given period. Under relevant accounting rules, public companies must use accrual accounting because it provides a more accurate picture of ongoing operations, matching revenues with the expenses incurred to generate them. A rebate is a partial refund or price reduction provided to a buyer after a purchase has been completed, typically as an incentive to encourage sales volume.

overall STI progress in 2024, enabling Brondeau to receive a 150% individual performance payout (45% total weighted payout); Sandifer to receive a 125% individual performance payout (37.5% of total weighted payout); and Pereira to receive a 125% individual performance payout (40.5% of total weighted payout).

408. In sum, that the Defendants were motivated to inflate the Company's financial performance—and in particular, the Company's free cash flow—to reap outsized short-term compensation benefits that nearly doubled their annual compensation further strengthens the inference of scienter. This is corroborated by the account of FE-12, who stated that Defendant Douglas's conduct was motivated by his desire to keep the share price artificially high and to achieve his bonus, and described FMC leadership's actions as "morally corrupt" and "brazen" for their own personal benefit.

* * * *

409. The facts set forth above, when viewed holistically and together with the other allegations in this Complaint, support a strong and compelling inference that each of the Defendants knew or were severely reckless in not knowing that each of the misrepresentations and omissions alleged herein were materially false and misleading at the time they were made.

## VIII. LOSS CAUSATION

410. The fraud alleged herein was the proximate cause of the economic loss suffered by Plaintiffs and the Class. There was "a causal connection between the material misrepresentation and the loss" (*i.e.*, stock price declines), as described herein. *See, e.g.*, *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010). The truth was revealed by a series of partial disclosures through which the truth gradually leaked out. *Dura*, 544 U.S. at 342.

411. As detailed herein, during the Class Period, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market. Defendants' materially false or misleading statements, omissions of material facts, and fraudulent course of conduct caused FMC's common stock to trade at artificially inflated prices during the Class Period and operated as a fraud and deceit on the Class. Specifically, despite assuring investors that the Company was reducing inventory levels and "normalizing" the channel to meet organic, lowered demand, Defendants' materially false and misleading statements and omissions misrepresented the nature of FMC's unsustainable and manipulative sales practices described *infra*, Section IV.E, through which FMC stuffed its sales channel with inventory that far exceeded organic market demand, as most pronounced in two of its top three markets (Brazil and India). This scheme and series of misrepresentations deceived investors into believing that FMC was implementing sustainable sales practices related to organic demand and growth, when in fact Defendants' concealed practices continued to materially worsen FMC's channel overstocking and materially jeopardize future revenues and even the very existence of the Company's India business.

412. Relying on the integrity of the market price for FMC common stock and public information relating to FMC, Plaintiffs and other Class members purchased or otherwise acquired FMC common stock at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact alleged herein.

413. The price of FMC's stock fell precipitously when the relevant truth regarding Defendants' prior misrepresentations and omissions of material fact were partially disclosed to the market on February 4, 2025, April 30, 2025, July 30, 2025, and October 29, 2025. As a result of these disclosures, the price of FMC common shares declined by approximately ***70.9%***, from a closing price of $53.43 per share on November 16, 2023, the first day of the Class Period, to a

closing price of $15.53 per share on October 30, 2025, the next trading day following the final corrective disclosure. Until the final disclosure, on October 29, 2025, each of FMC's disclosures described below only partially revealed the relevant truth, and, moreover, Defendants accompanied each disclosure with additional false and misleading information, which maintained the artificial inflation in the price of FMC's stock. As such, the full amount of inflation was not removed until after the final disclosure on the last day of the Class Period.

414. As a result of their purchases of FMC common stock during the Class Period, Plaintiffs and other members of the Class suffered harm. When the relevant truth regarding Defendants' prior misrepresentations and omissions of material fact were disclosed to investors, the price of FMC common stock fell significantly.

415. The disclosures that partially corrected the market price of FMC's common stock and reduced the artificial inflation caused by Defendants' materially false and misleading statements and omissions are detailed below:

| Date of Corrective Event[14] | Closing Stock Price After Disclosure | Common Stock Price Change[15] | Common Stock % Change[16] | S&P Price Change | Trading Volume | Approx. Market Cap Loss |
|---|---|---|---|---|---|---|
| 2/4/2025<br><br>(2/5/2025) | $35.92 | -$18.12 | -33.5% | +0.39% | 25,337,900 | $2.3 Billion |
| 4/30/2025<br><br>(5/1/2025) | $38.45 | -$3.47 | -8.28% | +0.63% | 4,021,900 | $433 Million |

[14] The date(s) in parentheses refer to the date(s) of stock price decline caused by the corrective event.

[15] This column compares the dollar decline in price at the close of the market before the corrective event and the price at the close of the market after the stock price decline caused by the corrective event.

[16] This column compares the percentage decline in price at the close of the market before the corrective event and the price at the close of the market after the stock price decline caused by the corrective event.

| Date of Corrective Event[14] | Closing Stock Price After Disclosure | Common Stock Price Change[15] | Common Stock % Change[16] | S&P Price Change | Trading Volume | Approx. Market Cap Loss |
|---|---|---|---|---|---|---|
| 7/30/2025<br><br>(7/31/2025) | $39.04 | -$2.39 | -5.54% | -0.37% | 4,617,500 | $299 Million |
| 10/29/2025<br><br>(10/30/2025) | $15.53 | -$13.51 | -46.52% | -0.99% | 45,473,500 | $1.6 Billion |

416. The declines in FMC's stock price during this period are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions.

417. It was entirely foreseeable to Defendants that their materially false and misleading statements and omissions would artificially inflate or maintain the price of FMC's common stock. It was also entirely foreseeable to Defendants that the revelation of the relevant truth about FMC's worsened channel inventory, reduced revenues, and sale and material charges related to the India business and inventory would cause the price of the Company's common stock to fall as the artificial inflation caused or maintained by Defendants' misstatements and omissions was removed. Thus, the economic losses (*i.e.*, damages suffered by Plaintiffs and other members of the Class) were a direct, proximate, and foreseeable result of Defendants' materially false and misleading statements and omissions of material fact and fraudulent scheme, which artificially inflated or maintained the price of the Company's common stock, and the subsequent significant decline in the value of the Company's common stock as the relevant truth was revealed. The timing and magnitude of FMC's stock price declines negate any inference that the economic losses and damages suffered by Plaintiffs and the other members of the Class were caused by changed market

conditions, macroeconomic factors, or even FMC-specific facts unrelated to Defendants' fraudulent conduct.

## IX. PRESUMPTION OF RELIANCE

418. To the extent that Plaintiffs allege that Defendants made affirmative misstatements, Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) FMC's common stock traded in an efficient market;

(d) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of FMC common stock;

(e) Plaintiffs and other members of the Class purchased FMC common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f) FMC common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(g) as a regulated issuer, FMC filed periodic public reports with the SEC and the NYSE;

(h) FMC regularly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(i) FMC was followed by securities analysts employed by major brokerage firms who wrote reports, which were distributed to those brokerage firms' sales force and certain customers and that were publicly available and entered the public marketplace; and

(j) Unexpected material news about FMC was reflected in and incorporated into the Company's stock price during the Class Period.

419. As a result of the foregoing, the market for FMC common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of FMC common stock. All persons and entities who or which purchased or otherwise acquired FMC common stock during the Class Period suffered similar injuries through their purchase of FMC common stock at artificially inflated prices, and thus, the presumption of reliance applies.

420. A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), to the extent the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose. Moreover, to the extent Plaintiffs' scheme liability claims brought in Count II are premised on deceptive acts by Defendants, as described therein, which concealed the truth, those claims are entitled to the *Affiliated Ute* presumption of reliance. *See, e.g.*, *In re DiDi Glob. Inc. Sec. Litig.,* 2025 WL 2345696, at *2 (S.D.N.Y. Aug. 13, 2025) (applying *Affiliated Ute* presumption of reliance to scheme claims).

## X. CLASS ACTION ALLEGATIONS

421. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of FMC during the period from November 16, 2023 through October 29, 2025, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, or control person of FMC during the Class Period and their immediate family members; (iv) any firm, trust, corporation or other entity in which any Defendant has or had a controlling or beneficial interest; (v) FMC's employee retirement and benefit plan(s), if any, and their participants or beneficiaries,

to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, subsidiaries, heirs, successors-in-interest, or assigns of any such excluded person or entity, in their capacities as such.

422. The members of the Class are so numerous that joinder is impracticable. During the Class Period, FMC had more than 124,909,227 shares of common stock outstanding and actively trading on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are hundreds or thousands of members in the Class, and they are geographically dispersed. Record owners and other Class members may be identified from records procured from or maintained by the Company or its transfer agent and may be notified of the pendency of this action using a form of notice similar to that customarily used in securities class actions.

423. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all other members of the Class purchased or otherwise acquired shares of FMC common stock during the Class Period and were similarly affected by Defendants' alleged conduct in violation of the Exchange Act as complained of herein.

424. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

425. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of FMC;

(c) whether the Individual Defendants caused FMC to issue false and misleading statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(e) whether the prices of FMC stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein;

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages; and

(g) the extent of harm sustained by Class members and the appropriate measure of harm.

426. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the wrongs alleged. There will be no difficulty in managing this action as a class action.

## XI. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

427. The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

428. Statements complained of herein were not forward-looking statements. Rather, they were historical statements or statements of purportedly current facts and conditions at the time each statement was made and/or statements that omitted material current or historical facts necessary to make the statements made not misleading.

429. To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was a mixed statement

of present and/or historical facts and future intent, and is not entitled to safe harbor protection with respect to the part of the statement that refers to the present and/or past.

430. To the extent that any materially false or misleading statement alleged herein, or any portions thereof, may be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof. As alleged above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

431. To the extent that the statutory safe harbor may apply to any materially false or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false or misleading statement because at the time such statement was made, the speaker knew the statement was false or misleading, did not actually believe the statement, had no reasonable basis for making the statement, or the statement was authorized and approved by an executive officer of FMC who knew that such statement was false or misleading.

## XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against FMC and the Individual Defendants

432. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

433. Plaintiffs assert this Count on behalf of themselves and all other members of the Class against FMC and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5.

434. As alleged herein, throughout the Class Period, FMC and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

435. During the Class Period, the Defendants disseminated or approved the false and misleading statements and omissions specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

436. As alleged above, FMC and the Individual Defendants acted with scienter throughout the Class Period, in that they intended to and did, as alleged herein: (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially inflate the price of FMC common stock and maintain the Company's common stock price at artificially inflated prices; and (iii) cause Plaintiffs and the other members of the Class to purchase or otherwise acquire the Company's common stock at artificially inflated prices.

437. As set forth above, FMC and the Individual Defendants made the materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased or otherwise acquired the Company's common stock during the Class Period.

438. Plaintiffs and Class members have suffered damages in that, in ignorance of the materially false and misleading nature of FMC's and the Individual Defendants' statements and omissions, and in reliance on the integrity of the market, they paid artificially inflated prices for FMC stock. Plaintiffs and Class members would not have purchased or acquired FMC stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated or maintained by Defendants' misleading statements.

439. As alleged herein, when the true facts were subsequently disclosed and/or the risks concealed by FMC and the Individual Defendants' public statements materialized, the price of FMC's common stock declined precipitously.

440. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases or acquisitions of FMC common stock during the Class Period.

441. By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder in that they made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading during the Class Period.

442. This claim is timely within the applicable statute of limitations and repose.

**COUNT II**
**For Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Against FMC and the Individual Defendants**

443. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

444. Plaintiffs assert this Count on behalf of themselves and all other members of the Class against FMC and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(c) promulgated thereunder, 17 C.F.R. § 240.10b-5.

445. FMC and the Individual Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) in that they: (1) employed devices, schemes, and artifices to defraud; and (2) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiffs and others similarly situated in connection with their purchases or acquisitions of FMC common stock during the Class Period in an effort to maintain artificially high market prices for FMC common stock.

446. FMC and the Individual Defendants individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, employed devices, schemes, and artifices to defraud and engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class in connection with the purchases or acquisitions and sale of FMC common stock; which did: (i) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, FMC's undisclosed manipulative sales and inventory tactics; (ii) artificially inflate and maintain the market price of FMC common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or acquire FMC common stock at artificially inflated prices and suffer losses when the true facts became known.

447. As part of their scheme to defraud investors in violation of Rules 10b-5(a) and (c), FMC and the Individual Defendants engaged in the fraudulent scheme to force through sham transactions in which the Company: (i) offered to pay for storage, transportation, and insurance for customers to convince them to take on more product than needed or take product early, despite knowing those customers' inventory levels were already overstocked; (ii) fostered a policy to offer generous rights of return to force through sales that they knew would be returned in ensuing quarters, and slow down or reconfigure product returns to avoid reporting lost revenues; (iii)

utilized deep rebates and adjusted payment terms to entice wholesalers to take on more product than needed in light of interest rate increases; (iv) pursued and recorded large sales with extended payment terms and rights of return while recording those sales for the present quarter; (v) continued to sell product and provide credit to companies FMC knew were exhibiting signs of financial distress, including by defaulting on payments to FMC; (vi) pulled forward sales and left FMC's books open past quarter end to make quarterly sales numbers at the expense of future quarters; and (vii) manufactured large volume products lacking market demand primarily to mitigate high return and reprocessing costs. Defendant Pereira, as President, was point man for this scheme, and implemented the scheme in all regions at the direction of and with the other Individual Defendants.

448. Indeed, the manipulative sales and inventory tactics employed by FMC and the Individual Defendants were multi-layered and Company-wide enterprise which, as discussed above *supra* Section IV.E, included (but was not limited to) the following key tactics: (i) to achieve unrealistic sales targets, FMC pulled through sales for the upcoming growing season and, in turn, "cannibalize[d]" sales from the following quarter to such a degree that at times, product for the next nine to twelve months had already been sold; (ii) throughout 2023 and 2024, during the final week of the fiscal quarter or year, FMC struck deals specifically aimed at meeting year-end sales targets, whereby customers would fill out paperwork assuming ownership without any physical exchange of product while FMC paid storage costs on behalf of the customer for product sitting unused in a distribution center and reported the transaction as a paid sale; (iii) to comply with India's Goods & Services Tax ("GST") and continue to purposefully oversell product to inflate its results and accept later returns, FMC manufactured a 200L drum of its most popular product in India—up to 666 to 1,333 times greater than the unit commonly sold in that market—primarily

because it was cheaper to accept returns for and to reprocess to sell again at this size; (iv) FMC exploited relationships with its Super Distributors, papering deals so it appeared that the Super Distributor was financially responsible for any claim or return associated with the sale, while FMC maintained the ultimate responsibility for collecting payment; (v) senior management in Latin America instructed sales representatives to have conversations about deals with generous rights of return verbally and not in writing and to be careful with emails; and (vi) FMC struck deals with extended payment terms with AgroGalaxy and Lavoro, despite both companies exhibiting signs of financial distress, such that these bankrupt companies now owe FMC $30 million and $50 million in debt, respectively.

449. These deceptive acts were part of a course of conduct that operated as a fraud and deceit upon Plaintiffs and others similarly situated in connection with their purchases or acquisitions of FMC common stock during the Class Period in an effort to maintain artificially high market prices for FMC common stock.

450. As described above, Defendant FMC and the Individual Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. FMC and the Individual Defendants engaged in this misconduct to conceal FMC's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

451. Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for FMC common stock, and this artificial inflation was removed from the stock when the true facts regarding Defendants'

fraudulent course of conduct became known. Plaintiffs and the Class would not have purchased or acquired FMC common stock at the prices they paid, or at all, had they been aware that the market prices for FMC common stock had been artificially inflated by Defendants' fraudulent course of conduct.

452. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their respective purchases or acquisitions of the Company's common stock during the Class Period.

453. By virtue of the foregoing, FMC and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c), promulgated thereunder.

454. This claim is timely within the applicable statute of limitations and repose.

**COUNT III**
**For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

455. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

456. Plaintiffs assert this Count on behalf of themselves and all other members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

457. The Individual Defendants, Douglas, Brondeau, Sandifer, and Pereira by virtue of their positions and specific acts described above, were, at the time of the wrongs alleged herein, controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.

458. By reason of their high-level positions of control and authority as FMC's most senior officers, Defendants Douglas, Brondeau, Sandifer, and Pereira had the authority to influence and control, and did influence and control, the day-to-day decision-making and activities of FMC

and its employees, and to cause FMC to engage in the wrongful conduct complained of herein. The Individual Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by FMC during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

459. The Individual Defendants communicated with investors or the public on behalf of FMC during the Class Period. Defendants Douglas, Brondeau, Sandifer, and Pereira were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Plaintiffs to be materially false or misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. Defendants Douglas, Brondeau, Sandifer, and Pereira were also each directly involved in providing false information and certifying and/or approving the materially false or misleading statements disseminated by FMC during the Class Period. Therefore, Defendants Douglas, Brondeau, Sandifer, and Pereira were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by FMC during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

460. The Individual Defendants had the power and influence and exercised the same to cause the Company to engage in the illegal conduct and practices complained of herein.

461. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

462. As a direct and proximate result of the Individual Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of FMC common stock.

463. This claim is timely within the applicable statutes of limitations and repose.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, respectfully pray for relief and judgment against Defendants as follows:

(A) determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

(B) awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

(C) awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

(D) granting such other, further, and/or different relief as the Court deems just and proper.

## XIV. JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED: January 12, 2026

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

*/s/ Carol V. Gilden*
Carol V. Gilden*

200 S. Wacker Drive, Suite 2375
Chicago, IL 60606
Telephone: (312) 357-0370
Facsimile: (312) 357-0369
cgilden@cohenmilstein.com

Steven J. Toll*
S. Douglas Bunch*
Nathan L. Weiser*
1100 New York Avenue, N.W., Suite 800
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohemilstein.com
dbunch@cohenmilstein.com
nweiser@cohenmilstein.com

*/s/ Christina D. Saler*
Christina D. Saler
100 N. 18th St.
Suite 1820
Philadelphia, Pennsylvania
Telephone: (267) 479-5700
csaler@cohenmilstein.com

**LABATON KELLER SUCHAROW LLP**

*/s/ Lauren A. Ormsbee*
Lauren A. Ormsbee*
Lisa M. Strejlau*
Danielle S. Lazarus*
Alexandra E. Forgione*
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
lormsbee@labaton.com
lstrejlau@labaton.com
dlazarus@labaton.com
aforgione@labaton.com
* Admitted *pro hac vice*

*Counsel for Plaintiffs and Lead Counsel for the Class*

**VANOVERBEKE MICHAUD & TIMMONY P.C.**
Thomas C. Michaud
Aaron L. Castle
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
tmichaud@vmtlaw.com
acastle@vmtlaw.com

*Additional Counsel for Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association*

**CERTIFICATE OF SERVICE**

I, Carol V. Gilden, hereby certify that on January 12, 2026, I caused a true and correct copy of the foregoing Amended Complaint for Violations of the Federal Securities Laws to be filed electronically with the Clerk of the Court using the ECF system, and it is available for viewing and downloading from the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

*/s/ Carol V. Gilden*
Carol V. Gilden